# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

---------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **CRESCENT RESOURCES, LLC,** *et. al.*, | : | **Case No.** 09 11507 (CAG) |
| | : | |
| **Debtors.** | : | **Joint Administration** |
| | : | **Requested** |
| | : | |

---------------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING (I) DEBTORS TO INCUR POST-PETITION SECURED INDEBTEDNESS; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS PURSUANT TO SECTIONS 105(a), 364(c) AND (d) OF THE BANKRUPTCY CODE; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS; (IV) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) SCHEDULING FINAL HEARING ON MOTION PURSUANT TO BANKRUPTCY RULES 2002, 4001 AND 9014

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Crescent Resources, LLC ("Crescent Resources"), its parent Crescent Holdings, LLC ("Crescent Holdings") and their affiliated debtors as debtors and debtors in possession (collectively, "Crescent" or the "Debtors"),[1] respectfully represent:

## SUMMARY OF RELIEF REQUESTED[2]

1. By this motion (the "Motion"), the Debtors (as indicated herein below)

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as Exhibit "A". A list of those Debtors that are party to the prepetition Credit Agreement (as defined below) (the "Prepetition Debtor Credit Parties"), is attached hereto as Exhibit "B" and a list of those Debtors (defined below as the "Loan Parties") that are to be parties to the DIP Credit Agreement (as defined below), is attached hereto as Exhibit "C".

[2] All capitalized terms used herein by not otherwise defined shall have the meanings ascribed to them in the DIP Credit Agreement.

request, pursuant to sections 105, 361, 362, 363(c), 364(d) and 507 of entry of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), entry of the proposed interim order (the "Interim Order") and the proposed final order (the "Final Order," and together with the Interim Order, the "DIP Orders") (1) authorizing certain Debtors[3] to incur post-petition debt in the total aggregate principal amount of $110,000,000, plus accrued interest, with priority over administrative expenses and secured by first-priority liens on substantially all of the Debtors' property, consisting of (a) the aggregate principal amount of up to $35,000,000 to be incurred on an interim basis in (the "Interim DIP Loan") and (b) an additional aggregate committed principal amount of up to $75,000,000 to be incurred on a final basis, (2) granting security interest and superpriority claims pursuant to sections 105(a), 364(c) and(d) of the Bankruptcy Code, (3) granting adequate protection of the interests of the Prepetition Secured Lenders (as defined below), whose liens and security interests are being primed by the DIP Liens and whose cash collateral and prepetition collateral may be used, sold or leased by certain Debtors[4] by granting superpriority claims, replacement liens and payment of certain costs and expenses, (4) authorizing Borrower to use cash collateral for working capital and general corporate purposes; (collectively, the "Financing Arrangement"), and (5) modifying the automatic stay, to the extent applicable, and (6) scheduling the final hearing on this motion ("Final Hearing"). Pending the Final Hearing, the Financing Arrangement will be implemented on an interim basis pursuant to the terms of the proposed Interim Order and Postpetition Credit Agreement (the "DIP Credit Agreement"), by and among Crescent Resources, as borrower and debtor and debtor in

---

[3] See Exhibit "C".

[4] See Exhibit "B".

possession, Crescent Holdings, as a guarantor and debtor and debtor in possession, certain of the

Subsidiary Guarantors (as defined below) and the DIP Lenders (as defined below). Copies of the

DIP Credit Agreement (in substantially final form) and proposed Interim Order are attached as

Exhibits "D" and "E", respectively.

      2.    In accordance with Bankruptcy Rule 4001, a summary[5] of the material

provisions of the DIP Credit Agreement is set forth below:

    (i)    <u>DIP Loan Borrower</u>:  Crescent Resources, as debtor in possession (the "<u>Borrower</u>").

    (ii)    <u>Guarantors</u>:  Crescent Holdings, the parent of Crescent Resources, and certain of the direct and indirect subsidiaries of Crescent Resources appearing on <u>Exhibit "C"</u>, which are debtors in possession (the "<u>Subsidiary Guarantors</u>," collectively with the Borrower and Holdings, the "<u>Loan Parties</u>").

    (iii)    <u>DIP Loan Lender</u>: Certain of the banks, financial institutions and other entities party to the Prepetition Credit Agreement (as defined below) who are lenders thereunder (collectively, the "<u>DIP Lenders</u>").

    (iv)    <u>DIP Agent</u>: Bank of America, N.A., as administrative agent and collateral agent (the "<u>DIP Agent</u>").

    (v)    <u>Co-Agent</u>:  Five Mile Capital Partners, LLC and Wachovia Bank, National Association.

    (vi)    <u>DIP Commitment</u>:  A credit facility in an aggregate principal amount of $110,000,000 (the "<u>DIP Commitment</u>"), comprised of (a) a delayed-draw term loan in the aggregate amount of $30,000,000, and (b) a revolving line of credit for loans and letters of credit in an amount not to exceed $80,000,000 for revolving advances to the Borrower ("<u>Revolver Advances</u>"), and a $20,000,000 letter of credit sublimit, Interim Revolver Advance not to exceed $35,000,000 or such amount as approved by this Court in the Interim Order and acceptable to the DIP Agent and the DIP Lenders, during the period from the Closing Date (as defined below) through the date of the entry of the Final Order. The remainder of the DIP Commitment will be available after the entry of the Final Order.

---

[5] To the extent anything in this Motion is inconsistent with the proposed Interim Order and DIP Credit Agreement, annexed hereto, the proposed Interim Order and DIP Credit Agreement shall control. For the purposes of this summary, any capitalized terms not otherwise defined herein, shall have the meanings ascribed thereto in the DIP Credit Agreement.

(vii)    Closing Date: The Closing Date will occur promptly, but not later than five (5) days after the entry of the Interim Financing Order (the "Closing Date").

DIP Credit Agreement, Section 1.01, definition of "Closing Date."

(viii)   Maturity Date: 365 days after the Commencement Date (the "Maturity Date"); subject to extension for up to an additional 90 days at the election of the Borrower and with the approval of the Super Majority Lenders.

DIP Credit Agreement, Section 1.01, definition of "Maturity Date."

(ix)    Termination Date:   The DIP Commitment shall terminate (the "Termination Date") on the earliest to occur of the (a) Maturity Date; (b) the date upon which any plan of reorganization or liquidation becomes effective in any one of the Debtors' cases, or (iii) acceleration of the loans and termination of the DIP Loan Commitment in accordance with the DIP Credit Agreement; provided, however, the Maturity Date may shall be subject to extension as described in clause (viii) above.

DIP Credit Agreement, Section 1.01, definition of "Maturity Date" and Section 5.03.

(x)    Availability and Term:  From the entry of the Interim Order until the Termination Date.

(xi)    Interest Rate:  One month LIBOR plus 10%, with a LIBOR Floor of 3.50% or Base Rate plus 10%, payable monthly in arrears.

DIP Credit Agreement Section 2.07.

(xii)   Collateral:  All obligations of the Loan Parties to the DIP Lenders in respect of the DIP Credit, including, without limitation, all accrued interest, costs, fees and expenses (the "DIP Obligations"), shall be secured by:

(a)    First priority security interest in and liens on all of the Debtors' property, subject to permitted liens (the "First Lien DIP Collateral" but excluding the Excluded Assets (as defined below)).  The following are "Excluded Assets": (i) customer deposits and other third party funds held by the Debtors in escrow (it being understood and agreed that the Debtors' respective interests in such deposits or funds shall not constitute Excluded Assets) and products and proceeds thereof; and (ii) for purposes of the Interim Order, claims and causes of action under sections 502(d), 545 and 547-550 of the Bankruptcy Code.

(b) The DIP Agent, for the ratable benefit of the DIP Lenders, is also granted, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming lien upon, and security interest (the "DIP Priming Liens") in all Prepetition Collateral (as defined below) including the Cash Collateral (the "DIP Priming Lien Collateral", and, together with the First Lien DIP Collateral, the "DIP Collateral"). The DIP Priming Liens on the Prepetition Collateral are senior in all respects to the security interests in, and liens on, the Prepetition Collateral of the agent party to the Credit Agreement (the "Prepetition Bank Agent") and the lenders party to the Credit Agreement, but will not be senior to any valid, perfected and unavoidable liens or other encumbrances, if any, on such property existing immediately prior to the Commencement Date and senior to the liens in favor of the Prepetition Bank Agent and the Prepetition Secured Lenders. (The First Lien DIP Collateral and the DIP Priming Lien Collateral are referred to as the "Postpetition Collateral" or the "Collateral").

DIP Credit Agreement Section 1.01, definition of "Collateral" and Section 9.01; Interim Order ¶ (7).

(xiii) Carve-Out: An administrative expense carve-out (the "Carve-Out") for (a) professional fees of the Debtors and Creditors' Committee, to the extent incurred and outstanding prior to an Event of Default, provided for in the Agreed Budget, and allowed by the Bankruptcy Court, plus (b) $2,500,000, plus (c) an amount up to $50,000 for the reasonable fees and expenses of a chapter 7 trustee and any professional retained by such trustee (collectively, the "Professional Expense Cap") and U.S. Trustee fees pursuant to 28 U.S.C. Section 1930 (collectively, the "Carve-Out Amount"). The Carve-Out may include up to $75,000 expended by the Creditors' Committee to investigate liens of or claims against Prepetition Secured Lenders but does not include any amounts to challenge or assert claims against DIP Lenders or Prepetition Lenders.

DIP Credit Agreement, Section 1.01, definition of "Carve-Out Expenses"; Interim Order ¶ (8).

(xiv) Events of Default: Events of Default include customary provisions for the loans of this type including:

(a) failure by the Borrower to pay principal, interest or fees when due;

(b) failure to observe or perform any covenant set forth in Sections 7.01, 7.02, 7.03, 7.05, 7.07, 710, 7.11, 7.13, 7.14,

7.16, or 7.17, Article VIII or Section 9.23 of the DIP Credit Agreement;

(c)   failure to observe or perform any other provision of the DIP Credit Agreement or of any other DIP Loan Document and subject to a 10 day grace period;

(d)   occurrence of a Change of Control;

(e)   failure of the Court to enter a Final Order acceptable to the DIP Lenders within 45 days of the entry of the Interim Order, or reversal, vacature or stay of the effectiveness of either the Interim Order or the Final Order;

(f)   the appointment of a Chapter 11 trustee, a responsible officer or examiner with expanded powers, or the conversion or dismissal of any of the Bankruptcy Cases;

(g)   failure of any Loan Party to comply in any material respect with any provision of the Final Order or the Interim Order, as applicable;

(h)   failure of Borrower to file an Acceptable Plan with the Bankruptcy Court within 240 days after the Petition Date, or a chapter 11 plan (other than an Acceptable Plan) is filed with the Bankruptcy Court by any of the Loan Parties (or by any other party with the support of any of the Loan Parties) that provides the DIP Lenders with any treatment with respect to the Obligations other than payment in full in cash on the effective date of such plan;

(i)   The sale, without the consent of the Administrative Agent, the Co-Agent, the L/C Issuer and the Required DIP Lenders, of all or substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code, though a confirmed plan of reorganization in the Bankruptcy Cases or otherwise, that does not provide for payment in full of the DIP Obligations and the termination of the Aggregate Commitments of the DIP Lenders;

(j)   Other customary Events of Default as set forth in Section 10.01 of the DIP Credit Agreement.

DIP Credit Agreement, Section 10.01.

(xv)   <u>Adequate Protection</u>:  As adequate protection, the Prepetition Bank Agent, for itself and on behalf of the Prepetition Secured Lenders (as defined below) will receive as follows:

(a) replacement liens to secure the Prepetition Obligations on all of the assets of the Debtors comprising the Postpetition Collateral and proceeds thereof and for any postpetition diminution in value of the Prepetition Collateral (each such replacement lien, a "Replacement Lien"). The Replacement Liens are subordinate only to

  (i) the DIP Liens;

  (ii) the Carve-Out Expenses; and

  (iii) Permitted Liens (permitted to have senior priority by the terms of the DIP Credit Agreement);

(b) administrative claims under sections 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code for the amount by which adequate protection granted for any diminution of value of the Prepetition Secured Lenders' Cash Collateral from and after the Commencement Date or any other Prepetition Collateral proves to be inadequate.

(c) payment, by the Debtors, to the Prepetition Bank Agent all of all actual and reasonable fees, costs and out-of-pocket expenses of the Prepetition Bank Agent and each of the Co-Agents, as leaders of an ad hoc steering committee of the Prepetition Secured Lenders, and Capstone Advisory Group, LLC, as financial advisor on behalf of the Prepetition Bank Agent;

(d) right to termination of the Debtors' exclusive period under section 1121 of the Bankruptcy Code to file a plan of reorganization if the Debtors fail to file a bankruptcy plan within 180 days after the Commencement Date; provided that the "Required Lenders" as defined in the Prepetition Credit Agreement may elect to extend such 180-day period; and

(e) a prohibition on the Debtors from seeking to grant any liens or security interest post-petition that are senior to or pari passu with the liens of the Prepetition Bank Agent and the Prepetition Secured Lenders in the Prepetition Collateral or the Collateral.

Interim Order ¶¶ (11) and (12).

(xvi) Fees: The following fees are payable:

(a) A commitment fee in an amount equal to 3.5% of the DIP Loan Commitment to the DIP Agent for the ratable account of the DIP Lenders in two installments. One shall be due upon the

entry of the Interim Order and the balance due upon entry of the Final Order.

(b) A DIP Agent's fee as provided in the Fee Letter payable to the DIP Agent for its own use and benefit payable upon the entry of the Interim Order.

(c) An unused availability fee as provided in the Fee Letter, payable monthly in arrears to the DIP Agent for the ratable account of the DIP Lenders.

DIP Credit Agreement, Section 2.08; Interim Order ¶¶ (3) and (4).

(xvii) <u>Indemnification</u>:  Crescent Resources agrees to indemnify the DIP Agent and the Co-Agents (and any sub-agent thereof), each DIP Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons in connection with the DIP Loan Documents, and the collateral, as specified in Section 12.04(b) of the DIP Credit Agreement.

DIP Credit Agreement, Section 12.04(b).

3.    The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) are set forth in the following sections of the Interim Order:

(a)    ***Name of Each Entity with Interest in Cash Collateral.***  Prepetition Secured Lenders.  Interim Order ¶ (a).

(b)    ***Purposes for Use of the Cash Collateral.***  For working capital purposes and general corporate needs.  Interim Order ¶¶ DG 7 (11).

(c)    ***The Material Terms, including Duration, of the Use of the Cash Collateral.***  Interim Order ¶¶ (1), (7), (11).

(d)    ***Liens, Cash Payments, or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral.***  Interim Order ¶¶ (11) and (12).

4.    In addition, the provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set out at the following sections of the DIP Credit Agreement and the Interim Order:

(a)    ***Grant of Priority or a Lien on Property of the Estate.***  DIP Credit Agreement Sections 9.01; Interim Order ¶¶ (6) and (7).

(b)    ***Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case.***  Interim Order ¶¶ (11) and (12).

(c)     ***Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case.*** Interim Order ¶ H, (18).

(d)     ***Waiver or Modification of the Automatic Stay.*** DIP Credit Agreement Section 10.02(a); Interim Order ¶ (17)(a).

(e)     ***Waiver of Modification of Authority or Right to File a Plan, Seek and Extension of Time of Exclusivity, Request the Use of Cash Collateral or Request Authority to Obtain Credit.*** DIP Credit Agreement Section 7.15; Interim Order ¶ (12)(e) and (f).

(f)     ***Establishment of Deadlines for Filing a Plan of Reorganization.*** DIP Credit Agreement Section 7.15; Interim Order ¶ (12)(e).

(f)     ***Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.*** Interim Order ¶ (10).

(h)     ***Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate.*** Interim Order ¶ H(4), (18).

(i)     ***Indemnification of Any Entity.*** DIP Credit Agreement Section 12.04.

(j)     ***Release, Waiver or Limitation on Rights under Section 506(c).*** Interim Order ¶ (6), (9), (12)(b).

(k)     ***Liens Granted on Claims Arising Under Chapter 5 under Section 544 only.*** Interim Order ¶ (7)(a) and (d).

## BACKGROUND

5.     On the date hereof (the "Commencement Date"), each of the Debtors filed a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. A motion seeking joint administration of the Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is currently pending before this Court.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## CRESCENT'S BUSINESS

7.      Crescent, which is headquartered in Charlotte, North Carolina, is a leading real estate development company that focuses on master-planned communities and commercial, industrial, and residential real estate primarily in the southeast, but also in other regions of the United States. In particular, Crescent has properties located in Arizona, Florida, Georgia, North Carolina, South Carolina, Tennessee, Texas, and Virginia. Although Crescent Resources and its predecessors-in-interest have been in existence since 1969, Crescent Holdings was created in 2006. Crescent Holdings' equity interests are held 50% by Duke Energy Corporation ("Duke Energy") and 50% by certain private equity limited partnerships known as Morgan Stanley Real Estate Fund V U.S. and/or its affiliates ("Morgan Stanley"). Throughout its history, Crescent and its predecessors have developed and sold over 20 million square feet of commercial and industrial projects, between 50 and 60 residential communities with a variety of features and amenities, and numerous other master-planned communities.

8.      Currently, Crescent Resources has four real estate divisions: residential, commercial, multifamily, and land management. The residential division (the "Residential Division") is Crescent Resources' largest division, comprising 54% of the Debtors' total gross asset value. The Residential Division includes 41 master-planned communities and 4 condominium projects totaling 53,404 acres of developed land. The commercial property division (the "Commercial Division") accounts for 19% of Crescent Resources' total gross asset value. The Commercial Division has 9 active projects, including office, industrial, and retail

projects currently under development, as well as 1,822 acres of commercially-zoned undeveloped land. The multifamily division (the "Multifamily Division") accounts for 6% of Crescent Resources' total gross asset value. The Multifamily Division includes 4 projects in various stages of development totaling 1,308 units and an additional 195 acres of entitled, but undeveloped land.

9. In the 1960s, Duke Energy acquired approximately 300,000 acres of land in rural areas of North and South Carolina (the "Legacy Land"). Beginning in 1969, Duke Energy contributed the Legacy Land to Crescent Resources' predecessor-in-interest. Since 2006, the Legacy Land has been managed by Crescent Resources (the "Land Management Division"). As the value of the Legacy Land has increased over time, the Legacy Land has been sold in accordance with a long-term, structured disposition plan, whereby the proceeds from the sales of Legacy Land are invested in commercial property projects in urban areas (the "Legacy Land Sales Plan"). The combined proceeds from the Legacy Land Sales Plan and the Debtors' other real estate ventures have enabled Crescent to fund and operate its various real estate divisions. The Land Management Division, which manages the Legacy Land, accounts for 21% of Crescent Resources' total gross asset value.

10. Crescent and its non-debtor affiliates are comprised of various joint ventures and wholly-owned subsidiaries that serve as holding companies, management companies, and project-level operating companies. Crescent Resources operates its business on an integrated basis with centralized administration, leasing, and management functions that enable it to achieve operating efficiencies and revenue enhancements that benefit the overall enterprise. In 2007, Crescent Resources acquired 100% control of LandMar Group, LLC ("LandMar Group") and its subsidiaries. The LandMar Group represents a significant part of the

Residential Division described above and maintains assets throughout Florida.

## PREPETITION DEBT

11.     On or about September 7, 2006, certain of the Debtors entered into that certain Credit Agreement dated as of such date (the "Credit Agreement") by and among Crescent Resources, as borrower, Crescent Holdings, as parent guarantor, the other guarantors identified therein, the lenders party thereto (the "Prepetition Lenders") and the Prepetition Bank Agent. The Credit Agreement was amended by that certain First Amendment to Credit Agreement dated as of December 16, 2006, and that certain Second Amendment to Credit Agreement dated as of April 30, 2007.  The Credit Agreement was amended and restated by that certain First Amended and Restated Credit Agreement, dated as of June 17, 2008 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Crescent Resources, as borrower, Crescent Holdings, the other guarantors identified therein, the lenders party thereto (the "Prepetition Lenders"), and Bank of America, N.A. ("Prepetition Agent" or "BOA"), as administrative agent and collateral agent.

12.     The Prepetition Credit Agreement provides for (i) a term loan facility (the "Term Loan Facility") in the principal amount of $1,225,000,000, (ii) a revolving credit facility (the "Revolving Credit Facility") in the principal amount of $300,000,000, which reduces to the principal amount of $275,000,000 after December 30, 2009, (iii) a swing line facility in the principal amount of $50,000,000 (which reduces borrowings available under the revolving credit facility), and (iv) a letter of credit facility (the "Letter of Credit Facility") in the principal amount of $150,000,000 (which reduces borrowings available under the revolving credit commitment). Obligations arising under the Prepetition Credit Agreement are direct obligations of Crescent Resources.  Certain interest hedge obligations of the Debtors also constitute "obligations" under the Prepetition Credit Agreement and the holders of such obligations together with the

Prepetition Lenders are collectively referred to as the "Prepetition Secured Lenders". These direct obligations are guaranteed (the "Guaranty") by (i) Crescent Holdings and (ii) most of the additional Debtors, pursuant to the terms of (A) the Prepetition Credit Agreement, (B) that certain Amended and Restated Joinder Agreement, dated as of June 17, 2008, by and between the entities party thereto and BOA, and (C) that certain Joinder Agreement, dated as of July 25, 2008, by and between the entities party thereto and BOA (the Joinder Agreements in (B) through (C), collectively, the "Joinder Agreements").

13.     Certain of the Debtors (the "Pledgors") also entered into a pledge agreement, dated as of September 7, 2006 (as supplemented by the Joinder Agreements, the "Pledge Agreement"), by and between the Pledgors and BOA pursuant to which they pledged 100% of the capital stock of substantially all their domestic subsidiaries with certain exceptions.[6] In addition, certain of the Debtors granted mortgages or deeds of trust on their real properties, except for (x) real property constituting qualified Legacy Land to the extent that the value of such real property is less than or equal to $500,000, or (y) any real property that, as of the closing date, was encumbered with non-recourse, project-level debt or security interests that prohibited the execution, delivery and recording of such mortgage instruments. Crescent Resources also entered into that certain Account, Security, Pledge, Assignment, and Control Agreement, dated as of August 24, 2007, pursuant to which Crescent Resources granted to BOA control over and a security interest in all deposit accounts opened by Crescent Resources with BOA.

14.     The aggregate principal amount of indebtedness owing under the Prepetition Credit Agreement as of the Commencement Date is approximately $1,491,128,277

---

[6] The Pledgors, include: Crescent Resources; Crescent Holdings; CLT Development, LLC; Crescent Potomac Yard, LLC; Crescent Twin Creeks, LLC; Crescent/Arizona, LLC; Palmetto Bluff Development, LLC; Palmetto Bluff Investments, LLC; Twin Creeks Management, LLC; Twin Creeks Property, Ltd.; LandMar Group, LLC; Hawk's Haven Joint Development, LLC; and Hawk's Haven Sponsor, LLC.

(excluding obligations arising under hedging obligations and outstanding and undrawn letters of credit).

## PROPERTY-LEVEL DEBT

15.     Approximately 10 of the Debtors also have secured property-level debt in the form of construction loans, mortgage loans, and seller-financed loans. As of the Commencement Date, there is $89,110,601 in outstanding property-level debt.

## FINANCIALS

16.     As of the Commencement Date, Crescent Resources, as a whole, reported approximately $2.2 billion[7] in total assets and approximately $1.9 billion in total liabilities, including $297,244,484 outstanding under the Revolving Credit Facility (including outstanding letters of credit) and $1,197,000,000 outstanding under the Term Loan Facility. For 2008, Crescent Resources reported consolidated revenue of approximately $373 million. Crescent Resources employs 247 people. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the declaration of Kevin H. Lambert, Chief Financial Officer of Crescent Resources filed concurrently herewith (the "Declaration").

### The Debtors' Proposed Postpetition Financing Arrangement

17.     As described above and in more detail in the Declaration of Kevin H. Lambert in Support of the Debtors' Chapter 11 Petitions and First Day Motions, prior to the Commencement Date, the Debtors financed their operations with cash from operating activities and a variety of financing arrangements, including loans under the Prepetition Credit Agreement. Although the Debtors' businesses generally generate sufficient cash to fund their operations on a

---

[7] Based on the Debtors unaudited financial statements as of December 31, 2008.

long-term basis, in the short term the Debtors project that they will need the liquidity provided by the proposed postpetition financing in addition to the use of the cash that they generate to fund their operations and to pay the costs and expenses of administering these chapter 11 cases. Such financing is necessary, essential and appropriate for the continued operation including working capital and general corporate needs of the Debtors' businesses and the preservation of their estates and of going concern values.

18. Accordingly, prior to the commencement of the Debtors' chapter 11 cases, the Debtors and Lazard Frères & Co., LLC ("Lazard"), the Debtors' financial advisors, surveyed various sources of postpetition financing, including financing from the Prepetition Secured Lenders and unrelated third parties. The Debtors and Lazard approached various other parties having the capability of providing a facility of the size required, including the proposed DIP Lenders. Although Lazard and the Debtors approached several parties, they were not able to solicit proposals from any other Lenders.

19. In exploring their options, the Debtors recognized that the obligations owed to the Prepetition Secured Lenders are secured by substantially all of the Debtors' real and personal property, such that either (i) the liens of the Prepetition Secured Lenders would have to be primed to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Secured Lenders. The Prepetition Secured Lenders advised the Debtors that they would not grant a blanket consent to be primed by another lender group; however, a steering committee comprised of a subset of the Prepetition Secured Lenders indicated a willingness to negotiate terms of a postpetition financing facility the steering committee and Debtors believed a majority of the other Prepetition Secured Lenders would find acceptable.

20.     Ultimately, the DIP Lenders, who also comprise certain of the Prepetition Secured Lenders, were willing to extend postpetition financing on the terms and conditions described herein.

21.     The Debtors and the DIP Lenders engaged in extensive, arms' length negotiations with respect to the terms and conditions DIP Credit Agreement. The Debtors and the DIP Lenders have agreed upon a budget (the "Budget," annexed in condensed form to the Interim Order as Exhibit "A") projecting cash flows for the next thirteen (13) months. The Budget may be updated by the Debtors with the consent of the Prepetition Agent and Co-Agents no more frequently than every 30 days and will show receipts and disbursements as budgeted. The Debtors have also agreed to provide the DIP Lenders with a monthly report on the Budget. The material terms and conditions of the DIP Loans are summarized in paragraph 2 of this Motion.

22.     The Debtors that are Loan Parties are seeking authorization to enter into the DIP Credit Agreement on an interim basis pending a Final Hearing.[8] Based on their cash needs during the interim period (as reflected in the Budget) and the inherent uncertainties in completion of ordinary course lot sales, the Debtors have determined that during the interim period and until the Final Order is entered, they will need to borrow from the DIP Lenders approximately up to $35,000,000.

**Proposed Adequate Protection and Use of Cash Collateral**

23.     In order to address their working capital need and general corporate needs and fund their reorganization efforts, the Debtors also require the use of Cash Collateral of the Prepetition Secured Lenders. Coupled with the proceeds of the DIP Credit Agreement, the use

---

[8]   See Exhibit "C".

of Cash Collateral consistent with the Budget will provide the Debtors with necessary additional capital to operate their businesses, pay their employees, maximize value, and successfully reorganize under chapter 11.

24.     The Prepetition Secured Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection. As adequate protection, the Financing Arrangement provides the Prepetition Secured Lenders with Replacement Liens to the extent that there is a diminution in the value of their interests in the Prepetition Collateral from and after the Commencement Date resulting from the use of such collateral and cash constituting proceeds of such collateral and the imposition of the DIP Lenders' priming liens (the "Adequate Protection Obligations").

25.     Specifically, the Prepetition Bank Agent will receive a replacement lien to secure the Prepetition Obligations on all Postpetition DIP Collateral for and to the extent of any postpetition diminution in value of the Prepetition Collateral. The Replacement Liens are subordinate only to (a) the liens granted to the DIP Agent and the DIP Lenders to secure the DIP Obligations and (b) the Carve-Out Expenses. Additional adequate protection provisions are described in paragraph 2(xv) above.

## RELIEF REQUESTED

26.     By this Motion, the Debtors that are Loan Parties request an order of this Court authorizing Crescent Resources to obtain the DIP Credit Facility from the DIP Lenders, pursuant to the terms of this Motion, the DIP Orders, and the DIP Credit Agreement. In addition, the Debtors that are Prepetition Debtor Credit Parties, request an order of this Court authorizing the use of Cash Collateral, pursuant to the terms of this Motion.

27.     Except as set forth therein, the proposed financing will be senior to all obligations under the Prepetition Credit Agreement. As such, the liens created under the

Financing Arrangement are priming liens with respect to liens currently held by the Prepetition Secured Lenders. Pending entry of the Final Order, the Debtors request that the Court authorize the Debtors, on an interim basis, to (i) borrow up to $35,000,000 from the DIP Commitment, (ii) use Cash Collateral as provided in the Interim Order, (iii) grant to the DIP Lenders the liens and super-priority claims described herein, and (iv) provide adequate protection in favor of the Prepetition Secured Lenders, as described herein and in the Interim Order. Moreover, the Debtors request that the Court approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof, and schedule the Final Hearing.

**The DIP Facility Should Be Authorized**

28.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

29.     As discussed above, despite their efforts, the Debtors have been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange

for the grant of a super-priority administrative expense claim pursuant to section 364(c)(1), (iv) without granting priming liens pursuant to section 364(d), or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

30. After considering all of the alternatives, the Debtors have concluded that the DIP Credit Agreement represents the best working capital financing available to the Debtors. Given the current capital market conditions, alternative financing is not available to the Debtors on more favorable terms than those set forth in the DIP Credit Agreement and related loan documents. Therefore, the Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, *inter alia*, super-priority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

31. Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Credit Agreement with the DIP Lenders extensively in good faith and at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also In re Funding Sys. Asset Mgmt.*

*Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14

(Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

        32.     Furthermore, section 364(d) does not require that a debtor seek alternative

financing from every possible lender; rather, the debtor simply must demonstrate sufficient

efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d

1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of

unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central

Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed

attempts to procure financing from various sources, explaining that "most lend money only in

return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa.

1991) (debtor adequately established that some degree of priming loan was necessary if debtor

were to obtain funding).

        33.     A debtor may borrow money under section 364(d)(4) of the Bankruptcy

Code if the debtors meets its burden of establishing that the holder of the lien to be subordinated

is adequately protected. *In re Futures Equity L.L.C.*, 2001 Bankr. LEXIS 2229 *14 (Bankr. N.D.

Texas April 11, 2001) (J. Houser). The transaction "should provide the prepetition secured

creditor with the same level of protection it would have had if there had not been postpetition

superpriority financing. *Id.* at *15 (internal citations omitted). The debtor also has the burden of

demonstrating that (i) the credit transaction is necessary to preserve the estate and (ii) the terms

of the transaction are fair and reasonable given the circumstances. *Id.*

        34.     Substantially all of the Debtors' assets are encumbered and, despite the

diligent efforts of the Debtors and Lazard, the Debtors have been unable to procure the required

funding absent the proposed super-priority claims and priming liens. The Debtors have

negotiated the best terms available to obtain funding they need to maintain sufficient liquidity to preserve their assets over the course of their chapter 11 cases. The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Credit Agreement reflects the exercise of their sound business judgment.

35.    The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms-length. The Debtors believe that the adequate protection and Replacement Liens provided to the Prepetition Secured Lenders furnish the same level of protection to the Prepetition Secured Lenders as if there had not been superpriority financing.

36.    The ability of the Debtors to continue to operate their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon their ability to obtain the financing memorialized in the DIP Credit Agreement. Without the proposed financing, the Debtors will not have the funds necessary to pay postpetition wages and salaries, payroll taxes, and costs related to trade vendors, as well as other expenses required to be paid by the Debtors to maintain their businesses as a going concern. Unless these expenditures are made, the Debtors will be forced to cease operations, which would result in immediate and irreparable harm to their businesses and going concern value and would jeopardize the Debtors' ability to reorganize.

37.    The credit provided under the DIP Credit Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their customers' needs, provide customer care and marketing services, pay their employees, and operate their businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Credit

Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtors' employees, customers and vendors, thereby promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative.

## The Use of Cash Collateral Should Be Approved

38.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the use of the Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Secured Lenders in the Debtors' Cash Collateral will be protected by the adequate protection set forth below.

## The Proposed Adequate Protection Should Be Authorized

39.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See MNBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472

(8th Cir. 1985); *In re Shaw Indus., Inc.,* 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.,* 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

40.     The Replacement Liens, cash payments, other protections offered to the Prepetition Secured Lenders will sufficiently protect their interest in any collateral taken as security under the Prepetition Credit Agreement. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

**The Automatic Stay Should Be Modified on a Limited Basis**

41.     The relief requested herein contemplates a modification of the automatic stay (subject to the DIP Credit Agreement and to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default and a default of the Debtors of any of their obligations under the Interim Order after the DIP Agent gives five (5) business days' written notice thereof delivered by facsimile or hand delivery, all rights and remedies under the DIP Credit Agreement; and (iii) implement the terms of the proposed DIP Orders.

42.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

**Interim Approval Should Be Granted**

43.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

44.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors that are Prepetition Debtor Credit Parties to use Cash Collateral and authorize the Debtors that are Loan Parties to borrow up to $35 million under the DIP Credit Agreement on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest and (b) schedule the Final Hearing.

45.     The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their businesses on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Credit Agreement will

provide necessary assurance to the Debtors' vendors, employees, and counterparties of the Debtors' ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' businesses, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

## **NOTICE**

46.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (i) the United States Trustee for the Western District of Texas; (ii) the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis); (iii) counsel to the Debtors' prepetition secured lenders; and (iv) counsel to the Agent to the Debtors' proposed postpetition lenders (collectively, the "Notice Parties"). The Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: June 10, 2009
      Austin, Texas

                        /s/ Eric J. Taube
                        Eric J. Taube (19679350)
                        HOHMANN, TAUBE & SUMMERS, L.L.P
                        100 Congress Avenue, Suite 1800
                        Austin, Texas 78701
                        Telephone: (512) 472-5997
                        Facsimile: (512) 472-5248

                        -and-

                        Martin A. Sosland (18855645)
                        Lydia T. Protopapas (00797267)
                        WEIL, GOTSHAL & MANGES LLP
                        200 Crescent Court, Suite 300
                        Dallas, Texas 75201
                        Telephone:  (214) 746-7700
                        Facsimile:  (214) 746-7777

                        -and-

                        Marcia L. Goldstein (*pro hac vice* pending)
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007

                        PROPOSED ATTORNEYS FOR
                        DEBTORS AND DEBTORS IN
                        POSSESSION