# EXHIBIT "D"

Form of DIP Credit Agreement

## POST-PETITION LOAN AND SECURITY AGREEMENT

Dated as of June __, 2009

among

### CRESCENT RESOURCES, LLC,
as the Borrower and Debtor-in-Possession,

### CRESCENT HOLDINGS, LLC,
as a Guarantor and Debtor-in-Possession,

### CERTAIN SUBSIDIARIES AND AFFILIATES OF THE BORROWER,
as additional Guarantors and Debtors-in-Possession,

### BANK OF AMERICA, N.A.,
as Administrative Agent and L/C Issuer,

and

### The DIP Lenders from time to time Party Hereto

Banc of America Securities LLC and Wachovia Capital Markets LLC,
as Joint Lead Arrangers and Joint Book Managers

Wachovia Bank, National Association,
as Documentation Agent

# TABLE OF CONTENTS

**Section**                                                                                        **Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ..................................................2
    1.01    Defined Terms. .................................................................................2
    1.02    Other Interpretive Provisions. ....................................................28
    1.03    Accounting Terms. .......................................................................29
    1.04    [Reserved]. ....................................................................................29
    1.05    Times of Day..................................................................................29
    1.06    Letter of Credit Amounts. ...........................................................30
ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ........................30
    2.01    Loans. .............................................................................................30
    2.02    Borrowings, Conversions and Continuations of Loans. ............31
    2.03    Letters of Credit. ..........................................................................33
    2.04    Prepayments. .................................................................................41
    2.05    Termination or Reduction of Commitments. ..............................43
    2.06    Repayment of Loans. ....................................................................44
    2.07    Interest............................................................................................44
    2.08    Fees. ...............................................................................................45
    2.09    Computation of Interest and Fees. ..............................................46
    2.10    Evidence of Debt. .........................................................................46
    2.11    Payments Generally; Administrative Agent's Clawback. ..........47
    2.12    Sharing of Payments by DIP Lenders. .......................................48
ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ........................49
    3.01    Taxes. .............................................................................................49
    3.02    Illegality. .......................................................................................53
    3.03    Inability to Determine Rates. .......................................................53
    3.04    Increased Costs. ............................................................................54
    3.05    Compensation for Losses. ............................................................55
    3.06    Mitigation Obligations; Designation of a Different Lending Office. ...................56
    3.07    Survival. ........................................................................................56
ARTICLE IV GUARANTY ...................................................................................57
    4.01    The Guaranty. ................................................................................57
    4.02    Obligations Unconditional. ..........................................................57
    4.03    Reinstatement. ...............................................................................58
    4.04    Certain Additional Waivers. ........................................................58
    4.05    Remedies. ......................................................................................59
    4.06    Guaranty of Payment; Continuing Guaranty. ............................59
ARTICLE V CONDITIONS PRECEDENT TO CREDIT EXTENSIONS; TERM OF
AGREEMENT ........................................................................................................59
    5.01    Conditions of Closing Date and Initial Credit Extension. ........59
    5.02    Conditions to all Credit Extensions. ...........................................62
    5.03    Term of Agreement; Extension of Maturity Date. .....................63

5.04    Effect of Termination............................................................................................63
ARTICLE VI REPRESENTATIONS AND WARRANTIES ..........................................................64
6.01    Existence, Qualification and Power; Compliance with Laws..............................64
6.02    Authorization. .....................................................................................................64
6.03    Governmental Authorization; Other Consents....................................................64
6.04    Binding Effect.....................................................................................................65
6.05    Financial Statements; No Material Adverse Effect. ............................................65
6.06    Litigation.............................................................................................................65
6.07    Ownership of Property; Liens. ............................................................................65
6.08    Environmental Compliance. ...............................................................................66
6.09    Insurance.............................................................................................................67
6.10    Taxes...................................................................................................................67
6.11    ERISA Compliance.............................................................................................67
6.12    Capital Structure/Subsidiaries. ..........................................................................68
6.13    Margin Regulations; Investment Company Act. .................................................68
6.14    Disclosure. ..........................................................................................................68
6.15    Compliance with Laws. ......................................................................................69
6.16    Intellectual Property............................................................................................69
6.17    Collateral Documents; Nature of Obligations.....................................................70
6.18    Investments.........................................................................................................70
6.19    Business Locations..............................................................................................70
6.20    Brokers' Fees. .....................................................................................................70
6.21    Labor Matters......................................................................................................70
6.22    Representations and Warranties from Other DIP Loan Documents......................70
6.23    Agreed Budget; Use of Proceeds. .......................................................................70
6.24    Compliance with Requirements of Interim Order and Final Order. ......................71
ARTICLE VII AFFIRMATIVE COVENANTS .........................................................................71
7.01    Financial Statements. ..........................................................................................71
7.02    Certificates; Other Information...........................................................................72
7.03    Notices and Information. .....................................................................................74
7.04    Payment of Obligations.......................................................................................75
7.05    Preservation of Existence, Etc. ...........................................................................76
7.06    Maintenance of Properties. ..................................................................................76
7.07    Maintenance of Insurance. ..................................................................................76
7.08    Compliance with Laws. ......................................................................................77
7.09    Books and Records. ............................................................................................77
7.10    Inspection Rights. ...............................................................................................77
7.11    Pledged Assets; Collateral; Mortgage Instruments.............................................77
7.12    Treasury Management; Deposit and Investment Accounts. ..................................79
7.13    Compliance with Interim Order and Final Order.................................................79
7.14    [Reserved]...........................................................................................................79
7.15    Milestones for Reorganization Plan....................................................................79
7.16    Chief Restructuring Officer. ...............................................................................79
7.17    Operate Within Agreed Budget. .........................................................................80
ARTICLE VIII NEGATIVE COVENANTS ..............................................................................80
8.01    Liens...................................................................................................................80

8.02   Investments. ...........................................................................................82
8.03   Indebtedness. .........................................................................................83
8.04   Fundamental Changes. ...........................................................................83
8.05   Dispositions...........................................................................................83
8.06   Restricted Payments. .............................................................................83
8.07   Change in Nature of Business. ...............................................................83
8.08   Transactions with Affiliates and Insiders. ..............................................84
8.09   Transactions Affecting Collateral or Obligations. ..................................84
8.10   Use of Proceeds......................................................................................84
8.11   Chapter 11 Claims. ...............................................................................84
8.12   [Reserved.] ...........................................................................................84
8.13   Amendment and Prepayment of Other Indebtedness................................85
8.14   Organization Documents; Fiscal Year. ...................................................85
8.15   Ownership of Subsidiaries; Limitations on Guarantors............................85
8.16   Sale Leasebacks.....................................................................................86
8.17   Operating Lease Obligations. .................................................................86
8.18   Assumption of Executory Contracts and Unexpired Leases......................86
8.19   Cumulative Net Operating Cash Flow. ...................................................86
8.20   Cumulative Total Disbursements; Cumulative Total Hard Costs..............87
8.21   Revision of Orders. ...............................................................................88
8.22   Use of Cash. .........................................................................................88
8.23   Cash and Cash Equivalents. ...................................................................88
ARTICLE IX .....................................................................................................88
9.01   Grant of Liens and Security Interests. ....................................................89
9.02   Preservation of Collateral and Perfection of Liens. .................................91
9.03   [Reserved]. ...........................................................................................92
9.04   Certain Bankruptcy Matters Regarding Collateral...................................92
9.05   Title, Perfection and Priority..................................................................94
9.06   Deposit Accounts. ..................................................................................94
9.07   Exact Names. .........................................................................................94
9.08   Letter-of-Credit Rights and Chattel Paper. .............................................94
9.09   Accounts and Chattel Paper....................................................................94
9.10   Filing Requirements...............................................................................95
9.11   No Financing Statements, Security Agreements. .....................................95
9.12   Pledged Shares. .....................................................................................95
9.13   Collateral Records; Authorization to File Financing Statements; Further
       Assurances; Etc. ..................................................................................100
9.14   Equipment. ..........................................................................................101
9.15   Delivery of Instruments, Securities, Chattel Paper and Documents. .......102
9.16   [Reserved]. ..........................................................................................102
9.17   [Reserved]. ..........................................................................................102
9.18   Intellectual Property. ...........................................................................102
9.19   Commercial Tort Claims.......................................................................103
9.20   Letter-of-Credit Rights.........................................................................103
9.21   Federal, State or Municipal Claims. .....................................................104
9.22   No Interference. ...................................................................................104

| | | |
|---|---|---|
| 9.23 | Insurance. | 104 |
| 9.24 | Cash Management. | 105 |
| 9.25 | Assigned Contracts. | 105 |
| 9.26 | [Reserved]. | 106 |
| 9.27 | Ordinary Course Sale; Release of Mortgage Instrument; Cooperation. | 106 |
| ARTICLE X EVENTS OF DEFAULT AND REMEDIES | | 106 |
| 10.01 | Events of Default. | 106 |
| 10.02 | Remedies Upon Event of Default | 111 |
| 10.03 | Application of Funds | 115 |
| ARTICLE XI ADMINISTRATIVE AGENT. | | 115 |
| 11.01 | Appointment and Authority. | 115 |
| 11.02 | Rights as a DIP Lender. | 116 |
| 11.03 | Exculpatory Provisions. | 116 |
| 11.04 | Reliance by Administrative Agent. | 117 |
| 11.05 | Delegation of Duties. | 117 |
| 11.06 | Resignation of Administrative Agent. | 118 |
| 11.07 | Non-Reliance on Administrative Agent and Other DIP Lenders. | 118 |
| 11.08 | No Other Duties, Etc. | 119 |
| 11.09 | Administrative Agent May File Proofs of Claim | 119 |
| 11.10 | Collateral and Guaranty Matters. | 120 |
| ARTICLE XII MISCELLANEOUS | | 120 |
| 12.01 | Amendments, Etc. | 120 |
| 12.02 | Notices. Effectiveness of Electronic Communications. | 122 |
| 12.03 | No Waiver; Cumulative Remedies; Enforcement | 124 |
| 12.04 | Expenses; Indemnity; Damage Waiver. | 125 |
| 12.05 | Payments Set Aside. | 127 |
| 12.06 | Successors and Assigns. | 127 |
| 12.07 | Treatment of Certain Information; Confidentiality. | 131 |
| 12.08 | Set-off. | 132 |
| 12.09 | Interest Rate Limitation. | 132 |
| 12.10 | Counterparts; Integration; Effectiveness. | 132 |
| 12.11 | Survival of Representations and Warranties. | 133 |
| 12.12 | Governing Law. | 133 |
| 12.13 | Waiver of Jury Trial. | 133 |
| 12.14 | Termination. | 133 |
| 12.15 | USA PATRIOT Act Notice. | 134 |
| 12.16 | Subordination of Intercompany Debt. | 134 |

## SCHEDULES

| | |
|---|---|
| 1.01 | Subject Subsidiaries |
| 2.01 | Commitments and Applicable Percentages |
| 6.06 | Litigation |
| 6.08 | Environmental Matters |
| 6.12(a) | Corporate Structure |
| 6.12(b) | Subsidiaries; Equity Interests in the Borrower |
| 6.12(c) | Non-Guarantor Affiliates |
| 6.16 | Intellectual Property |
| 6.19(a) | Real Properties |
| 6.19(b) | Chief Executive Office, Jurisdiction of Incorporation, Principal Place of Business |
| 8.01 | Existing Liens |
| 8.02 | Existing Investments |
| 8.03 | Existing Indebtedness |
| 9.06 | Deposit Accounts |
| 9.07 | Fictitious and Other Corporate Names |
| 9.08 | Letter of Credit Rights and Chattel Paper |
| 12.02 | Administrative Agent's Office, Certain Addresses for Notices |

## EXHIBITS

| | |
|---|---|
| A | Form of Loan Notice |
| B-1 | Form of Revolving Note |
| B-2 | Form of Term Note |
| C | Form of Compliance Certificate |
| D | [Reserved] |
| E | Form of Assignment and Assumption |
| F | [Reserved] |
| G | Form of Interim Order |
| H | [Reserved] |
| I-1 | Form of Release Notice |
| I-2 | Form of Escrow Instruction Letter |

# POST-PETITION LOAN AND SECURITY AGREEMENT

This POST-PETITION LOAN AND SECURITY AGREEMENT (as amended or supplemented from time to time, the "DIP Loan Agreement") is entered into as of June ___, 2009 by and among each of the DIP Lenders listed on the signature pages hereof (together with their respective successors and assigns as permitted hereunder, the "DIP Lenders" or individually, a "DIP Lender"), BANK OF AMERICA, N.A., as Administrative Agent and L/C Issuer (each as defined herein), CRESCENT RESOURCES, LLC, a Georgia limited liability company (the "Borrower"), CRESCENT HOLDINGS, LLC, a Delaware limited liability company (the "Parent"), and certain subsidiaries and affiliates of the Borrower identified herein as Guarantors. Each of the Borrower, the Parent and the other Guarantors is a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (the cases of the Borrower, the Parent and the Guarantors being referred to collectively as the "Bankruptcy Cases" and individually as a "Bankruptcy Case;" each of the Borrower, the Parent and the Guarantors may be referred to herein individually as a "Debtor," and, collectively, as the "Debtors").

## RECITALS

A.  On June ___, 2009, the Borrower, the Parent and the other Guarantors filed voluntary petitions with the Bankruptcy Court initiating the Bankruptcy Cases.

B.  The Borrower, the Parent and the other Guarantors have continued in the possession of their respective assets and in the management of their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.  The Borrower, the Parent and the other Guarantors have requested the DIP Lenders make available to the Borrower a revolving line of credit for loans and letters of credit in an amount not to exceed [$80,000,000] and to make a term loan to the Borrower in the aggregate principal amount of [$30,000,000], which extensions of credit the Borrower will use for, among other purposes as described in this Agreement and permitted hereunder, the working capital needs and, general business purposes of the Borrower, the Parent and the other Guarantors, including the repayment of certain pre-petition indebtedness of the Debtors.

D.  To provide security for the repayment of the loans and letters of credit made available pursuant hereto and payment of the other obligations of the Borrower, the Parent and the other Guarantors under the DIP Loan Documents, the Borrower, the Parent and the other Guarantors have agreed to provide the Administrative Agent and the DIP Lenders with the following:

(a)  with respect to the obligations of the Borrower, the Parent and the other Guarantors hereunder and under the other DIP Loan Documents, an allowed administrative expense claim in each of the Bankruptcy Cases pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b) 507(a), 507(b), 546(c) or 726 thereof);

(b)     a perfected Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, on all property of the Borrower, the Parent and the other Guarantors which was unencumbered by any Lien as of the Petition Date;

(c)     a perfected Lien, pursuant to Section 364(c)(3) of the Bankruptcy Code, upon all property of the Borrower, the Parent and the other Guarantors (other than property subject to the pre-petition Liens granted to the Pre-Petition Secured Lenders), junior to existing valid, perfected and unavoidable Liens on such property; and

(d)     pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected Lien upon all property of the Borrower, the Parent or the other Guarantors that on the Petition Date is subject to a Lien securing any obligations owed to the Pre-Petition Secured Lenders (except to the extent that any such obligation is secured by a Permitted Lien of the type permitted under <u>Sections 8.01(a)</u> through <u>(p)</u>).

E.     The DIP Lenders have agreed to make available to the Borrower a revolving credit facility and the term loan upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the DIP Lenders, the Administrative Agent, the Borrower, the Parent and each of the other Guarantors hereby agree as follows.

# ARTICLE I
# DEFINITIONS AND ACCOUNTING TERMS

## 1.01    <u>Defined Terms</u>.

As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acceptable Plan</u>" means a chapter 11 plan of reorganization in form and substance reasonably acceptable to the Administrative Agent and the Required DIP Lenders.

"<u>Administrative Agent</u>" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the DIP Loan Documents, or any successor administrative agent.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 12.02</u>, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the DIP Lenders.

"<u>Administrative Expense Priority Claims</u>" means, with respect to any specified period, the aggregate amount of cash disbursements for such period with respect to claims in the Bankruptcy Cases entitled to administrative priority under Sections 503(b)(9) or 546(c) of the Bankruptcy Code.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreed Budget" means a detailed monthly budget for the Borrower and the Guarantors for the period commencing on the Petition Date and ending on the Maturity Date, satisfactory in form and substance to the Administrative Agent and each Co-Agent in all material respects (with such supporting detail as the Administrative Agent and the Co-Agents may request) and including, without limitation, limitations on capital and other expenditures satisfactory to the Administrative Agent and the Co-Agents; provided, however, that the Borrower may submit to the Administrative Agent and the Co-Agents, no more frequently than every 30 days, a proposed updated monthly budget for a period extending from the date such budget is provided through the earlier of (x) the date that is twelve months after the date such budget is provided, or (y) the Extended Maturity Date, which, upon review and approval by the Administrative Agent and the Co-Agents (in their sole discretion), shall, for all purposes other than compliance with the covenants set forth in Sections 8.19 and 8.20, become the Agreed Budget from and after the date of any such approval.

"Aggregate Commitments" means the sum of (i) the Aggregate Revolving Commitments plus (ii) the Aggregate Term Loan Commitments.

"Aggregate Revolving Commitments" means the Revolving Commitments of all the DIP Lenders. The amount of the Aggregate Revolving Commitments in effect on the Closing Date is _____ MILLION DOLLARS ($___,000,000).

"Aggregate Term Loan Commitments" means the Term Loan Commitments of all the DIP Lenders. The amount of the Aggregate Term Loan Commitments in effect and to be funded upon entry of the Final Order is _____ MILLION DOLLARS ($__,000,000), and on the Delayed Draw Date the Aggregate Term Loan Commitments shall increase to $_____, to be funded in accordance with the terms hereof.

"Agreement" has the meaning assigned to such term in the heading hereof.

"Applicable Percentage" means as to each DIP Lender (a) with respect to such DIP Lender's Revolving Commitment at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Revolving Commitments represented by such DIP Lender's Revolving Commitment at such time; provided that if the commitment of each DIP Lender to make Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 10.02 or if the Revolving Commitments have expired, then the Applicable Percentage of each DIP Lender shall be determined based on the Applicable Percentage of such DIP Lender most recently in effect, giving effect to any subsequent assignments, and (b) with respect to such DIP Lender's outstanding Term Loans at any time, the

percentage (carried out to the ninth decimal place), of the total aggregate principal amount of the Term Loan represented by the Term Loans held by such DIP Lender at such time. The initial Applicable Percentage of each DIP Lender is set forth opposite the name of such DIP Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such DIP Lender becomes a party hereto, as applicable.

"Applicable Rate" means (a) with respect to Eurodollar Rate Loans, 10.00% per annum, (b) with respect to Letter of Credit Fees for Letters of Credit, 10.00% per annum and (c) with respect to Base Rate Loans, 10.00% per annum.

"Approved Fund" means any Fund that is administered or managed by (a) a DIP Lender, (b) an Affiliate of a DIP Lender or (c) an entity or an Affiliate of an entity that administers or manages a DIP Lender.

"Arranger" means, collectively, Banc of America Securities LLC and Wachovia Capital Markets LLC, in their capacities as joint lead arrangers.

"Assigned Contracts" means, collectively, all of the Loan Parties' rights and remedies under, and all moneys and claims for money due or to become due to such Loan Parties under all contracts and agreements to which any Loan Party is a party or by which its assets are bound, and any and all amendments, supplements, extensions, and renewals thereof, including all rights and claims of the Loan Parties now or hereafter existing: (a) under any insurance, indemnities, warranties, and guarantees provided for or arising out of or in connection with any of the foregoing agreements; (b) for any damages arising out of or for breach or default under or in connection with any of the foregoing contracts; (c) to all other amounts from time to time paid or payable under or in connection with any of the foregoing agreements; or (d) to exercise or enforce any and all covenants, remedies, powers and privileges thereunder.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a DIP Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 12.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit "E" or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2007, and the related

consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower and its Subsidiaries, including the notes thereto.

"Availability Period" means, (i) with respect to the Revolving Commitments, the period from the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to Section 2.05 and (c) the date of termination of the commitment of each DIP Lender to make Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 10.02, and (ii) with respect to the Term Loan Commitments, the period from the Closing Date to the earliest of (a) the Maturity Date, (b) the Term Loan Commitment Expiration Date, and (c) the date of termination of the commitment of each DIP Lender to make Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 10.02.

"Bank of America" means Bank of America, N.A. and its successors.

"Bankruptcy Case" or "Bankruptcy Cases" shall have meanings given to such terms in the first paragraph of this Agreement.

"Bankruptcy Code" means the Bankruptcy Code in Title 11 of the United States Code, as amended, modified, succeeded or replaced from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Texas.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," (c) except during a Eurodollar Unavailability Period, the Eurodollar Rate, and (d) 3.50%. "Prime Rate" means the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate." The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Base Rate Revolving Loan" means a Revolving Loan that is a Base Rate Loan.

"Books" has the meaning specified in Section 9.01(b).

"Borrower" means Crescent Resources, LLC, a Georgia limited liability company, as debtor and debtor-in-possession.

"Borrowing" means a borrowing consisting of simultaneous Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the DIP Lenders pursuant to Section 2.01.

"Bulk Asset Sales" means, with respect to any specified period, the aggregate amount of cash receipts for all items for such period to be reported under the "Residential Tract / Bulk Sales", Commercial Project Sales", "Commercial Land Sales", "Multifamily Project / Land Sales", and "Land Management Land Sales" categories of cash receipts, as reflected in the initial Agreed Budget, and in any event it shall include any sale that is not an Ordinary Course Sale.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Businesses" means, at any time, a collective reference to the businesses operated by the Loan Parties at such time.

"Capital Lease" means, as applied to any Person, any lease of any Property (whether real, personal or mixed) by that Person as lessee which, in accordance with GAAP, is required to be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means, (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Carve-Out" means sums having priority ahead of the Super-Priority Claims and Liens securing the Loans for (x) in the event of the occurrence and during the continuance of a Default or an Event of Default, the payment of unpaid professional fees and disbursements incurred by the Loan Parties and any statutory committees appointed in the Bankruptcy Cases (exclusive of success fees or transaction fees of similar type or nature), in each case to the extent approved by the Bankruptcy Court, in an aggregate amount not to exceed the lesser of (1) the amount of such unpaid professional fees and disbursements outstanding and incurred prior to the occurrence of such Event of Default and (2) the budgeted amount of professional fees and disbursements for the Loan Parties and any statutory committees set forth in the Agreed Budget for such corresponding periods but only to the extent not disbursed in accordance with the Agreed Budget, plus, in each case $2,500,000 (the "Professional Expenses Cap"), (y) the payment of fees pursuant to 28 U.S.C. §1930 and (z) in the event of a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $50,000; provided, that no portion of the Carve-Out shall be eligible for or include any payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority,

validity, perfection or enforcement of the indebtedness of the Loan Parties owing to the DIP Lenders, the Administrative Agent, and the Pre-Petition Secured Lenders, or (ii) the collateral securing such indebtedness or the perfection, priority or validity of the liens granted in favor of the Administrative Agent, the DIP Lenders, and the Pre-Petition Secured Lenders with respect thereto; provided, further, that notwithstanding anything to the contrary herein, no more than an aggregate of $75,000 of the Carve-Out may be eligible for any investigation by the official committee of unsecured creditors of the matters described in the foregoing clauses (i) and (ii). Notwithstanding the foregoing, so long as the Maturity Date has not occurred and no Default or Event of Default shall have occurred and be continuing, the Loan Parties shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §330 and §331, as the same may be due and payable, and the same shall not reduce the Carve-Out; provided, that upon the occurrence and during the continuance of a Default or an Event of Default or any default under the Interim Order or the Final Order, as the case may be, any payments of compensation or reimbursements of expenses actually made shall reduce the Professional Expenses Cap on a dollar-for-dollar basis.

"Cash Collateralize" has the meaning specified in Section 2.03(g).

"Cash Equivalents" means, as at any date, (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (b) Dollar denominated time deposits and certificates of deposit of (i) any DIP Lender, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $100,000,000 or (iii) any bank whose short-term commercial paper rating from S&P is at least A-2 or the equivalent thereof or from Moody's is at least P-2 or the equivalent thereof (any such bank being an "Approved Bank"), in each case with maturities of not more than 270 days from the date of acquisition, (c) commercial paper and variable or fixed rate notes issued by any Approved Bank (or by the parent company thereof) or any variable rate notes issued by, or guaranteed by, any domestic corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's and maturing not more than 270 days from the date of acquisition, (d) repurchase agreements entered into by any Person with a bank or trust company (including any of the DIP Lenders) or recognized securities dealer having capital and surplus in excess of $100,000,000 for direct obligations issued by or fully guaranteed by the United States or any agency or instrumentality thereof in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations and (e) Investments, classified in accordance with GAAP as current assets, in money market funds registered under the Investment Company Act of 1940, as amended, which are operated in accordance with Rule 2a-7 under the Investment Company Act of 1940 and the portfolios of which are limited to Investments of the character described in the foregoing subdivisions (a) through (d).

"CDD Indebtedness" means, as to any Person, Indebtedness incurred by such Person to a taxing or other municipal authority with respect to a community development district or similar program for the development of certain improvements benefiting Real Property owned by such Person; provided, that such Indebtedness shall only consist of liabilities for increased taxes,

assessments or similar charges by a municipality or other taxing district related to such Real Property.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any ruling, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Change of Control" means the occurrence of any of the following events: (a) the Parent shall fail to own directly 100% of the outstanding Capital Stock of the Borrower; or (b) any "person" or group" (within the meaning of Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) shall have acquired after the Petition Date beneficial ownership, directly or indirectly, of, or shall have acquired by contract or otherwise, 30% or more of the outstanding Voting Stock of the Parent, or (c) during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent cease to be composed of individuals who were members of that board or equivalent governing body on the first day of such period. As used herein, "beneficial ownership" shall have the meaning provided in Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act.

"Closing Date" means the first date all the conditions precedent in Section 5.01 are satisfied or waived in accordance with Section 12.01.

"Club Subsidies" means, collectively, all amounts paid by the Loan Parties (or any of them) to or for the benefit of any non-profit Non-Guarantor Affiliate formed for the purposes of providing recreational or social amenities or other similar services to, or in connection with the development and sale of subdivided lots or other units in, any residential community being developed and/or managed by any Loan Party, whether or not such amounts paid to such Non-Guarantor Affiliate(s) are evidenced by a promissory note, equity or stock certificate or any other document or instrument.

"Co-Agent" means each of (a) Five Mile Capital Partners LLC, a _____ limited liability company, and (b) Wachovia Bank, National Association, a national banking association.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means a collective reference to all real and personal Property required to be pledged to the Administrative Agent (for the benefit of the DIP Lenders) pursuant to and in accordance with Section 7.11 and Article IX.

"Collateral Documents" means a collective reference to each of the security or collateral documents that may now or hereafter be executed and delivered by the Loan Parties in favor of the Administrative Agent or the DIP Lenders pursuant to Section 7.13, Article IX hereof, the Interim Order or the Final Order , including, without limitation, the Mortgage Instruments.

"Commitment" means, as to each DIP Lender, the Revolving Commitment of such DIP Lender and/or the Term Loan Commitment of such DIP Lender.

"Compliance Certificate" means a certificate substantially in the form of Exhibit "C".

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Extension" means each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Cumulative Net Operating Cash Flow" means, with respect to any specified period, "Total Net Cash Flow" for such period, in each case (x) for the Loan Parties for the period starting with June 15, 2009 and ending on the last day of such specified period, and (y) consistent with the "Total Net Cash Flow" category reflected in the initial Agreed Budget (but excluding Bulk Asset Sales and Administrative Expense Priority Claims, and items under the "DIP Loan Interest and Fees" and "Mechanics Liens" categories of cash disbursements under such initial Agreed Budget, and excluding Non-Debtor Professional Fees and Ordinary Course Professional Fees for such period).

"Cumulative Total Disbursements" means, with respect to any specified period, "Total Disbursements" for such period, in each case (x) for the Loan Parties for the period starting with June 15, 2009 and ending on the last day of such specified period, and (y) consistent with the "Total Disbursements" category reflected in the initial Agreed Budget (but excluding Administrative Expense Priority Claims and items under the "DIP Loan Interest and Fees" and "Mechanics Liens" categories of cash disbursements under such initial Agreed Budget, and excluding Non-Debtor Professional Fees and Ordinary Course Professional Fees for such period).

"Cumulative Total Hard Costs" means, with respect to any specified period, cumulative total "Hard Costs" for such period, in each case (x) for the Loan Parties for the period starting with June 15, 2009 and ending on the last day of such specified period, and (y) consistent with the "Hard Costs" category of cash disbursements reflected in the initial Agreed Budget.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of notice, the passage of a stated grace period, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Rate applicable to Base Rate Loans plus (iii) 2% per annum; provided, however, that with respect to a Eurodollar

Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2% per annum, and (b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Rate plus 2% per annum.

"Defaulting DIP Lender" means any DIP Lender that (a) has failed to fund any portion of the Loans or participations in L/C Obligations required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other DIP Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"Delayed Draw Date" shall have the meaning set forth in Section 2.01(b).

"Delayed Draw Term Loan" shall have the meaning set forth in Section 2.01(b).

"DIP Lenders" means a collective reference to the Persons identified as "DIP Lenders" on the signature pages hereto, together with any Person that subsequently becomes a DIP Lender by way of assignment in accordance with the terms of Section 12.06, together with their respective successors, other than any Person that ceases to be a DIP Lender as a result of an assignment in accordance with the terms of Section 12.06 or Section 12.13, and "DIP Lender" means any one of them.

"DIP Loan Documents" means this Agreement, each Note, each Letter of Credit, each Issuer Document, the Collateral Documents, the Fee Letter and each other document or instrument executed by the Loan Parties, or any of them, in connection with or in relation to any of the foregoing.

"Disposition" or "Dispose" means any disposition (including pursuant to a Sale and Leaseback Transaction) of any or all of the Property, whether tangible or intangible (including without limitation the Capital Stock of a Subsidiary) of any Loan Party or any Controlled Subsidiary of a Loan Party, whether by sale, lease, assignment, transfer or other method of disposal, and including any Involuntary Disposition.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any State of the United States or the District of Columbia.

"Eligible Assignee" means (a) a DIP Lender; (b) an Affiliate of a DIP Lender; (c) an Approved Fund; and (d) any other Person (other than a natural person) approved by (i) the Administrative Agent and (ii) with respect to Revolving Loans only, the L/C Issuer in its sole discretion; provided, that notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower or any of the Borrower's Affiliates.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure of any person to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Loan Parties within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Eurodollar Rate" means, for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to the greater of (a) 3.50 % and (b) the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If the BBA LIBOR rate is not available at such time for any reason, then the rate for clause (b)(i) above for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by Bank of America and with a

term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period.

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"Eurodollar Unavailability Period" means any period of time during which a notice delivered to the Borrower in accordance with Section 3.03(a) shall remain in force and effect.

"Event of Default" has the meaning specified in Section 9.01.

"Excluded Taxes" means, with respect to the Administrative Agent, any DIP Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which its principal office is located or in which it is doing business (other than by reason of any DIP Loan Document) or, in the case of any DIP Lender, in which its applicable Lending Office is located, (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which the Borrower is located, (c) in the case of a Foreign DIP Lender (other than an assignee pursuant to a request by the Borrower under Section 11.13), any withholding Tax that is imposed on amounts payable to such Foreign DIP Lender at the time such Foreign DIP Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign DIP Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign DIP Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 3.01(a) and (d) in the case of any DIP Lender that is not a Foreign DIP Lender, U.S. backup withholding taxes required to be withheld.

"Extended Maturity Date" shall mean the date that is ninety (90) days after the Initial Maturity Date.

"Extraordinary Receipts" means any collections or other payments or transfers received by the Borrower or any Guarantor not in the ordinary course of business, including, without limitation, (a) pension plan reversions, proceeds of insurance (including proceeds of any key man life insurance policies or casualty insurance respecting any Property), judgments, proceeds of judgments or other consideration of any kind in connection with any cause of action (b) condemnation awards (and payments in lieu thereof) in connection with any Involuntary Disposition, (c) indemnity payments and (d) any purchase price adjustment received in connection with any purchase agreement.

"Federal Funds Rate" means, for any day, the rate per annum (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by

Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means that certain fee letter agreement, dated as of June 2, 2009, among the Borrower, the Administrative Agent and Banc of America Securities LLC, as joint lead arranger.

"Final Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court approving this Agreement, the other DIP Loan Documents and authorizing the incurrence by the Loan Parties of permanent post-petition secured Indebtedness in accordance with this Agreement, in form and substance satisfactory to the Administrative Agent, each Co-Agent and the Required DIP Lenders, in their sole discretion, which order or judgment is in effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending.

"Final Order Term Loan" shall have the meaning set forth in Section 2.01(b).

"FIRREA" means the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended, and any successor statute thereto, as interpreted by the rules and regulations thereunder, as amended, including, without limitation, 12 CFR part 34.41 to 34.47.

"First-Tier Foreign Subsidiary" means any Foreign Subsidiary that is owned directly by the Parent, Borrower or a Domestic Subsidiary.

"First Tier Incremental Prepayment Amount" shall have the meaning set forth in Section 2.04(b)(ii)(A).

"Foreign DIP Lender" means any DIP Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes (including such a DIP Lender when acting in the capacity of the L/C Issuer). For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fully Satisfied" means, with respect to the Obligations as of any date, that, as of such date, (a) all principal of and interest accrued to such date which constitute Obligations shall have been irrevocably paid in full in cash, (b) all fees, expenses and other amounts then due and

payable which constitute Obligations shall have been irrevocably paid in cash, (c) all outstanding Letters of Credit shall have been (i) terminated, (ii) fully irrevocably Cash Collateralized or (iii) secured by one or more letters of credit on terms and conditions, and with one or more financial institutions, reasonably satisfactory to the L/C Issuer and (d) the Commitments shall have expired or been terminated in full.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease Property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, the Parent and each Person that is identified on the signature pages hereto as a "Guarantor" as of the Closing Date.

"Guaranty" means the Guaranty made by the Guarantors in favor of the Administrative Agent and the DIP Lenders pursuant to Article IV hereof.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"HOA/POA Deficit Funding" means, collectively, all amounts paid by the Loan Parties (or any of them) to fund or make up any operating deficit of any non-profit Non-Guarantor Affiliate that constitutes a home owners' association or property owners' association or similar entity formed for, or in connection with the development and sale of subdivided lots or other units in, any residential community being developed and/or managed by any Loan Party, whether or not such amounts paid to such Non-Guarantor Affiliate(s) are evidenced by a promissory note, equity or stock certificate or any other document or instrument.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Impacted Lender" means any Lender as to which (a) L/C Issuer has a good faith belief that the Lender has defaulted in fulfilling its obligations under one or more other syndicated credit facilities or (b) an entity that controls the Lender has been deemed insolvent or become subject to a bankruptcy or other similar proceeding.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

     (a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

     (b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

     (c)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

     (d)    net obligations under any interest rate hedging agreement or swap contract or any similar instrument or agreement;

     (e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under

conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     capital leases and Synthetic Lease Obligations;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any capital lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning specified in Section 12.04(b).

"Information" has the meaning specified in Section 12.07.

"Initial Maturity Date" means the date that is 365 days after the Petition Date.

"Intellectual Property" has the meaning specified in Section 6.16.

"Interim Facility Amount" has the meaning specified in Section 2.01(a).

"Interim Order" shall mean the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Cases substantially in the form of Exhibit "G" hereto, on an application or motion by the Borrower that is satisfactory in form and substance to the Administrative Agent, each Co-Agent and the Required DIP Lenders, which order or judgment shall have been entered on such prior notice to such parties (including, without limitation, the Pre-Petition Secured Lenders) as may be satisfactory to the Administrative Agent, each Co-Agent and the Required DIP Lenders, approving the transactions contemplated herein and granting the superpriority claim status and senior priming and other liens contemplated herein, and which order or judgment shall (a) approve this Agreement and the other DIP Loan Documents, (b) authorize the incurrence by the Loan Parties of the interim post-petition secured indebtedness in accordance with this Agreement, the other DIP Loan Documents, which indebtedness shall be in amounts satisfactory to the Administrative Agent, each Co-Agent and the Required DIP Lenders, (c) approve the payment by the Borrower of all of the fees and expenses provided for herein and in any other DIP Loan Document, (d) afford the Pre-Petition Secured Lenders adequate protection as set forth in Exhibit "G", and (e) not have been (i) stayed, vacated, reversed or rescinded or (ii) without the prior written consent of the

Administrative Agent, each Co-Agent and the Required DIP Lenders, in their sole discretion, amended or modified.

"Intercompany Debt" shall have the meaning assigned such term in Section 12.16.

"Interest Payment Date" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; and (b) as to any Base Rate Loan, the first Business Day of each calendar month (for interest accruing through the last day of the most recently ended calendar month) and the Maturity Date.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter, as selected by the Borrower in its Loan Notice; provided that:

> (a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

> (b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

> (c)     no Interest Period shall extend beyond the Maturity Date.

"Investment" means, with respect to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, any Club Subsidies, and any HOA/POA Deficit Funding, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any Property of any Loan Party.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrower (or any Subsidiary) or in favor of the L/C Issuer and relating to such Letter of Credit.

"Joint Venture" means any Person (other than a natural person or a Wholly Owned Subsidiary of the Borrower or the Parent), a portion (but less than 100%) of the Capital Stock in which is owned by the Borrower, the Parent or any Wholly Owned Subsidiary.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Advance" means, with respect to each DIP Lender, such DIP Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when such drawing is made or refinanced as a Borrowing of Revolving Loans.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means Bank of America, N.A., in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder.

"L/C Obligations" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all L/C Borrowings. For the purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lending Office" means, as to any DIP Lender, the office or offices of such DIP Lender described as such in such DIP Lender's Administrative Questionnaire, or such other office or

offices as a DIP Lender may from time to time notify the Borrower and the Administrative Agent.

"Letter of Credit" means any standby letter of credit issued hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Expiration Date" means the day that is 60 days after the Maturity Date (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(i).

"Letter of Credit Sublimit" means an amount equal to $20,000,000.00. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means any extension of credit by a DIP Lender to the Borrower under Article II in the form of a Revolving Loan or a Term Loan.

"Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit "A".

"Loan Parties" means, collectively, the Borrower, the Parent and each other Guarantor, and "Loan Party" means any one of them.

"Loan Party Materials" has the meaning specified in Section 7.02.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and the Guarantor taken as a whole since the Petition Date; (b) a material impairment of the ability of any Loan Party to perform its material obligations under any DIP Loan Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any DIP Loan Document to which it is a party; (d) a material adverse effect on the Collateral (or the value thereof) or a material impairment of the Administrative Agent's or DIP Lenders' Liens or priority of their Liens with respect thereto; or (e) a material impairment of the Administrative Agent's or DIP Lenders' ability to enforce the Obligations or realize upon the Collateral.

"Maturity Date" means the Initial Maturity Date; provided, that in the event the extension option set forth in Section 5.03(b) has been exercised and is in effect, then the term "Maturity Date" shall mean the Extended Maturity Date.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage Instrument" means a fully executed and notarized fee or leasehold mortgage, deed of trust or deed to secure debt (as applicable) in favor of the Administrative Agent for the benefit of the DIP Lenders) encumbering the fee or leasehold interest of a Loan Party in any Real Property owned or leased by such Loan Party.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means the aggregate cash or Cash Equivalents proceeds received by any Loan Party in respect of any Disposition, net of (a) direct costs incurred in connection therewith (including, without limitation, legal, accounting and investment banking fees, and sales commissions), (b) Taxes paid or payable as a result thereof and (c) the amount necessary to retire any Indebtedness secured by a Permitted Lien (to the extent such Permitted Lien is senior to any Lien of the Administrative Agent) on the related Property; it being understood that "Net Cash Proceeds" shall include, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by any such Loan Party in any Disposition.

"Non-Debtor Professional Fees" means the aggregate costs, fees and expenses paid by the Loan Parties to attorneys, accountants, financial advisors, and other professionals retained by or on behalf of the Administrative Agent, the Co-Agents or the DIP Lenders, or by or on behalf of any official statutory committee appointed in the Bankruptcy Cases pursuant to an order of the Bankruptcy Court.

"Non-Guarantor Affiliate" means any Subsidiary or Affiliate of the Parent, the Borrower or any other Loan Party that is not a Guarantor.

"Non-Recourse Indebtedness" means any Indebtedness of a Person or with respect to the assets of such Person, in each case, which is not Recourse Indebtedness.

"Non-Voting Equity" has the meaning specified in Section 9.01(n).

"Note" or "Notes" means the Revolving Notes and/or the Term Notes, individually or collectively, as appropriate.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under (a) any DIP Loan Document or otherwise with respect to any Loan or Letter of Credit, and (b) all obligations under any Treasury Management Agreement, in each case whether direct or indirect (including those acquired by assumption),

absolute or contingent, due or to become due, now existing or hereafter arising and including interest, expenses, costs and fees that accrue before or after the Petition Date and before or after the Closing Date. Any reference in the DIP Loan Agreement or in the other DIP Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals or alterations thereto.

"Operating Lease" means, as applied to any Person, any lease (including, without limitation, leases which may be terminated by the lessee at any time) of any Property (whether real, personal or mixed) which is not a Capital Lease other than any such lease in which that Person is the lessor.

"Ordinary Course Professional Fees" means the fees and expenses of attorneys, accountants, financial advisors, and other professionals (other than Alvarez & Marsal North America, LLC, Lazard Frères & Co, LLC, Robinson, Bradshaw & Hinson, P.A., Weil, Gotshal & Manges LLP and Hohmann, Taube & Summers, LLP) retained by the Loan Parties and incurred in the ordinary course of business.

"Ordinary Course Sale" shall mean any Disposition of (w) less than 6 condominium units, (x) less than 10 finished lots, (y) less than 20 or more platted but undeveloped lots, or (z) less than 100 acres of raw land or timberland, in each case to a single purchaser or affiliated purchasers (other than any Affiliate or Affiliates of the Borrower) in a single transaction or series of related transactions.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise or Property Taxes, charges or similar levies arising from any payment made hereunder or under any other DIP Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other DIP Loan Document.

"Outstanding Amount" means (a) with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrower of Unreimbursed Amounts.

"Parent" has the meaning provided in the recitals hereto, together with its successors and permitted assigns.

"Participant" has the meaning specified in Section 12.06(d).

"PBGC" means the United States Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Asset Sale" means, without duplication, any of the foregoing:

(a)     Any Disposition with a purchase price equal to or less than $5,000,000;

(b)     Any Disposition with a purchase price greater than $5,000,000 but less than or equal to $10,000,000, to the extent the Administrative Agent and each Co-Agent have approved such Disposition, which approval shall be deemed granted if the none of the Administrative Agent nor either Co-Agent has objected to such proposed Disposition within five (5) Business Days after actual receipt of written notice from the Borrower with respect to such proposed Disposition; or

(c)     Any Disposition with a purchase price greater than $10,000,000 with the prior written approval of the Required DIP Lenders.

"Permitted Disposition" means, with respect to any Loan Party, any Disposition consisting of (a) Permitted Asset Sales (b) the sale, lease, license, transfer or other disposition of machinery, equipment, or other Property no longer used or useful in the conduct of such Loan Party's business in an aggregate amount not to exceed $1,000,000 during the term of this Agreement; (c) any Involuntary Disposition by any Loan Party; (d) leases or subleases granted to others in the ordinary course of such Loan Party's business, not interfering in any material respect with the business of such Loan Party; or (e) the granting of easements, rights-of-way, restrictions and other similar encumbrances permitted by Section 8.01(f).

"Permitted Investments" means, at any time, Investments by the Loan Parties permitted to exist at such time pursuant to the terms of Section 8.02.

"Permitted Liens" means, at any time, Liens in respect of Property of the Loan Parties permitted to exist at such time pursuant to the terms of Section 8.01.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" means June 10, 2009.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Platform" has the meaning specified in Section 7.02.

"Pledged Shares" has the meaning specified in Section 9.01(n).

"Pre-Petition Credit Agreement" means that certain First Amended and Restated Credit Agreement, dated as of June 17, 2008, among Crescent Resources, LLC, as borrower, and Crescent Holdings, LLC and other subsidiaries and affiliates of Crescent Resources, LLC, as guarantors party thereto from time to time, Bank of America, N.A. as administrative agent, the lenders party thereto from time to time, and the other parties thereto, as amended, modified, or supplemented from time to time.

"Pre-Petition Secured Lenders" means the lenders and, where appropriate, the administrative agent, under the Pre-Petition Credit Agreement.

"Professional Expenses Cap" shall have the meaning given to such term in the definition of the term "Carve-Out."

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Real Properties" means, at any time, a collective reference to each of the facilities and real Properties owned, leased or operated by the Loan Parties at such time.

"Recourse Indebtedness" means any Indebtedness of any Person or with respect to the assets of such Person, in each case, for which such Person is personally liable to the holder of such Indebtedness, other than solely pursuant to customary recourse exceptions to non-liability (including those related to indemnities for environmentally-related costs, expenses and liabilities) related to a transaction.

"Reduction Amount" means, in respect of any reduction of the Aggregate Revolving Commitments pursuant to Section 2.05(a) or in connection with a mandatory prepayment pursuant to Section 2.04(b)(iii), the amount of the Aggregate Revolving Commitment reduced thereby.

"Register" has the meaning specified in Section 11.07(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Release" has the meaning specified in <u>Section 9.27</u>.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of Loans, a Loan Notice and (b) with respect to an L/C Credit Extension, a Letter of Credit Application.

"Required DIP Lenders" means, at any time, DIP Lenders holding in the aggregate more than 50% of (a) the unfunded Commitments and the outstanding Loans, L/C Obligations and participations therein or (b) if the Commitments have been terminated, the outstanding Loans, L/C Obligations and participations therein; <u>provided</u>, that the additional consent of the Administrative Agent and each Co-Agent shall be required in connection with any matter requiring the approval of the Required DIP Lenders, but only if such Administrative Agent or Co-Agent (together with any of such Co-Agent's Affiliates), as the case may be, then holds at least 20% of the aggregate unfunded Commitments and the outstanding Loans, L/C Obligations and participations therein or, if the Commitments have been terminated, at least 20% of the outstanding Loans, L/C Obligations and participations therein. The unfunded Commitments of, and the outstanding Loans, L/C Obligations and participations therein held or deemed held by, any Defaulting DIP Lender shall be excluded for purposes of making a determination of Required DIP Lenders.

"Required Financial Information" means, with respect to each fiscal year or quarter of the Borrower, (a) the financial statements required to be delivered pursuant to <u>Section 7.01(a)</u> or <u>(b)</u> for such fiscal year or quarter, and (b) the certificate of the chief executive officer or the chief financial officer of the Borrower required by <u>Section 7.02(b)</u> to be delivered with the financial statements described in clause (a) above.

"Required Revolving DIP Lenders" means, at any time, Revolving DIP Lenders holding in the aggregate more than 50% of (a) the unfunded Revolving Commitments and the outstanding Revolving Loans, L/C Obligations and participations therein or (b) if the Revolving Commitments have been terminated, the outstanding Loans, L/C Obligations and participations therein, and the Administrative Agent. The unfunded Commitments of, and the outstanding Loans, L/C Obligations and participations therein held or deemed held by, any Defaulting DIP Lender shall be excluded for purposes of making a determination of Required Revolving DIP Lenders.

"Responsible Officer" means the chief executive officer, president, chief financial officer, or vice president and assistant treasurer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Capital Stock of the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other

property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Capital Stock, or of any option, warrant or other right to acquire any such Capital Stock.

"Revolving Commitment" means, as to each DIP Lender, its obligation (if any) to (a) make Revolving Loans to the Borrower pursuant to Section 2.01(a) and (b) purchase participations in L/C Obligations, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such DIP Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such DIP Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving DIP Lender" means (a) at any time prior to the termination of the Revolving Commitments, any DIP Lender that has a Revolving Commitment at such time, and (b) at any time on or after the termination of the Revolving Commitments, any DIP Lender that holds Revolving Loans or L/C Obligations at such time.

"Revolving Loan" has the meaning specified in Section 2.01(a).

"Revolving Note" has the meaning specified in Section 2.10(a).

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale and Leaseback Transaction" means any arrangement pursuant to which any Loan Party, directly or indirectly, becomes liable as lessee, guarantor or other surety with respect to any lease, whether an Operating Lease or a Capital Lease, of any Property (a) which such Loan Party has sold or transferred (or is to sell or transfer) to a Person which is not a Loan Party or (b) which such Loan Party intends to use for substantially the same purpose as any other Property which has been sold or transferred (or is to be sold or transferred) by such Loan Party to another Person which is not a Loan Party in connection with such lease.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Tier Incremental Prepayment Amount" shall have the meaning set forth in Section 2.04(b)(ii)(B).

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002 and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"Seller Financing" means, in connection with any contract entered into in the ordinary course of the Borrower's business to sell raw land owned by it to a well-qualified developer,

conservation group, recreational group, or individual, purchase money financing provided by the Borrower not to exceed 80% of the purchase price for such raw land, at an interest rate per annum equal to no less than 7.5% and for a term not to exceed 12-months (except that such financing may provide an option for an extension of the term for up to 9 additional months).

"Subject Subsidiaries" means those Subsidiaries of the Borrower identified on Schedule 1.01, as such Schedule 1.01 shall be amended or supplemented from time with the consent of the Administrative Agent and each Co-Agent (in their sole discretion), and any Subsidiaries of such entities.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of Capital Stock having ordinary voting power for the election of directors or other governing body (other than Capital Stock having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified herein, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Super-Majority DIP Lenders" means, at any time, DIP Lenders holding in the aggregate more than 66% of (a) the unfunded Commitments and the outstanding Loans, L/C Obligations and participations therein or (b) if the Commitments have been terminated, the outstanding Loans, L/C Obligations and participations therein; provided, that Super-Majority DIP Lenders shall also include each and every DIP Lender that holds at least 20% of the unfunded Commitments and the outstanding Loans, L/C Obligations and participations therein or, if the Commitments have been terminated, at least 20% of the outstanding Loans, L/C Obligations and participations therein. Without limiting the foregoing, Super-Majority DIP Lenders shall include the Administrative Agent and each Co-Agent if, at the time of any determination, such Administrative Agent or Co-Agent (together with any of such Co-Agent's Affiliates), as the case may be, then holds at least 20% of the aggregate unfunded Commitments and the outstanding Loans, L/C Obligations and participations therein or, if the Commitments have been terminated, at least 20% of the outstanding Loans, L/C Obligations and participations therein. The unfunded Commitments of, and the outstanding Loans, L/C Obligations and participations therein held or deemed held by, any Defaulting DIP Lender shall be excluded for purposes of making a determination of Super-Majority DIP Lenders.

"Super-Priority Claim" means, in relation to the Borrower and the Guarantor, a claim against the Borrower or the Guarantor in such Person's Bankruptcy Case which is an administrative expense claim authorized and established by the Bankruptcy Court pursuant to sections 364(c) and 507(b) of the Bankruptcy Code and having priority over any or all administrative expenses of the kind specified in sections 503(b), 507(b) and 546(c) of the Bankruptcy Code.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of Property creating obligations that do not appear on the balance sheet of such

Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" has the meaning specified in Section 2.01(b), and shall include both the Final Order Term Loan and the Delayed Draw Term Loan, unless the context otherwise requires, in which case such term shall mean the Final Order Term Loan or the Delayed Draw Term Loan, as applicable.

"Term Loan Commitment" means, collectively as to each DIP Lender, its obligation to make its portion of the Term Loan to the Borrower pursuant to Section 2.01(b), in the principal amount set forth opposite such DIP Lender's name on Schedule 2.01.

"Term Loan Commitment Expiration Date" means September 1, 2009.

"Term Note" has the meaning specified in Section 2.10(a).

"Threshold Amount" means $2,000,000.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Revolving Loans and all L/C Obligations.

"Treasury Management Agreement" means any agreement, entered into before or after the Petition Date, which governs the provision of treasury or cash management services provided to the Loan Parties by the Administrative Agent, either Co-Agent, one or more of the DIP Lenders or one or more of the Pre-Petition Secured Lenders, including deposit accounts, funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation, and reporting and trade finance services.

"Type" means, with respect to any Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"UCC" means the Uniform Commercial Code in effect from time to time in the State of New York.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 2.03(c)(i).

"Voting Equity" has the meaning specified in Section 9.01(n).

"Voting Stock" means, with respect to any Person, Capital Stock issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

"Wholly Owned Subsidiary" means, with respect to any direct or indirect Subsidiary of any Person, that 100% of the Capital Stock with ordinary voting power issued by such Subsidiary (other than directors' qualifying shares and investments by foreign nationals mandated by applicable Law) is beneficially owned, directly or indirectly, by such Person.

**1.02    Other Interpretive Provisions.**

With reference to this Agreement and each other DIP Loan Document, unless otherwise specified herein or in such other DIP Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other DIP Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any DIP Loan Document, shall be construed to refer to such DIP Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a DIP Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the DIP Loan Document in which such references appear, and (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other DIP Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other DIP Loan Document.

(d)     The following terms shall have the meanings ascribed to them in the UCC: Accession, Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, General Intangible, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Proceeds, Securities Account, Supporting Obligation, and Tangible Chattel Paper.

## 1.03    Accounting Terms.

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Borrower's unaudited consolidated financial statements and the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any DIP Loan Document, and either the Borrower or the Required DIP Lenders shall so request, the Administrative Agent and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required DIP Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the DIP Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(c)     Consolidation of Variable Interest Entities.  All references herein to consolidated financial statements of the Loan Parties or to the determination of any amount for the Loan Parties on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Borrower is required to consolidate pursuant to FASB Interpretation No. 46 – Consolidation of Variable Interest Entities: an interpretation of ARB No. 51 (January 2003), as if such variable interest entity were a Subsidiary as defined herein.

## 1.04    [Reserved].

## 1.05    Times of Day.

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06 Letter of Credit Amounts.**

Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

# ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

**2.01 Loans.**

    (a)    Revolving Loans.

Subject to the terms and conditions set forth herein, each DIP Lender severally agrees to make loans (each such loan, a "Revolving Loan") to the Borrower from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such DIP Lender's Revolving Commitment; provided, however, that after giving effect to any Borrowing of Revolving Loans, (i) the Total Revolving Outstandings shall not exceed the Aggregate Revolving Commitments, and (ii) the aggregate Outstanding Amount of the Revolving Loans of any DIP Lender, plus such DIP Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such DIP Lender's Revolving Commitment; provided, further, that until the entry of the Final Order, the Total Revolving Outstandings shall not exceed $35,000,000 (such maximum amount, the "Interim Facility Amount"). Within the limits of each DIP Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01(a), prepay under Section 2.04(a), and reborrow under this Section 2.01(a). Revolving Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein.

    (b)    Term Loan; Final Order Term Loan; Delayed Draw Term Loan.

Subject to the terms and conditions set forth herein, each DIP Lender severally agrees to make a term loan (the "Term Loan") to or for the benefit of the Borrower in an aggregate amount equal to such DIP Lender's Applicable Percentage of the Aggregate Term Loan Commitment. The initial portion of the Term Loan, in an amount equal to $_____ (such initial advance, the "Final Order Term Loan") shall be advanced upon entry of the Final Order for the benefit of the Borrower, pro rata by each DIP Lender in accordance with its respective Applicable Percentage of the Aggregate Term Loan Commitment. The remaining portion of the Term Loan, in an amount equal to $_____ (such advance, the "Delayed Draw Term Loan"), shall be advanced on September 1, 2009 (the "Delayed Draw Date") for the benefit of the Borrower, pro rata by each DIP Lender in accordance with its respective Applicable Percentage of the Aggregate Term Loan Commitment; provided, however, that notwithstanding the foregoing, no

DIP Lender shall have any obligation to make a Delayed Draw Term Loan that, together with the sum of such DIP Lender's Final Order Term Loan, would cause such DIP Lender to make Term Loans in an amount in excess of its Term Loan Commitment. Amounts repaid on the Term Loan may not be reborrowed. The Term Loan may consist of Base Rate Loans or Eurodollar Rate Loans, as further provided herein. Subject to the terms and conditions set forth herein, each DIP Lender shall make the amount of such DIP Lender's Term Loan Commitment available to the Administrative Agent in same day funds, to such account of the Administrative Agent as the Administrative Agent may designate, not later than 1:00 p.m. (New York time) upon entry of the Final Order and on the Delayed Draw Date, as applicable. After the Administrative Agent's receipt of the proceeds of such Term Loan, upon satisfaction of the conditions precedent set forth in Sections 5.01 and 5.02, as applicable, the Administrative Agent shall apply the proceeds of such Term Loan to repay outstanding Revolving Loans in accordance with Section 2.04(b). Notwithstanding any provision herein to the contrary (including without limitation Sections 2.02(a) and 5.02(c)), the commitment of the DIP Lenders to fund the Final Order Term Loan and the Delayed Draw Term Loan shall be automatic, and such DIP Lenders shall be required to fund such Final Order Term Loan and Delayed Draw Term Loan whether or not the Borrower shall have provided to the Administrative Agent a Loan Notice in connection with such Final Order Term Loan or Delayed Draw Term Loan; provided, the commitment of such DIP Lenders to fund such Final Order Term Loan and Delayed Draw Term Loan shall be subject to the satisfaction or waiver of the other conditions precedent set forth in Sections 5.01 and 5.02.

## 2.02    Borrowings, Conversions and Continuations of Loans.

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the irrevocable notice from the Borrower to the Administrative Agent, which may be given by telephone (provided that such telephonic notice complies with the information requirements of the form of Loan Notice attached hereto). Each such notice must be received by the Administrative Agent not later than 12:00 noon, Charlotte, North Carolina time, (i) two Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of (1) with respect to Term Loans, $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (2) with respect to Revolving Loans, $1,000,000 or a whole multiple of $500,000 in excess thereof. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of (1) with respect to Term Loans, $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (2) with respect to Revolving Loans, except as provided in Section 2.03(c), $150,000 or a whole multiple of $50,000 in excess thereof. Each Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of

the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)     Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each DIP Lender of the amount of its Applicable Percentage of the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each DIP Lender of the details of any automatic conversion to Base Rate Loans described in the preceding subsection. In the case of a Borrowing, each DIP Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 5.02 (and, if such Borrowing is the initial Credit Extension, Section 5.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower; provided, however, that if, on the date a Loan Notice with respect to a Borrowing consisting of Revolving Loans is given by the Borrower, there are L/C Borrowings outstanding, then the proceeds of such Borrowing first shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the Borrower as provided above.

(c)     Subject to Section 3.05, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan. During the existence of a Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required DIP Lenders.

(d)     The Administrative Agent shall promptly notify the Borrower and the DIP Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the DIP Lenders of any change in Bank of America's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than six Interest Periods in effect with respect to the Loans.

**2.03**    **Letters of Credit.**

(a)    The Letter of Credit Commitment.

(i)    Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Revolving DIP Lenders set forth in this Section 2.03, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit for the account of the Borrower, and to amend or extend Letters of Credit previously issued by it after the Petition Date, in accordance with subsection (b) below, and (2) to honor drawings under the Letters of Credit; and (B) the Revolving DIP Lenders severally agree to participate in Letters of Credit issued for the account of the Borrower and any drawings thereunder; provided that after giving effect to any L/C Credit Extension with respect to any Letter of Credit (x) the Total Revolving Outstandings shall not exceed the Aggregate Revolving Commitments, (y) the aggregate Outstanding Amount of the Revolving Loans of any Revolving DIP Lender, plus such Revolving DIP Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such Revolving DIP Lender's Revolving Commitment, or (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit.  Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)    The L/C Issuer shall not issue any Letter of Credit if:

(A)    subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Required Revolving DIP Lenders have approved such expiry date; or

(B)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all the Revolving DIP Lenders have approved such expiry date; or

(C)    a default of any Revolving DIP Lender's obligations to fund under Section 2.03(c) exists or any Revolving DIP Lender is at such time a Defaulting Revolving DIP Lender or an Impacted Lender hereunder, unless the L/C Issuer has entered into arrangements satisfactory to the L/C Issuer with the Borrower or such Lender to eliminate the L/C Issuer's risk with respect to such Revolving DIP Lender.

(iii)    The L/C Issuer shall not be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the L/C Issuer in good faith deems material to it;

(B)    the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally; or

(C)    except as otherwise agreed by the Administrative Agent and the L/C Issuer, such Letter of Credit is in an initial stated amount less than $100,000;

(D)    such Letter of Credit is to be denominated in a currency other than Dollars;

(E)    such Letter of Credit contains any provision for automatic reinstatement of the stated amount after any drawing thereunder; or

(F)    a default of any Revolving DIP Lender's obligations to fund under Section 2.03(c) exists or any Revolving DIP Lender is at such time a Defaulting Revolving DIP Lender hereunder, unless the L/C Issuer has entered into satisfactory arrangements with the Borrower or such Revolving DIP Lender to eliminate the L/C Issuer's risk with respect to such Revolving DIP Lender.

(iv)    The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof.

(v)    The L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) the L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(vi)    The L/C Issuer shall act on behalf of the Revolving DIP Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the

Administrative Agent in <u>Article XI</u> with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in <u>Article XI</u> included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)    <u>Procedures for Issuance and Amendment of Letters of Credit</u>.

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower. Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent not later than 11:00 a.m. at least two Business Days (or such later date and time as the Administrative Agent and the L/C Issuer may agree in a particular instance in its sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the L/C Issuer may require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the L/C Issuer may require. Additionally, the Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may require.

(ii)    Promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof. Unless the L/C Issuer has received written notice from any Revolving DIP Lender, the Administrative Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more of the applicable conditions contained in <u>Article V</u> shall not then be satisfied, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance of each Letter of Credit, each Revolving DIP Lender shall be deemed

to, and hereby irrevocably and unconditionally agrees to, purchase from the L/C Issuer a risk participation in such Letter of Credit in an amount equal to the product of such Revolving DIP Lender's Applicable Percentage times the amount of such Letter of Credit.

(iii)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)    Drawings and Reimbursements; Funding of Participations.

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Borrower and the Administrative Agent thereof and of the date that the L/C Issuer is to make payment under such Letter of Credit (such payment date, the "Honor Date"). Not later than 11:00 a.m. on the Honor Date, the Borrower shall reimburse the L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing. If the Borrower fails to so reimburse the L/C Issuer by such time, the Administrative Agent shall promptly notify each Revolving DIP Lender of the Honor Date, the amount of the unreimbursed drawing (the "Unreimbursed Amount"), and the amount of such Revolving DIP Lender's Applicable Percentage thereof. In such event, the Borrower shall be deemed to have requested a Borrowing of Base Rate Revolving Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Aggregate Revolving Commitments and the conditions set forth in Section 5.02 (other than the delivery of a Loan Notice). Any notice given by the L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    Each Revolving DIP Lender (including the Revolving DIP Lender acting as L/C Issuer) shall upon any notice pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent for the account of the L/C Issuer at the Administrative Agent's Office in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.03(c)(iii), each Revolving DIP Lender that so makes funds available shall be deemed to have made a Base Rate Revolving Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the L/C Issuer.

(iii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Borrowing of Base Rate Revolving Loans because the conditions set forth in Section 5.02 cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on

demand (together with interest) and shall bear interest at the Default Rate. In such event, each Revolving DIP Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Revolving DIP Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)　　Until each Revolving DIP Lender funds its Revolving Loan or L/C Advance pursuant to this Section 2.03(c) to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Revolving DIP Lender's Applicable Percentage of such amount shall be solely for the account of the L/C Issuer.

(v)　　Each Revolving DIP Lender's obligation to make Revolving Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving DIP Lender may have against the L/C Issuer, the Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Revolving DIP Lender's obligation to make Revolving Loans pursuant to this Section 2.03(c) is subject to the conditions set forth in Section 5.02 (other than delivery by the Borrower of a Loan Notice). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)　　If any Revolving DIP Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Revolving DIP Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), the L/C Issuer shall be entitled to recover from such Revolving DIP Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the L/C Issuer in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing. A certificate of the L/C Issuer submitted to any Revolving DIP Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d)　　Repayment of Participations.

(i)　　At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Revolving DIP Lender such Revolving DIP Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the

Administrative Agent receives for the account of the L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Revolving DIP Lender its Applicable Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving DIP Lender's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

(ii)     If any payment received by the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 12.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each Revolving DIP Lender shall pay to the Administrative Agent for the account of the L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Revolving DIP Lender, at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Revolving DIP Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)     Obligations Absolute. The obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other DIP Loan Document;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)     any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any

beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under the Bankruptcy Code or any receivership, insolvency or similar debtor relief laws; or

(v)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or any Subsidiary;

provided that nothing in this Section 2.03(e) shall be deemed a waiver of (A) any rights of the Borrower to the extent such waiver is not permitted under applicable Law or (B) the provisos to the third and fourth sentences in Section 2.03(f).

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will notify the L/C Issuer within one Business Day of receipt. The Borrower shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)     Role of L/C Issuer. Each Revolving DIP Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuer, any Agent-Related Person nor any of the respective correspondents, participants or assignees of the L/C Issuer shall be liable to any Revolving DIP Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Revolving DIP Lenders or the Required Revolving DIP Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuer, any Agent-Related Person nor any of the respective correspondents, participants or assignees of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or

purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)     Cash Collateral. Upon the request of the Administrative Agent, (i) if the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing, or (ii) if, as of the Letter of Credit Expiration Date, any L/C Obligations for any reason remains outstanding, the Borrower shall, in each case, immediately (i) Cash Collateralize the then Outstanding Amount of all L/C Obligations, or (ii) cause the then Outstanding Amount of all L/C Obligations to be secured by a back-to-back letter of credit that is in an amount equal to 105% of the then Outstanding Amount of all L/C Obligations, in a form that is satisfactory to the Administrative Agent and the L/C Issuer and issued by a bank that is satisfactory to the Administrative Agent and the L/C Issuer in their sole discretion. Sections 2.05 and 10.02(c) set forth certain additional requirements to deliver Cash Collateral hereunder. For purposes of this Section 2.03, Section 2.05 and Section 10.02(c), "Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the L/C Issuer and the Revolving DIP Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all L/C Obligations, such cash or deposit accounts to be under the sole and exclusive control of the Administrative Agent, all pursuant to documentation in form and substance satisfactory to the Administrative Agent and the L/C Issuer (which documents are hereby consented to by the Revolving DIP Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the L/C Issuer and the Revolving DIP Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in blocked accounts at Bank of America.

(h)     Applicability of ISP. Unless otherwise expressly agreed by the L/C Issuer and the Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), the rules of the ISP shall apply to each Letter of Credit.

(i)     Letter of Credit Fees. The Borrower shall pay to the Administrative Agent for the account of each Revolving DIP Lender, in accordance with its Applicable Percentage of the Aggregate Revolving Commitments, a Letter of Credit fee (the "Letter of Credit Fee") accruing at the Applicable Rate times the daily amount available to be drawn under such Letter of Credit. For the purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. Letter of Credit Fees shall be (i) computed on a monthly basis in arrears and (ii) due and payable on the second Business Day of each calendar month (for Letter of Credit Fees accruing through the last day of the most recently ended calendar month), commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate.

(j)     Fronting Fee and Processing Charges Payable to L/C Issuer. The Borrower shall pay directly to the L/C Issuer for its own account a fronting fee with respect to each Letter of Credit, at a rate per annum as set forth in the Fee Letter, computed on the daily amount available

to be drawn under such Letter of Credit on a quarterly basis in arrears. Such fronting fee shall be due and payable on the last Business Day of each March, June, September and December in respect of each such quarterly period (or portion thereof, in the case of the first payment), commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. In addition, the Borrower shall pay directly to the L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k)     Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Documents, the terms hereof shall control.

## 2.04    Prepayments.

(a)     Voluntary Prepayments of Loans. The Borrower may, upon notice to the Administrative Agent, at any time (i) voluntarily prepay Base Rate Loans in whole or in part without premium or penalty, and (ii) subject to Section 3.05, voluntarily prepay Eurodollar Rate Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Administrative Agent not later than 12:00 noon (A) two Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; (ii) any prepayment of Term Loans (whether Eurodollar Rate Loans or Base Rate Loans) shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding); and (iii) any prepayment of Revolving Loans shall be in a principal amount of (A) $1,000,000 or a whole multiple of $1,000,000 in excess thereof with respect to Eurodollar Rate Loans and (B) $150,000 or a whole multiple of $50,000 in excess thereof with respect to Base Rate Loans (or in each case, if less, the entire principal amount thereof then outstanding). Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each DIP Lender of its receipt of each such notice, and of the amount of such DIP Lender's Applicable Percentage of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each such prepayment shall be applied to the Loans of the DIP Lenders in accordance with their respective Applicable Percentages. Prepayments made pursuant to this Section 2.04(a) shall not reduce the Aggregate Commitments.

(b)     Mandatory Prepayments.

(i)     Aggregate Revolving Commitments. If for any reason the Total Revolving Outstandings at any time exceed the Aggregate Revolving Commitments then in effect, the Borrower shall immediately prepay Revolving Loans and/or Cash

Collateralize the L/C Obligations in an aggregate amount equal to such excess; provided, however, that the Borrower shall not Cash Collateralize the L/C Obligations pursuant to this Section 2.04(b)(i) unless, after the prepayment in full of the Revolving Loans, the Total Revolving Outstandings exceed the Letter of Credit Sublimit.

(ii)     Dispositions.

(A) to the extent Net Cash Proceeds from Dispositions and other Extraordinary Receipts (excluding any insurance or condemnation proceeds that are used to repair or replace the affected Property as required or permitted hereunder) on a cumulative basis since the Closing Date is equal to or greater than $85,000,000 and less than or equal to $125,000,000, 100% of the amount of the Net Cash Proceeds received in excess of $85,000,000 (such amount, the "First Tier Incremental Prepayment Amount") shall be paid to the Administrative Agent to prepay first, the Term Loans and second, the Revolving Loans, with a corresponding permanent reduction of the Aggregate Revolving Commitments in an amount equal to the product of (a) 0.50 and (b) the First Tier Incremental Prepayment Amount applied to the Revolving Loans; and

(B) to the extent Net Cash Proceeds from Dispositions and other Extraordinary Receipts (excluding any insurance or condemnation proceeds that are used to repair or replace the affected Property as required or permitted hereunder) on a cumulative basis since the Closing Date is greater than $125,000,000, 100% of the amount of the Net Cash Proceeds received in excess of such cumulative amount (the "Second Tier Incremental Prepayment Amount") shall be paid to the Administrative Agent to prepay first, the Term Loans and second, the Revolving Loans, with a corresponding permanent reduction of the Aggregate Revolving Commitments in an amount equal to the Second Tier Incremental Prepayment Amount applied to the Revolving Loans, and shall otherwise be applied as set forth in Section 2.04(b)(v)(B) below;

provided, that notwithstanding the foregoing, the Aggregate Revolving Commitments shall not be reduced pursuant to this Section 2.04(b)(ii) to an amount less than $50,000,000.

(iii)     If Borrower or any of the Loan Parties shall hold, individually or collectively, net cash and Cash Equivalents (other than restricted cash) in an aggregate amount of more than $25,000,000 for more than three (3) consecutive Business Days, the Borrower shall immediately prepay (or cause to be prepaid) the Revolving Loans in an amount equal to the amount by which such cash and Cash Equivalents exceeds $25,000,000 on such third Business Day.

(iv)    Funding of Term Loan.  Immediately upon funding of the Final Order Term Loan or the Delayed Draw Term Loan pursuant to Section 2.01(b), the Borrower shall prepay the Revolving Loans in an amount equal to the amount of such Final Order Term Loan or Delayed Draw Term Loan, as applicable.

(v)    Application of Mandatory Prepayments.  All amounts required to be paid pursuant to this Section 2.04(b) shall be applied as follows:

(A)    with respect to all amounts prepaid pursuant to Section 2.04(b)(i),(iii) or (iv), to Revolving Loans and (after all Revolving Loans have been repaid) to Cash Collateralize L/C Obligations (with no corresponding reduction to the Aggregate Revolving Commitments other than as set forth in this Section 2.04(b)); and

(B)    Subject to clauses (ii)(A) and (B) of this Section 2.04(b), with respect to all amounts prepaid pursuant to Section 2.04(b)(ii), in the following order: first, to repay the Term Loans, second, to prepay Revolving Loans, third, to Cash Collateralize the L/C Obligations, and fourth, to be deposited in a segregated interest-bearing deposit account maintained with the Administrative Agent, subject to the Liens securing the Obligations and the replacement liens in favor of the Pre-Petition Secured Lenders, for distribution or disposition as provided for under a confirmed plan of reorganization or liquidation.

Within the parameters of the applications set forth above, prepayments shall be applied first to Base Rate Loans and then to Eurodollar Rate Loans in direct order of Interest Period maturities.  All prepayments under this Section 2.04(b) shall be subject to Section 3.05, but otherwise without premium or penalty, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

(vi)    Prepayment Account.  If the Borrower is required to make a mandatory prepayment of Eurodollar Rate Loans under this Section 2.04(b) (other than pursuant to Section 2.04(b)(iv)), the Borrower shall have the right, in lieu of making such prepayment in full, to deposit an amount equal to such mandatory prepayment with the Administrative Agent in a cash collateral account maintained (pursuant to documentation reasonably satisfactory to the Administrative Agent) by and in the sole dominion and control of the Administrative Agent.  Any amounts so deposited shall be held by the Administrative Agent as collateral for the prepayment of such Eurodollar Rate Loans and shall be applied to the prepayment of the applicable Eurodollar Rate Loans at the end of the current Interest Periods applicable thereto.

## 2.05    Termination or Reduction of Commitments.

(a)    Voluntary Reductions.  The Borrower may, upon notice to the Administrative Agent, terminate the Aggregate Revolving Commitments, or from time to time permanently reduce the Aggregate Revolving Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 12:00 noon five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount

of $2,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Borrower shall not terminate or reduce the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments, and (iv) if, after giving effect to any reduction of the Aggregate Revolving Commitments, the Letter of Credit Sublimit exceeds the amount of the Aggregate Revolving Commitments, the Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(b)     Automatic Reductions.  The Aggregate Term Loan Commitments automatically shall be permanently reduced by the amount of the Final Order Term Loan funded on the date of entry of the Final Order, and the Aggregate Term Loan Commitments shall automatically be further permanently reduced by the amount of Delayed Draw Term Loan funded on the Delayed Draw Date.

(c)     General.  The Administrative Agent will promptly notify the DIP Lenders of any notice of termination or reduction of the Aggregate Revolving Commitments.  Any reduction of the Aggregate Revolving Commitments shall be applied to the Revolving Commitment of each DIP Lender according to its Applicable Percentage.  All commitment and other fees accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

**2.06    Repayment of Loans.**

(a)     Revolving Loans.  On the Maturity Date, the Borrower shall repay the aggregate principal amount of all Revolving Loans outstanding as of such date.

(b)     Term Loan.  On the Maturity Date, the Borrower shall repay the outstanding principal amount of the Term Loan as of such date.

**2.07    Interest.**

(a)     Subject to the provisions of subsection (b) below, (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)     (i)     If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)     If any amount (other than principal of any Loan ) payable by the Borrower under any DIP Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then, upon the request of the Required DIP Lenders, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)     Upon the request of the Required DIP Lenders, if any Event of Default exists, the Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv)     Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**2.08   Fees.**

In addition to certain fees described in subsections (i) and (j) of Section 2.03:

(a)     Commitment Fee.  The Borrower shall pay to the Administrative Agent, for the account of each DIP Lender in accordance with its Applicable Percentage of the Aggregate Commitments, a commitment fee equal to the product of 3.50% times the Aggregate Commitments.  The commitment fee shall be due and payable as follows:

(i)     The first installment, in an amount equal to $_____, shall be due and payable upon entry of the Interim Order.

(ii)     The balance of the commitment fee, in an amount equal to $_____, shall be due and payable upon entry of the Final Order.

(b)     Unused Fee.  The Borrower shall pay to the Administrative Agent, for the account of each Revolving DIP Lender in accordance with its Applicable Percentage of the Aggregate Revolving Commitments, an unused fee equal to 1.00% per annum times the actual daily amount by which the Aggregate Revolving Commitments exceeds the sum of (i) the aggregate Outstanding Amount of Revolving Loans and (ii) the aggregate Outstanding Amount of L/C Obligations.  The unused fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article V is not met, and shall be due and payable monthly in arrears on the second Business Day of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period; provided, that with respect to the period commencing with the first such day after the Closing Date and ending on the date of entry of the Final Order, such unused fee shall be equal to 1.00% per annum times the actual daily amount by which the Interim Facility Amount exceeds the sum of (i) the aggregate Outstanding Amount of Revolving Loans and (ii) the aggregate Outstanding Amount of L/C Obligations.  The unused fee shall be calculated monthly in arrears.

(c)     Other Fees.  The Borrower shall pay to the Arranger and the Administrative Agent for their own respective accounts fees in the amounts and at the times specified in the Fee

Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

## 2.09 Computation of Interest and Fees.

All computations of interest for Base Rate Loans when the Base Rate is determined by Bank of America's "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.11(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

## 2.10 Evidence of Debt.

(a)     The Credit Extensions made by each DIP Lender shall be evidenced by one or more accounts or records maintained by such DIP Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each DIP Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the DIP Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any DIP Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any DIP Lender made through the Administrative Agent, the Borrower shall execute and deliver to such DIP Lender (through the Administrative Agent) a promissory note which shall evidence such DIP Lender's Loans in addition to such accounts or records. Each such promissory note shall (i) in the case of Revolving Loans, be in the form of Exhibit B-1 (a "Revolving Note"), and (ii) in the case of the Term Loan, be in the form of Exhibit B-2 (a "Term Note"). Each DIP Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)     In addition to the accounts and records referred to in subsection (a), each DIP Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such DIP Lender of participations in Letters of Credit. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any DIP Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**2.11  Payments Generally; Administrative Agent's Clawback.**

(a)  <u>General</u>.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective DIP Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each DIP Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such DIP Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)  (i)  <u>Funding by DIP Lenders; Presumption by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a DIP Lender prior to the proposed date of any Borrowing of Eurodollar Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such DIP Lender will not make available to the Administrative Agent such DIP Lender's share of such Borrowing, the Administrative Agent may assume that such DIP Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or, in the case of a Borrowing of Base Rate Loans, that such DIP Lender has made such share available on such date in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a DIP Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable DIP Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent (A) in the case of a payment to be made by such DIP Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans.. If the Borrower and such DIP Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such DIP Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such DIP Lender's Loan included in such Borrowing. Any payment by the Borrower shall be applied as a reduction of the Obligation represented by the portion of the Borrowing not funded by the Defaulting DIP Lender but shall be without prejudice to any claim the Borrower may have against a DIP Lender that shall have failed to make such payment to the Administrative Agent. Nothing in this <u>Section 2.11(b)</u> shall be deemed to relieve any DIP Lender from liability for the failure to perform its obligations hereunder.

(ii)    Payments by Borrower; Presumptions by Administrative Agent.    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the DIP Lenders or the L/C Issuer hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the DIP Lenders or the L/C Issuer, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the DIP Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such DIP Lender or the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any DIP Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any DIP Lender makes available to the Administrative Agent funds for any Loan to be made by such DIP Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article V are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such DIP Lender) to such DIP Lender, without interest.

(d)    Obligations of DIP Lenders Several.    The obligations of the DIP Lenders hereunder to make Loans and to fund participations in Letters of Credit and to make payments pursuant to Section 12.04(c) are several and not joint.  The failure of any DIP Lender to make any Loan, to fund any such participation or to make any payment under Section 12.04(c) on any date required hereunder shall not relieve any other DIP Lender of its corresponding obligation to do so on such date, and no DIP Lender shall be responsible for the failure of any other DIP Lender to so make its Loan, purchase its participation or make its payment pursuant to Section 12.04(c).

(e)    Funding Source.  Nothing herein shall be deemed to obligate any DIP Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any DIP Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

## 2.12    Sharing of Payments by DIP Lenders.

If any DIP Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, or the participations in L/C Obligations held by it resulting in such DIP Lender's receiving payment of a proportion of the aggregate amount of such Loans or participations and accrued interest thereon

greater than its pro rata share thereof as provided herein, then the DIP Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and sub-participations in L/C Obligations of the other DIP Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the DIP Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that:

(i)     if any such participations or sub-participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or sub-participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a DIP Lender as consideration for the assignment of or sale of a participation in any of its Loans or sub-participations in L/C Obligations to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any DIP Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such DIP Lender were a direct creditor of such Loan Party in the amount of such participation.

# ARTICLE III
# TAXES, YIELD PROTECTION AND ILLEGALITY

## 3.01   Taxes.

(a)     Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes. (i) Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes. If, however, applicable Laws require the Borrower or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined by the Borrower or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)     If the Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant

Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, DIP Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Borrower.  Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)    Tax Indemnifications.  (i) Without limiting the provisions of subsection (a) or (b) above, the Borrower shall, and does hereby, indemnify the Administrative Agent, each DIP Lender and the L/C Issuer, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) withheld or deducted by the Borrower or the Administrative Agent or paid by the Administrative Agent, such DIP Lender or the L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The Borrower shall also, and does hereby, indemnify the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which a DIP Lender or the L/C Issuer for any reason fails to pay indefeasibly to the Administrative Agent as required by clause (ii) of this subsection.  A certificate as to the amount of any such payment or liability delivered to the Borrower by a DIP Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a DIP Lender or the L/C Issuer, shall be conclusive absent manifest error.

(ii)    Without limiting the provisions of subsection (a) or (b) above, each DIP Lender and the L/C Issuer shall, and does hereby, indemnify the Borrower and the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the fees, charges and disbursements of any counsel for the Borrower or the Administrative Agent) incurred by or asserted against the Borrower or the Administrative Agent by any Governmental Authority as a result of the failure by such DIP Lender or the L/C Issuer, as the case may be, to deliver, or as a result of the inaccuracy, inadequacy or deficiency of, any documentation required to be delivered by such DIP Lender or the L/C Issuer, as the case may be, to the Borrower or the Administrative Agent pursuant to subsection (e).  Each DIP Lender and the L/C Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such DIP Lender or the L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).  The agreements in this clause (ii) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a DIP Lender or the L/C Issuer, the termination of the

Aggregate Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d)     Evidence of Payments.  Upon request by the Borrower or the Administrative Agent, as the case may be, after any payment of Taxes by the Borrower or the Administrative Agent to a Governmental Authority as provided in this Section 3.01, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Law to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(e)     Status of DIP Lenders; Tax Documentation. (i) Each DIP Lender shall deliver to the Borrower and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such DIP Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such DIP Lender by the Borrower pursuant to this Agreement or otherwise to establish such DIP Lender's status for withholding tax purposes in the applicable jurisdiction.

(ii)     Without limiting the generality of the foregoing, if the Borrower is resident for tax purposes in the United States,

(A)     any DIP Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent executed originals of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable Laws or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent, as the case may be, to determine whether or not such DIP Lender is subject to backup withholding or information reporting requirements; and

(B)     each Foreign DIP Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign DIP Lender becomes a DIP Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign DIP Lender is legally entitled to do so), whichever of the following is applicable:

(I)     executed originals of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(II)     executed originals of Internal Revenue Service Form W-8ECI,

(III)    executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation,

(IV)    in the case of a Foreign DIP Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign DIP Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) executed originals of Internal Revenue Service Form W-8BEN, or

(V)     executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)    Each DIP Lender shall promptly (A) notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction, and (B) take such steps as shall not be materially disadvantageous to it, in the reasonable judgment of such DIP Lender, and as may be reasonably necessary (including the re-designation of its Lending Office) to avoid any requirement of applicable Laws of any jurisdiction that the Borrower or the Administrative Agent make any withholding or deduction for taxes from amounts payable to such DIP Lender.

(f)     <u>Treatment of Certain Refunds</u>. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a DIP Lender or the L/C Issuer, or have any obligation to pay to any DIP Lender or the L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such DIP Lender or the L/C Issuer, as the case may be. If the Administrative Agent, any DIP Lender or the L/C Issuer determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the Administrative Agent, such DIP Lender or the L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Borrower, upon the request of the Administrative Agent, such DIP Lender or the L/C Issuer, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such DIP Lender or the L/C Issuer in the event the Administrative Agent, such DIP Lender or the L/C Issuer is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Administrative Agent, any DIP Lender or the L/C Issuer to make available its tax

returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**3.02    Illegality.**

If any DIP Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any DIP Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such DIP Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such DIP Lender to the Borrower through the Administrative Agent, any obligation of such DIP Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such DIP Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, upon demand from such DIP Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such DIP Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such DIP Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such DIP Lender may not lawfully continue to maintain such Eurodollar Rate Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates.**

If the Administrative Agent or the Required DIP Lenders determine that for any reason in connection with any request for a Loan or a conversion to or continuation thereof that (i) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Loan, (ii) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with a Base Rate Loan, or (iii) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such DIP Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each DIP Lender. Thereafter, the obligation of the DIP Lenders to make or maintain Eurodollar Rate Loans and Base Rate Loans as to which the interests rate is determined with reference to the Eurodollar Rate shall be suspended until the Administrative Agent (upon the instruction of the Required DIP Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**3.04** <u>Increased Costs</u>.

    (a)   <u>Increased Costs Generally</u>.  If any Change in Law shall:

        (i)   impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any DIP Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>) or the L/C Issuer;

        (ii)   subject any DIP Lender or the L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Eurodollar Rate Loan made by it, or change the basis of taxation of payments to such DIP Lender or the L/C Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such DIP Lender or the L/C Issuer); or

        (iii) ·   impose on any DIP Lender or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such DIP Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such DIP Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such DIP Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such DIP Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such DIP Lender or the L/C Issuer, the Borrower will pay to such DIP Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such DIP Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

    (b)   <u>Capital Requirements</u>.  If any DIP Lender or the L/C Issuer determines that any Change in Law affecting such DIP Lender or the L/C Issuer or any Lending Office of such DIP Lender or such DIP Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such DIP Lender's or the L/C Issuer's capital or on the capital of such DIP Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such DIP Lender or the Loans made by, or participations in Letters of Credit held by, such DIP Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such DIP Lender or the L/C Issuer or such DIP Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such DIP Lender's or the L/C Issuer's policies and the policies of such DIP Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such DIP Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such DIP Lender or

the L/C Issuer or such DIP Lender's or the L/C Issuer's holding company for any such reduction suffered.

(c)     <u>Certificates for Reimbursement</u>.  A certificate of a DIP Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such DIP Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such DIP Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     <u>Delay in Requests</u>.  Failure or delay on the part of any DIP Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such DIP Lender's or the L/C Issuer's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a DIP Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such DIP Lender or the L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such DIP Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     <u>Reserves on Eurodollar Rate Loans</u>.  The Borrower shall pay to each DIP Lender, as long as such DIP Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such DIP Lender (as determined by such DIP Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, <u>provided</u> the Borrower shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such DIP Lender.  If a DIP Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

**3.05    <u>Compensation for Losses</u>.**

Upon demand of any DIP Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such DIP Lender for and hold such DIP Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrower (for a reason other than the failure of such DIP Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)      any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 12.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such DIP Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the DIP Lenders under this Section 3.05, each DIP Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

## 3.06     Mitigation Obligations; Designation of a Different Lending Office.

If any DIP Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any DIP Lender, the L/C Issuer or any Governmental Authority for the account of any DIP Lender or the L/C Issuer pursuant to Section 3.01, or if any DIP Lender gives a notice pursuant to Section 3.02, then (upon request of the Borrower, except in the case of Section 3.02) such DIP Lender or the L/C Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such DIP Lender or the L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such DIP Lender or the L/C Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such DIP Lender or the L/C Issuer, as the case may be.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any DIP Lender or the L/C Issuer in connection with any such designation or assignment.

## 3.07     Survival.

All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Revolving Commitments and repayment of all other Obligations hereunder.

**4.01    The Guaranty.**

Each of the Guarantors hereby guarantees to (a) each DIP Lender, (b) each Affiliate of a DIP Lender that enters into a Treasury Management Agreement with a Loan Party, and (c) the Administrative Agent as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof.   The Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

**4.02    Obligations Unconditional.**

The obligations of the Guarantors under Section 4.01 are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the DIP Loan Documents or Treasury Management Agreements, or any other agreement or instrument referred to therein, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 4.02 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each of the Guarantors agrees that its rights of subrogation, indemnity, reimbursement or contribution against the Borrower for amounts paid under this Article IV shall not be enforceable until, and shall be subordinate and subject in right of payment to, the Obligations, until such time as the Obligations have been Fully Satisfied.  Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of any of the DIP Loan Documents or any Treasury Management Agreement between any Loan Party and the Administrative Agent, any DIP Lender, or any Affiliate of a DIP Lender, or any other agreement or instrument referred to in the DIP Loan Documents or such Treasury Management Agreements shall be done or omitted;

(c)    the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the DIP Loan Documents or any Treasury Management Agreement between any Loan Party and the Administrative Agent, any DIP Lender, or any Affiliate of a DIP Lender, or any other agreement or instrument referred to in the DIP Loan Documents or such Treasury Management Agreements shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien granted to, or in favor of, the Administrative Agent or any DIP Lender or DIP Lenders as security for any of the Obligations shall fail to attach or be perfected; or

(e)    any of the Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including, without limitation, any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent or any DIP Lender exhaust any right, power or remedy or proceed against any Person under any of the DIP Loan Documents or any Treasury Management Agreement between any Loan Party and the Administrative Agent, any DIP Lender, or any Affiliate of a DIP Lender, or any other agreement or instrument referred to in the DIP Loan Documents or such Treasury Management Agreements, or against any other Person under any other guarantee of, or security for, any of the Obligations.

## 4.03    Reinstatement.

The obligations of the Guarantors under this Article IV shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in the Bankruptcy Cases or otherwise, and each of the Guarantors agrees that it will indemnify the Administrative Agent and each DIP Lender on demand for all reasonable costs and expenses (including, without limitation, fees and expenses of counsel) incurred by the Administrative Agent or such DIP Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted an avoidable transfer or similar payment under any bankruptcy, insolvency or similar law.

## 4.04    Certain Additional Waivers.

Each Guarantor agrees that it shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 4.02.

**4.05** **Remedies.**

The Guarantors agree that, to the fullest extent permitted by law, as between the Guarantors, on the one hand, and the Administrative Agent and the DIP Lenders, on the other hand, the Obligations may be declared to be forthwith due and payable as provided in Section 10.02 for purposes of Section 4.01 notwithstanding any stay, injunction or other prohibition preventing such declaration as against any other Person and that, in the event of such declaration, the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantor for purposes of Section 4.01. The Guarantors acknowledge and agree that the Obligations are secured in accordance with the terms of the Collateral Documents and that the DIP Lenders may exercise their remedies thereunder in accordance with the terms thereof.

**4.06** **Guaranty of Payment; Continuing Guaranty.**

The guaranty in this Article IV is a guaranty of payment and not of collection, is a continuing guaranty, and shall apply to all Obligations whenever arising.

# ARTICLE V
# CONDITIONS PRECEDENT TO CREDIT EXTENSIONS; TERM OF AGREEMENT

**5.01** **Conditions of Closing Date and Initial Credit Extension.**

The occurrence of the Closing Date, the effectiveness of this Agreement and the obligation of the L/C Issuer and each DIP Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

      (a)    DIP Loan Documents, Organization Documents, Etc. The Administrative Agent's receipt of the following, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and dated the Closing Date (or, in the case of certificates of governmental officials, each duly issued and certified by the governmental issuer and dated a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent and each Co-Agent:

          (i)    executed counterparts of this Agreement and such other DIP Loan Documents as are specified by the Administrative Agent;

          (ii)    a Note executed by the Borrower in favor of each DIP Lender requesting a Note;

          (iii)    copies of the Organization Documents of each Loan Party certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state or other jurisdiction of its incorporation or organization, where applicable, and certified by a secretary or assistant secretary of such Loan Party to be true and correct as of the Closing Date;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent or the Co-Agents may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other DIP Loan Documents to which such Loan Party is a party; and

(v)    good standing certificates of each Loan Party in the jurisdiction of its incorporation or organization.

(b)    Opinions of Counsel. The Administrative Agent shall have received, in each case dated as of the Closing Date, addressed to the Administrative Agent and each DIP Lender and in form and substance satisfactory to the Administrative Agent, legal opinions of counsel for each Loan Party.

(c)    Agreed Budget. The Administrative Agent and each Co-Agent shall have received and approved the initial Agreed Budget.

(d)    Interim Order; Pleadings and Other Documents. The Interim Order shall have been entered by the Bankruptcy Court promptly following the Petition Date, and all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Loan Documents and the transactions contemplated thereby (including, without limitation, the Interim Order containing terms of adequate protection for the Pre-Petition Secured Lenders) and the "first day" applications and motions and forms of orders shall be in form and substance reasonably satisfactory to the Administrative Agent, each Co-Agent and the Required DIP Lenders in their sole discretion.

(e)    No Material Adverse Change. Since the Petition Date, no event causing or having a Material Adverse Effect shall have occurred.

(f)    Third Party Consents. The DIP Lenders shall have received, in form and substance reasonably satisfactory to the DIP Lenders, all governmental and third party consents, licenses and approvals necessary in connection with the DIP Loan Documents and the transactions contemplated thereby, and all such consents and approvals shall remain in full force and effect.

(g)    Evidence of Insurance. Receipt by the Administrative Agent of copies of insurance policies or certificates of insurance of the Loan Parties evidencing liability and casualty insurance meeting the requirements set forth in the DIP Loan Documents, including, but not limited to, naming the Administrative Agent as additional insured (in the case of liability insurance) or lenders loss payee or mortgagee, as its interest may appear (in the case of hazard insurance).

(h)     Environmental Matters.    The Loan Parties shall have granted the Administrative Agent, its financial advisor, and the Co-Agents access to and the right to inspect all reports, audits and other internal information of the Loan Parties relating to environmental matters and any third party verification of certain matters relating to compliance with environmental laws and regulations requested by the Administrative Agent or either Co-Agent, and the Administrative Agent and each Co-Agent shall be satisfied that the Loan Parties are in compliance in all material respects with all applicable environmental laws and regulations, and shall be satisfied with the costs of maintaining such compliance.

(i)     Other Matters.    All corporate and judicial proceedings and all instruments and agreements in connection with the transactions among the Loan Parties, the Administrative Agent, the Co-Agents and the DIP Lenders contemplated by the DIP Loan Documents shall be satisfactory in form and substance to the Administrative Agent, each Co-Agent and the Required DIP Lenders in all respects, and the Administrative Agent shall have received all information (financial or otherwise) and copies of all documents requested by the Administrative Agent or either Co-Agent or any of their respective counsel.

(j)     Officer's Certificates.    The Administrative Agent shall have received a certificate or certificates executed by the chief executive officer or the chief financial officer of the Borrower as of the Closing Date, in form and substance satisfactory to the Administrative Agent, stating that (A) the conditions specified in Sections 5.02(a) and (b) have been satisfied, and (B) each Loan Party is in material compliance with all existing orders of the Bankruptcy Court.

(k)     Fees and Expenses.    There shall have been paid (i) to the Administrative Agent, the Co-Agents and the DIP Lenders all fees and expenses owed to the Administrative Agent, the Co-Agents and the DIP Lenders hereunder and (ii) all fees due and owing under the Fee Letter, in each case that are required hereunder or thereunder to be paid on or before the Closing Date.

(l)     Attorney Costs.    The Borrower shall have paid all reasonable fees, charges and disbursements of counsel of the Administrative Agent and the Co-Agents (Moore & Van Allen PLLC and Paul, Hastings, Janofsky & Walker and Milbank, Tweed, Hadley & McCloy LLP, respectively), and in addition, local counsel in each jurisdiction that the Administrative Agent and the Co-Agents reasonably determine, to the extent invoiced prior to or on the Closing Date.

(m)     Lazard Engagement Letter.    The Administrative Agent and the Co-Agents shall have received the current version of the Loan Parties' engagement letter for Lazard Frères & Co, LLC.

Without limiting the generality of the provisions of Section 11.04, for purposes of determining compliance with the conditions specified in this Section 5.01, each DIP Lender that

has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder.

**5.02**    **Conditions to all Credit Extensions.**

The obligation of each DIP Lender to honor any Request for Credit Extension (other than a Loan Notice requesting only a conversion or a continuation of Loans), including the Credit Extensions to be made hereunder as of the Closing Date, is subject to the following conditions precedent:

(a)    The representations and warranties of the Loan Parties contained in Article VI or any other DIP Loan Document, or which are contained in any certificate furnished at any time pursuant to Section 7.01 and 7.02 hereof shall be true and correct in all material respects on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided, that with respect to any representation and warranty as to "no material adverse change" or "no Material Adverse Effect" since a specific earlier date contained in Article VI, such representation and warranty shall be true and correct in all material respects on and as of such specific earlier date after giving effect to any disclosure made to the Administrative Agent and the Co-Agents in writing on or prior to the Closing Date.

(b)    No Default or Event of Default shall exist and be continuing either prior to or after giving effect to such proposed Credit Extension and the application of the proceeds thereof (irrespective of whether the Administrative Agent has been directed to exercise any remedy in respect of any such Event of Default or has given notice to the Borrower of any such Event of Default).

(c)    The Administrative Agent and, if applicable, the L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)    No injunction, writ, restraining order, or other order of any nature (whether temporary, preliminary or permanent) restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority (including, without limitation, the Bankruptcy Court) against the Borrower, the Guarantor, any DIP Lender or any of their Affiliates, and such extension of credit shall not violate any requirement of applicable Laws.

(e)    Since the Petition Date, no event causing a Material Adverse Effect shall have occurred.

(f)    [Reserved].

(g)    The Bankruptcy Court shall have entered an Interim Order (and, in the case of the Final Order Term Loan, the Final Order), in form and substance satisfactory to the DIP Lenders in their sole discretion, including with respect to the adequate

protection granted to the Pre-Petition Secured Lenders, which Interim Order (and, in the case of the Final Order Term Loan, Final Order) shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lenders (which consent may be withheld in their sole discretion) authorizing and approving the Loan Documents and the transactions contemplated thereby, including, without limitation, the granting of the Super-Priority Claims, security interests and Liens, and the payment of all fees referred to herein.

(h)     [Reserved].

(i)     There shall have been paid (i) to the Administrative Agent and the DIP Lenders all fees and expenses owed to the Administrative Agent and the DIP Lenders hereunder and (ii) all fees due and owing under the Fee Letter, in each case that are required hereunder or thereunder to be paid on or before the date of the requested Credit Extension.

(j)     At all times on or prior to the requested Credit Extension, the Borrower shall have operated in all material respects in accordance with the Agreed Budget.

Each Request for Credit Extension (other than a Loan Notice requesting only a conversion or a continuation of Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 5.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

**5.03    Term of Agreement; Extension of Maturity Date.**

(a)     This DIP Loan Agreement shall continue in full force and effect for a term ending on the earliest to occur of (i) the Maturity Date, (ii) the effective date of a reorganization plan in the Bankruptcy Cases, or (iii) the date that all of the Loans and other Obligations hereunder and under the DIP Loan Documents are paid in full by the Loan Parties and Fully Satisfied, unless terminated earlier in accordance with the terms of this DIP Loan Agreement.

(b)     The Borrower may, with the prior written approval of the Super-Majority DIP Lenders, elect to extend the Initial Maturity Date to the Extended Maturity Date.

**5.04    Effect of Termination.**

On the date of termination of this DIP Loan Agreement, all Obligations immediately shall become due and payable without notice or demand. No termination of this DIP Loan Agreement, however, shall relieve or discharge the Loan Parties of their respective duties, Obligations, or covenants hereunder or under any other DIP Loan Document, and the Administrative Agent's and DIP Lenders' Liens in the Collateral shall remain in effect until all Obligations have been Fully Satisfied.

# ARTICLE VI
# REPRESENTATIONS AND WARRANTIES

In order to induce the DIP Lenders to enter into this DIP Loan Agreement, each Loan Party makes the following representations and warranties to the DIP Lenders which shall be true, correct and complete in all material respects as of the date hereof, and shall be true, correct and complete in all material respects as of the Closing Date and at and as of the date of each Credit Extension hereunder as though made on and as of the date of such Credit Extension (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) and such representations and warranties shall survive the execution and delivery of this DIP Loan Agreement. The Loan Parties represent and warrant to the Administrative Agent and the DIP Lenders that:

## 6.01    Existence, Qualification and Power; Compliance with Laws.

Subject to the entry of the Interim Order or the Final Order, as applicable, each Loan Party (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the DIP Loan Documents, if any, to which it is a party and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

## 6.02    Authorization.

Subject to the entry of the Interim Order or Final Order, as applicable, the execution, delivery and performance by each Loan Party of each DIP Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or result in or require the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the Property of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law (including, without limitation, Regulation U or Regulation X issued by the FRB).

## 6.03    Governmental Authorization; Other Consents.

No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of any DIP Loan Document, except for the approval of the Bankruptcy Court in the Interim Order or the

Final Order, as applicable (neither of which shall have been (i) stayed, vacated, reversed or rescinded, or (ii) without the prior written consent of the Administrative Agent, each Co-Agent and the Required DIP Lenders, in their sole discretion, amended or modified), and such other consents or approvals that have been obtained and that are still in force and effect.

**6.04    Binding Effect.**

Each DIP Loan Document has been duly executed and delivered by each Loan Party that is party thereto. Upon entry of the Interim Order (and, as applicable, the Final Order), each DIP Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against such Loan Party in accordance with its terms.

**6.05    Financial Statements; No Material Adverse Effect.**

(a)    The unaudited consolidated financial statements for the fiscal year ended December 31, 2008 that have been delivered by the Loan Parties to the Administrative Agent and the DIP Lenders have been prepared in accordance with GAAP and are fairly stated in all material respects; _provided_, that such financial statements are subject to an ongoing analysis and review of impairments with the Borrower's auditors which may result in a material impact on reported asset values.

(b)    No material adverse change in the operations, business, properties, assets, prospects or condition (financial or otherwise) of the Parent and its consolidated subsidiaries, taken as a whole has occurred from that set forth in the unaudited consolidated financial statements for the fiscal year ended December 31, 2008, other than those which have been previously disclosed to the Administrative Agent and the Co-Agents in writing on or before the Closing Date.

**6.06    Litigation.**

Other than as set forth on Schedule 6.06 or as may occur directly in connection with the entry of the Interim Order and the Final Order or have been stayed by the filing of the Bankruptcy Cases, there are no material actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of its properties or revenues that (a) purport to affect or pertain to any of the DIP Loan Documents, or any of the transactions contemplated thereby, or any of the DIP Lenders' remedies hereunder, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

**6.07    Ownership of Property; Liens.**

Each Loan Party has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Properties, and good and indefeasible title to, or valid leasehold interest in, all personal Property, necessary or used in the ordinary conduct of its business. Other than Permitted Liens, no Lien exists with respect to any Real Property or personal Property or other

assets of the Loan Parties. The Administrative Agent's and the DIP Lenders' Liens are validly created, perfected and first priority Liens, subject only to (i) valid, enforceable and unavoidable Permitted Liens under Section 8.01(a) through (p), and (ii) the Carve-Out.

**6.08    Environmental Compliance.**

Except as set forth on Schedule 6.08 or in each case where the existence and/or occurrence of any of the following could not reasonably be expected to have a Material Adverse Effect:

(a)    Each of the Real Properties and all operations at the Real Properties are in compliance with all applicable Environmental Laws, and there is no violation of any Environmental Law with respect to the Real Properties or the Businesses.

(b)    None of the Real Properties contains, or to the knowledge of the Responsible Officers of the Loan Parties has previously contained, any Hazardous Materials at, on or under the Real Properties in amounts or concentrations that constitute or constituted a violation of, or could give rise to liability under, Environmental Laws.

(c)    No Loan Party has received any written notice of, or inquiry from any Governmental Authority regarding, any violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Real Properties or the Businesses, except for such notice or inquiry that has been fully and finally adjudicated, withdrawn, settled or otherwise resolved; nor does any Responsible Officer of any Loan Party have knowledge or reason to believe that any such notice will be received or is being threatened.

(d)    Hazardous Materials have not been transported or disposed of from the Real Properties, or generated, treated, stored or disposed of at, on or under any of the Real Properties or any other location, in each case by or on behalf of any Loan Party in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law.

(e)    No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Responsible Officers of the Loan Parties, threatened, under any Environmental Law to which any Loan Party is or will be named as a party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Loan Parties, the Real Properties or the Businesses.

(f)    During any Loan Party's period of ownership or lease (with respect to real Property previously owned or operated by any Loan Party) or, to the knowledge of the Responsible Officers of the Loan Parties, at any time (with respect to real Property currently owned or operated by any Loan Party), there has been no release, or threat of release, of Hazardous Materials at or from the Real Properties, or arising from or related to the operations (including, without limitation, disposal) of any Loan Party in connection with the Real Properties or otherwise in connection with the Businesses, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws.

**6.09   Insurance.**

All of the tangible Property of the Borrower is insured with financially sound and reputable insurance companies that are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar Property in localities where the Loan Parties operate.

**6.10   Taxes.**

The Loan Parties have filed all Federal income tax returns and all other material Federal, state and other tax returns and reports required to be filed, and have paid all Federal income taxes and all other material Federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (i) when a non-payment is permitted by the Bankruptcy Code or (ii) with respect to those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. To the best knowledge of the Borrower, there is no proposed tax assessment against the Borrower or any Guarantor that would, if made, have a Material Adverse Effect. No Loan Party is party to any tax sharing agreement.

**6.11   ERISA Compliance.**

(a)     Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (i) each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws; (ii) each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently pending before the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred that would prevent, or cause the loss of, such qualification; and (iii) the Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)     Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (i) there are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan; and (ii) there has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c)     Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects

to incur, any liability (and no event has occurred that, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

**6.12    Capital Structure/Subsidiaries.**

As of the Closing Date, the corporate capital and ownership structure of the Parent and its Subsidiaries is as described in Schedule 6.12(a). Set forth on Schedule 6.12(b) is a complete and accurate list with respect to each of the direct and indirect Subsidiaries of the Parent of (i) jurisdiction of organization, (ii) number of ownership interests (if expressed in units or shares) of each class of Capital Stock outstanding, (iii) number and percentage of outstanding ownership interests (if expressed in units or shares) of each class owned (directly or indirectly) by the Parent and/or its Subsidiaries and (iv) all outstanding options, warrants, rights of conversion or purchase and all other similar rights with respect thereto as of the Closing Date. The outstanding Capital Stock of each such Person is, to the extent applicable depending on the organizational nature of such Person, validly issued, fully paid and non assessable and is owned by the Parent, the Borrower or a Subsidiary thereof (as applicable), directly or indirectly, in the manner set forth on Schedule 6.12(b), free and clear of all Liens (other than Permitted Liens or, in the case of the Capital Stock of the Loan Parties, statutory Liens or Liens arising under or contemplated in connection with the DIP Loan Documents). Other than as set forth in Schedule 6.12(b), no Loan Party has outstanding any securities convertible into or exchangeable for its Capital Stock nor does any such Person have outstanding any rights to subscribe for or to purchase or any options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to its Capital Stock. Set forth on Schedule 6.12(c) is a complete and accurate list of all Non-Guarantor Affiliates as of the Closing Date.

**6.13    Margin Regulations; Investment Company Act.**

(a)    None of the Loan Parties is engaged in, nor will any of the Loan Parties engage in, principally or as one of its important activities, the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    None of the Loan Parties (i) is or is required to be registered as an "investment company" under the Investment Company Act of 1940 or (ii) is subject to regulation under any other Law which limits its ability to incur Indebtedness.

**6.14    Disclosure.**

Each Loan Party has disclosed to the Administrative Agent and the DIP Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information (a)

prepared by or at the request of any Loan Party or (b) to such Loan Party's knowledge, otherwise furnished (whether in writing or orally) by or on behalf of such Loan Party, in each case to the Administrative Agent or any DIP Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other DIP Loan Document pursuant to a provision of any DIP Loan Document or pursuant to a specific request from the Administrative Agent (or any DIP Lender through the Administrative Agent) in accordance with the DIP Loan Documents (in each case, as modified or supplemented by other information so furnished), when taken as a whole, contains any misstatement of material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that (i) with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time and (ii) with respect to reports, financial statements, certificates and other information that was not prepared at the request of any Loan Party, the Loan Parties represent only that they are not aware that such materials contain any material misstatements of fact or material omissions.

### 6.15    Compliance with Laws.

Each Loan Party is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its Properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. After giving effect to the funding of each requested Credit Extension, the use of the proceeds thereof by the Borrower will not violate any applicable Laws or regulations.

### 6.16    Intellectual Property.

Each Loan Party owns, or has the legal right to use, all material trademarks, service marks, trade names, trade dress, patents, copyrights, technology, know-how and processes (the "Intellectual Property") reasonably necessary for each of them to conduct its business as currently conducted. Set forth on Schedule 6.16 is a list of all Intellectual Property registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office and owned by each Loan Party or that any Loan Party has the exclusive right to use. Except as set forth on Schedule 6.16, no written claim has been received by any Loan Party and currently is pending by any Person challenging the use of, or the validity or effectiveness of, the Intellectual Property owned by such Loan Party under applicable Law, nor does any Loan Party know of any such claim, and, to the knowledge of the Responsible Officers of the Loan Parties, the use of the Intellectual Property by any Loan Party or the granting of a right or a license in respect of the Intellectual Property from any Loan Party does not infringe on the rights of any Person, except for such claims and infringements that, in the aggregate, would not reasonably be expected to have a Material Adverse Effect. As of the Closing Date, none of the Intellectual Property used by the Loan Parties is subject to any exclusive licensing agreement or similar arrangement except as set forth on Schedule 6.16.

### 6.17   Collateral Documents; Nature of Obligations.

The provisions of the Collateral Documents, taken together with the Interim Order, and as applicable the Final Order, are effective to create in favor of the Administrative Agent for the benefit of the DIP Lenders and any other secured parties identified therein, a legal, valid and enforceable first priority (subject to Permitted Liens under Section 8.01(a) through (p)) Lien or security interest in all right, title and interest of the Loan Parties in the Collateral and all proceeds thereof. Pursuant to the terms of the Interim Order and the Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.

### 6.18   Investments.

None of the Loan Parties holds any Investments other than Permitted Investments.

### 6.19   Business Locations.

Set forth on Schedule 6.19(a) is a list of all Real Properties located in the United States that are owned or leased by the Loan Parties as of the Closing Date. Set forth on Schedule 6.19(b) is the chief executive office, jurisdiction of incorporation or formation and principal place of business of each Loan Party as of the Closing Date.

### 6.20   Brokers' Fees.

No Loan Party has any obligation to any Person in respect of any finder's, broker's, investment banking or other similar fee in connection with any of the transactions contemplated under the DIP Loan Documents.

### 6.21   Labor Matters.

There are no collective bargaining agreements or Multiemployer Plans covering the employees of a Loan Party as of the Closing Date, there are no labor controversies pending or threatened against any of the Loan Parties that could reasonably be expected to have a Material Adverse Effect, and none of the Loan Parties has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five years.

### 6.22   Representations and Warranties from Other DIP Loan Documents.

Each of the representations and warranties made by any of the Loan Parties in any of the other DIP Loan Documents is true and correct in all material respects.

### 6.23   Agreed Budget; Use of Proceeds.

A true and complete copy of the initial Agreed Budget has been furnished to the Administrative Agent and the Co-Agents, and has been made available to the DIP Lenders by the Administrative Agent. The proceeds of the DIP Loans will be used solely (i) for working capital and other general corporate purposes of the Loan Parties including the payment of professional

fees and expenses, (ii) to pay the fees and expenses of the Administrative Agent, the Co-Agents and the DIP Lenders, (iii) to pay claims in respect of certain pre-petition creditors, including but not limited to employees, taxing authorities and trade vendors in the ordinary course, in each case, to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the Administrative Agent, each Co-Agent and the Required DIP Lenders, (iv) to refinance obligations arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Loan Parties by any Pre-Petition Secured Lender, in each case in accordance with the Agreed Budget, and (v) for such other purposes as are expressly permitted hereunder and as are in accordance with the Agreed Budget.

**6.24**    **Compliance with Requirements of Interim Order and Final Order.**

The Loan Parties are in compliance in all material respects with the terms and conditions of the Interim Order or the Final Order, as applicable, including, without limitation, the provision of adequate protection to the Pre-Petition Secured Lenders as required therein.

**ARTICLE VII**
**AFFIRMATIVE COVENANTS**

So long as any DIP Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall not be Fully Satisfied, or any Letter of Credit shall remain outstanding, each Loan Party shall:

**7.01**    **Financial Statements.**

Deliver to the Administrative Agent (for itself and each DIP Lender), in form and detail satisfactory to the Required DIP Lenders:

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of the Loan Parties, a consolidated balance sheet of the Loan Parties as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, all in reasonable detail and certified by the chief executive officer or the chief financial officer of the Borrower as fairly presenting the financial condition of the Loan Parties in accordance with GAAP and subject to an ongoing analysis and review of impairments with the Borrower's auditors which may result in a material impact on reported asset values;

(b)    as soon as available, but in any event within 30 days after the end of each fiscal quarter of each fiscal year of the Guarantor, a consolidated balance sheet of the Loan Parties as at the end of such fiscal quarter, and the related consolidated statements of income or operations and a consolidated statement of cash flows for such fiscal quarter and for the portion of the Loan Parties' fiscal year then ended, setting forth in each case in

comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year (other than balance sheet information), all in reasonable detail, such statements to be certified by the chief executive officer or the chief financial officer of the Borrower as fairly presenting the financial condition, results of operations and cash flows of the Loan Parties in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and also subject to an ongoing analysis and review of impairments with the Borrower's auditors which may result in a material impact on reported asset values; and

(c)    as soon as available, but in any event no later than the fifteenth (15th) day of each calendar month (or no later than (i) the thirtieth (30th) calendar day of such month in the case of any month that is also the last month of a fiscal quarter (other than the last month of the fiscal year) or (ii) the ninetieth (90th) calendar day of such fiscal quarter in the case of any fiscal quarter that is also the last fiscal quarter of the fiscal year), a consolidated balance sheet of the Loan Parties as at the end of the prior fiscal month, and the related consolidated statement of income or operations and a consolidated statement of cash flows for such fiscal month and for the portion of the Loan Parties' fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding calendar month of the previous fiscal year and the corresponding portion of the previous fiscal year (other than balance sheet information), all in reasonable detail, such statements to be certified by the chief executive officer or the chief financial officer of the Borrower as fairly presenting the financial condition, results of operations and cash flows of the Loan Parties in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and also subject to an ongoing analysis and review of impairments with the Borrower's auditors which may result in a material impact on reported asset values.

As to any information contained in materials furnished pursuant to Section 7.02(g), the Loan Parties shall not be separately required to furnish such information under clause (a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Loan Parties to furnish the information and materials described in clauses (a) and (b) above at the times specified therein.

**7.02    Certificates; Other Information.**

Deliver to the Administrative Agent and each DIP Lender, in form and detail satisfactory to the Administrative Agent and the Required DIP Lenders:

(a)    concurrently with the delivery of the financial statements referred to in Sections 7.01(a) and (b), a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower;

(b)    by 5:00 p.m. New York time on the fourth Business Day of each week (i) cash balance calculations and (ii) a rolling 13-week cash flow projection (together with a comparison of actual receipts and disbursements to the corresponding projection from the prior week contained therein and explanations of any individual line item variances equal to or greater than 5% of such projected item, current through the last Business Day of the

prior calendar week), each in a form and in substance reasonably satisfactory to the Administrative Agent and each Co-Agent;

(c)     no later than the fifteenth (15th) calendar day of each month, a variance report in form and substance satisfactory to the Administrative Agent and each Co-Agent reflecting the actual cash receipts and disbursements for the prior month showing a reconciliation and the percentage variance of actual receipts and disbursements from those reflected in the Agreed Budget for such month (together with an explanation of each individual line item variance equal to or greater than 5% of such budgeted item);

(d)     concurrently with the delivery of the financial statements referred to in Section 7.01(c), a certificate containing information regarding the amount of all Dispositions reflected in such financial statements that occurred during the fiscal period;

(e)     promptly after the same are available, (i) copies of any detailed audit reports, management letters or written recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Borrower or Parent by independent accountants in connection with the accounts or books of the Parent, Borrower or any Subsidiary, or any audit of any of them, and (ii) upon the request of the Administrative Agent, all reports and written information to and from the United States Environmental Protection Agency, or any state or local agency responsible for environmental matters, the United States Occupational Health and Safety Administration, or any state or local agency responsible for health and safety matters, or any successor agencies or authorities concerning environmental, health or safety matters;

(f)     [Reserved];

(g)     with a copy to counsel for the Administrative Agent, copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of any of the Loan Parties with the Bankruptcy Court or distributed by or on behalf of any of the Loan Parties to any official committee appointed in any of the Bankruptcy Cases;

(h)     promptly, all written reports given by any of the Loan Parties to any official or unofficial creditors' committee in the Bankruptcy Cases; and

(i)     promptly, such additional information regarding the business, financial or corporate affairs of any Loan Party, or compliance with the terms of the DIP Loan Documents, as the Administrative Agent (or any DIP Lender through the Administrative Agent) may from time to time reasonably request.

Documents required to be delivered pursuant to Section 7.01(a), (b) or (c) or Section 7.02(i) may, but are not required to, be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Loan Parties post such documents, or provides a link thereto, on the Loan Parties' website on the Internet at the website address listed on Schedule 12.02; or (ii) on which such documents are posted on the Loan Parties' behalf on an

Internet or intranet website, if any, to which each DIP Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Loan Parties shall deliver paper copies of such documents to the Administrative Agent or any DIP Lender that requests the Loan Parties to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such DIP Lender and (ii) the Loan Parties shall notify the Administrative Agent and each DIP Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Loan Parties shall be required to provide paper copies of the Compliance Certificates required by Section 7.02(b) to the Administrative Agent for each of the DIP Lenders. Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each DIP Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that (a) the Administrative Agent and/or the Arranger will make available to the DIP Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Loan Party Materials") by posting the Loan Party Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the DIP Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Each Loan Party hereby agrees that (w) all Loan Party Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Loan Party Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger, the L/C Issuer and the DIP Lenders to treat such Loan Party Materials as not containing any material non-public information with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Loan Party Materials constitute Information, they shall be treated as set forth in Section 12.07); (y) all Loan Party Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Loan Party Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform that is not designated "Public Side Information."

**7.03    Notices and Information.**

(a)    Promptly notify the Administrative Agent of the occurrence of any Default or Event of Default and the nature thereof.

(b)    Promptly notify the Administrative Agent of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-

performance of, or any default under, a Contractual Obligation of any Loan Party arising after the Petition Date; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party and any Governmental Authority; (iii) the commencement of, or any material development in, any litigation or proceeding (other than in the Bankruptcy Cases) affecting any Loan Party, including pursuant to any applicable Environmental Laws; or (iv) any breach or non-performance by any of the Loan Parties under the Interim Order, the Final Order, or any other order of the Bankruptcy Court.

(c)     Promptly notify the Administrative Agent of the occurrence of any ERISA Event.

(d)     Promptly notify the Administrative Agent (who shall notify the other DIP Lenders) of any material change in accounting policies or financial reporting practices by any Loan Party.

(e)     Upon the reasonable written request of the Administrative Agent following the occurrence of any event or the discovery of any condition which the Administrative Agent or the Required DIP Lenders reasonably believe has caused (or could be reasonably expected to cause) the representations and warranties set forth in Section 6.08 to be untrue in any material respect, the Loan Parties will furnish or cause to be furnished to the Administrative Agent, at the Loan Parties' expense, a report of an environmental assessment of reasonable scope, form and depth, (including, where appropriate, invasive soil or groundwater sampling) by a consultant reasonably acceptable to the Administrative Agent as to the nature and extent of the presence of any Hazardous Materials on any Real Properties and as to the compliance by any Loan Party with Environmental Laws at such Real Properties. If the Loan Parties fail to deliver such an environmental report within seventy-five (75) days after receipt of such written request then the Administrative Agent may arrange for same, and the Loan Parties hereby grant to the Administrative Agent and its representatives access to the Real Properties to reasonably undertake such an assessment (including, where appropriate, invasive soil or groundwater sampling). The reasonable cost of any assessment arranged for by the Administrative Agent pursuant to this provision will be payable by the Loan Parties on demand and added to the Obligations.

Each notice pursuant to this Section 7.03(a) through (e) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 7.03(a) shall describe with particularity any and all provisions of this Agreement and any other DIP Loan Document that have been breached.

## 7.04   Payment of Obligations.

Pay and discharge as the same shall become due and payable, all its obligations and liabilities arising after the Petition Date, including (a) all Tax liabilities, assessments and governmental charges or levies upon it or any of its Property arising after the Petition Date, unless non-payment is permitted by the Bankruptcy Code or the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the applicable Loan Party; (b) all lawful claims arising after the Petition Date which, if unpaid, would by law become a Lien upon any portion of its Property;

and (c) all Indebtedness arising after the Petition Date, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

**7.05    Preservation of Existence, Etc.**

Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business; and (c) preserve or renew all of its registered copyrights, patents, trademarks, trade names and service marks, except, in the case of clauses (b) and (c), where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**7.06    Maintenance of Properties.**

Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear and Involuntary Dispositions excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities.

**7.07    Maintenance of Insurance.**

(a)    Maintain in full force and effect insurance (including worker's compensation insurance, liability insurance, property insurance and business interruption insurance) with insurance companies having an A.M. Best Rating of at least A- (that are not Affiliates of the Borrower) in such amounts, covering such risks and liabilities and with such deductibles or self-insurance retentions and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Parties operate. The Administrative Agent shall be named as additional insured (in the case of liability insurance) or loss payee or mortgagee, as its interest may appear (in the case of hazard insurance), with respect to any such insurance providing coverage in respect of any Collateral, and each provider of any such insurance shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Administrative Agent, that it will give the Administrative Agent thirty (30) days prior written notice before any such policy or policies shall lapse, be canceled or be terminated. At the request of the Administrative Agent, the Borrower will provide to the Administrative Agent a schedule showing the then-current insurance coverage of the Loan Parties, outlined as to carrier, policy number, expiration date, type and amount.

(b)    In the event that any Loan Party receives Net Cash Proceeds on account of any Involuntary Disposition, such Loan Party shall, within 120 days following the receipt thereof, apply (or cause to be applied) an amount equal to such Net Cash Proceeds to (i) repair or replace the Property subject to such Involuntary Disposition or (ii) cause the Loans to be pre-paid (and/or cause the L/C Obligations to be Cash Collateralized) in accordance with the terms of Section 2.04(b)(v)(B); provided, however, that such Person shall not undertake to repair or replace such Property unless no Default exists at such time. Pending final application thereof, the Loan Parties

may apply such Net Cash Proceeds to temporarily reduce the Revolving Loans. All insurance proceeds shall be subject to the security interest of the Administrative Agent (for the benefit of the DIP Lenders).

**7.08    Compliance with Laws.**

Comply with the requirements of all Laws (including without limitation ERISA and Environmental Laws), orders, writs, injunctions and decrees applicable to it or to its business or Property, except in such instances in which the failure to comply therewith, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**7.09    Books and Records.**

(a)    Maintain proper books of record and account, in which full, true and correct in all material respects entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Party; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Party.

**7.10    Inspection Rights.**

Permit representatives and independent contractors of the Administrative Agent or either Co-Agent (including, without limitation, financial advisors retained by or for the benefit of the Administrative Agent, either Co-Agent or the DIP Lenders) to visit and inspect any of its Properties, to conduct examinations of and to monitor any Collateral pledged to the Administrative Agent for the benefit of the DIP Lenders, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss the Agreed Budget and its affairs, finances and accounts with their directors, officers, and independent public accountants, all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when an Event of Default exists the Administrative Agent or the Co-Agents (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

**7.11    Pledged Assets; Collateral; Mortgage Instruments.**

(a)    Capital Stock. (i) Cause 100% of the issued and outstanding Capital Stock owned of record by the Parent, the Borrower or any other Loan Party with respect to each Domestic Subsidiary (whether direct or indirect) of the Parent, the Borrower or any Loan Party to be subject at all times to a first priority (subject only to Permitted Liens under Section 8.01(a) through (p)), perfected Lien in favor of the Administrative Agent pursuant to the terms and conditions of the Collateral Documents, the Interim Order, the Final Order, or such other security documents as the Administrative Agent shall reasonably request, and (ii) cause 65% of the issued and outstanding Capital Stock owned of record by the Parent, Borrower or any other Loan Party with respect to each First-Tier Foreign Subsidiary to be subject at all times to a first priority,

perfected Lien in favor of the Collateral Agent pursuant to the terms and conditions of the Collateral Documents or such other security documents as the Collateral Agent shall reasonably request, which such Lien shall, upon satisfaction of any filing or delivery requirements set forth in the Collateral Documents, be perfected; provided, that the requirement pursuant to clause (ii) for the pledge of not more than 65% of the Capital Stock in each such First-Tier Foreign Subsidiary is intended to avoid treatment of the undistributed earnings of a Foreign Subsidiary as a deemed dividend to its United States parent for United States federal income tax purposes and each of the Parent, Borrower or any Subsidiary shall pledge or cause to be pledged any greater percentage of its interest in a Foreign Subsidiary that (whether pursuant to existing Law or as the result of changes to, or clarifications of, existing Law after the date hereof) (x) would not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary to be treated as a deemed dividend to the United States parent of such Foreign Subsidiary, as determined for United States federal income tax purposes, and (y) would not otherwise reasonably be expected to result in material adverse tax consequences to such Foreign Subsidiary or its United States parent.

(b)     Other Assets.  (i) Cause all of the Collateral (including, without limitation, all owned and leased real and personal Property of each Loan Party) to be subject at all times to first priority (except in the case of Property subject to a Permitted Lien under Section 8.01(a) through (p)), perfected Liens in favor of the Administrative Agent to secure the Obligations pursuant to the terms and conditions hereof, the Collateral Documents, the Interim Order and the Final Order, and (ii) deliver such other documentation as the Administrative Agent may reasonably request in connection with the foregoing, including, without limitation, appropriate UCC-1 financing statements, certified resolutions and other organizational and authorizing documents of such Person, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to above and the perfection of the Administrative Agent's Liens thereunder) and other items of the types required to be delivered pursuant to Article IX, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(c)     Mortgage Instruments.  Without limiting the requirements of Section 7.11(b) or any other provision of this Agreement, at the request of the Administrative Agent, cause a Mortgage Instrument covering each of the Real Properties owned in fee by any Loan Party (and, if further requested by the Administrative Agent, covering each Real Property as to which any Loan Party is the tenant or lessee to the extent the consent of the lessor under the lease with respect to such Mortgage Instrument is not required) to be executed and delivered to the Administrative Agent within 90 days after the Closing Date (or any such later date that is acceptable to the Administrative Agent and each Co-Agent); provided, at any time, the Administrative Agent may, and at the request of the Administrative Agent the Borrower shall, in either case at the sole cost and expense of the Borrower, cause each such Mortgage Instrument (or any of them) to be recorded in the jurisdiction where the corresponding Real Properties identified therein are located and/or in such other jurisdictions as the Administrative Agent shall specify, whether or not the recording of any such Mortgage Instrument in such jurisdiction is necessary to perfect the Liens of the Administrative Agent in the Real Properties described therein.

**7.12    Treasury Management; Deposit and Investment Accounts.**

(a)    At all times during the term hereof, cause all of their primary operating accounts to be held with the Administrative Agent and comply with all Treasury Management Agreements.

(b)    To the extent required by the Administrative Agent or if a Default or Event of Default shall have occurred and is continuing, cause all cash, Cash Equivalents and investment property (other than accounts of any Loan Party established for the purpose of holding segregated security deposits or other deposits on behalf of third parties (tenants, etc.)) to be held in deposit accounts or securities accounts subject to control agreements providing the Administrative Agent with the right to direct the disposition of funds upon an Event of Default and otherwise in form and substance satisfactory to the Administrative Agent; provided that, so long as no Default or Event of Default shall have occurred and is then continuing, the Loan Parties will not be required to obtain such agreements with respect to one or more deposit or securities accounts so long as the aggregate balance of funds on deposit in such accounts at any one time (and for a period of two (2) consecutive Business Days) does not exceed $100,000 (determined after deduction of unpresented checks in accordance with GAAP).

(c)    To the extent that, at any one time (and for a period in excess of five (5) days), the Loan Parties have on deposit in any one or more deposit accounts that are not subject to any control agreement in favor of the Administrative Agent net cash balances in excess of $100,000 in the aggregate (determined after deduction of unpresented checks in accordance with GAAP), transfer such excess cash to a deposit account that is subject to a control agreement in favor of the Administrative Agent by the close of business on the following Business Day.

**7.13    Compliance with Interim Order and Final Order.**

Comply with the Interim Order and the Final Order, as applicable, and each of the other orders entered by the Bankruptcy Court.

**7.14    [Reserved].**

**7.15    Milestones for Reorganization Plan.**

File an Acceptable Plan with the Bankruptcy Court within 240 days after the Petition Date.

**7.16    Chief Restructuring Officer.**

At all times, retain and utilize the current chief restructuring officer (or such other Person acceptable to the Required DIP Lenders), on the terms and conditions contemplated on the Closing Date, whose retention shall be (or shall have been) approved by the Bankruptcy Court within 45 days after the Petition Date.

**7.17    Operate Within Agreed Budget.**

At all times, operate in accordance with the Agreed Budget in all material respects.

**ARTICLE VIII**
**NEGATIVE COVENANTS**

So long as any DIP Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall not be Fully Satisfied, or any Letter of Credit shall remain outstanding, no Loan Party shall, directly or indirectly:

**8.01    Liens.**

Except for (i) Liens in favor of the Administrative Agent and the DIP Lenders arising pursuant to the DIP Loan Documents, the Interim Order or the Final Order, and (ii) Liens in favor of the Pre-Petition Secured Lenders arising in connection with the Pre-Petition Credit Agreement (including, without limitation, replacement liens granted pursuant to the Interim Order and the Final Order), create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, other than the following:

(a)      Liens existing on the Petition Date and listed on Schedule 8.01;

(b)      Liens (other than Liens imposed under ERISA) for Taxes, assessments or governmental charges, levies or other similar amounts (i) that are not yet due, (ii) which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) with respect to which the applicable Loan Party has made adequate payment with respect to the underlying obligation to release such Lien and is awaiting release of such Lien;

(c)      statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business, provided that such Liens secure only amounts not yet due and payable or, if due and payable, are unfiled and no other action has been taken to enforce the same or are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established;

(d)      pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(e)      deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course

of business, in an aggregate amount outstanding at any one time not in excess of $500,000;

(f)     easements, rights-of-way, restrictions and other similar encumbrances affecting Real Property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(g)     Liens securing judgments for the payment of money not constituting an Event of Default;

(h)     leases or subleases granted to others in the ordinary course of business or not otherwise interfering in any material respect with the business of any Loan Party;

(i)     any interest of title of a lessor under, and Liens arising from UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, capital leases existing as of the Petition Date or as otherwise permitted by this Agreement;

(j)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(k)     normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(l)     Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection;

(m)     Liens of sellers of goods to the Borrower arising under Article 2 of the UCC or similar provisions of applicable law in the ordinary course of business, covering only the goods sold and securing only the unpaid purchase price for such goods and related expenses;

(n)     Liens arising prior to the Petition Date in connection with CDD Indebtedness;

(o)     Liens to secure the obligations of the Borrower or the Guarantors under any contract pursuant to which the Person receiving the Lien is or will be making progress payments to the Borrower or the Guarantors, provided, that the aggregate fair market value of the Property subject to such progress payment Liens does not exceed $500,000 at any time;

(p)     deposits made with utilities pursuant to any order of the Bankruptcy Court, provided that the aggregate amount of such deposits shall not exceed $500,000 at any time;

(q)    Liens junior to the Liens in favor of the Administrative Agent for the benefit of the DIP Lenders that are granted by the Interim Order or the Final Order pursuant to 11 U.S.C. §364(d)(1) of the Bankruptcy Code as adequate protection to the Pre-Petition Secured Lenders; provided, such junior Liens shall only be permitted to the extent that the Interim Order and the Final Order (if such Final Order has then been entered) continue to provide that the holders of such junior liens shall not be permitted to take any action to foreclose their rights with respect to such junior liens as long as any Obligations are outstanding hereunder or the DIP Lenders have any Commitments hereunder.

## 8.02    Investments.

Make any Investments, except (without duplication):

(a)    Investments held by the Borrower or any other Loan Party in the form of Cash Equivalents;

(b)    Investments existing as of the Petition Date and set forth in Schedule 8.02;

(c)    Guarantees constituting Indebtedness permitted by Section 8.03, to the extent such Guarantees also constitute Investments;

(d)    To the extent included in the Agreed Budget (but without duplication), (i) Investments by the Loan Parties in Non-Guarantor Affiliates (other than Investments in Subject Subsidiaries and excluding Investments constituting Club Subsidies or HOA/POA Deficit Funding) that provide support or other necessary services to one or more of the Loan Parties in the ordinary course of such Loan Parties' business, in an aggregate amount not to exceed $5,000,000, (ii) Investments constituting Club Subsidies and HOA/POA Deficit Funding in an aggregate amount not to exceed $6,000,000, and (iii) Investments by the Loan Parties in Subject Subsidiaries, in an aggregate amount not to exceed $2,000,000;

(e)    Investments consisting of Seller Financing in an aggregate principal amount not to exceed $10,000,000; and

(f)    Other Investments provided for and disclosed in the Agreed Budget, provided that no such Investments shall be made if immediately prior to making such Investment, or after giving effect thereto, there shall exist an Event of Default which is continuing.

Without limiting the foregoing, no Loan Party shall form or acquire any Subsidiary after the Petition Date.

### 8.03  Indebtedness.

Create, incur, assume or suffer to exist any Indebtedness (including any Guarantee with respect to any Indebtedness), except:

(a)  Indebtedness under the DIP Loan Documents;

(b)  Indebtedness of the Loan Parties outstanding on the Petition Date and set forth in Schedule 8.03 (including, without limitation, existing Capital Leases, existing CDD Indebtedness, and existing Indebtedness that (i) is Non-Recourse Indebtedness with respect to all Persons other than the single-purpose entity holding such Indebtedness related to Real Properties that are either (A) owned by a Loan Party (but only to the extent such Non-Recourse Indebtedness constitutes a construction or development loan with respect to such Property) or (B) owned by Persons other than a Loan Party; and (ii) constitutes completion, interest carry or standard parent recourse carve-out guaranties with respect to (A) financing provided by creditors of Affiliates of the Borrower or any of its Subsidiaries that are not Loan Parties, (B) Indebtedness described under subclause (i) above, or (C) other Indebtedness set forth on Schedule 8.03); and

(c)  indebtedness owed to depositary banks or any of their banking affiliates in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house transfers of funds, including under any Treasury Management Agreement.

### 8.04  Fundamental Changes.

Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person other than in a Permitted Disposition.

### 8.05  Dispositions.

Make any Disposition other than a Permitted Disposition; provided, that notwithstanding any provision herein or in any other DIP Loan Document to the contrary, if a Default or Event of Default shall have occurred and then be continuing, no Loan Party shall make or consummate any Disposition without the written consent of the Required DIP Lenders.

### 8.06  Restricted Payments.

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

**8.07    Change in Nature of Business.**

Modify or alter in any material manner the nature and type of business of the Loan Parties as of the Closing Date, or engage in any material line of business substantially different from those lines of business conducted by the Loan Parties on the Closing Date, except for changes resulting from Dispositions permitted hereunder and except as required by the Bankruptcy Code.

**8.08    Transactions with Affiliates and Insiders.**

Directly or indirectly enter into or permit to exist any material transaction or series of transactions between any Loan Party and any Non-Guarantor Affiliate, except for transactions that are entered into in the ordinary course of such Loan Party's business in good faith and upon fair and reasonable terms as provided for in the Agreed Budget, or enter into any transaction with the holder of any Capital Stock of any Loan Party other than transactions that are entered into in good faith and upon fair and reasonable terms, which terms are substantially as favorable to such Loan Party as would be obtainable in a comparable arm's-length transaction with a Person other than a holder of any Capital Stock of any Loan Party.

**8.09    Transactions Affecting Collateral or Obligations.**

Enter into any transaction or Contractual Obligation subsequent to the Petition Date which could be reasonably expected to have a Material Adverse Effect.

**8.10    Use of Proceeds.**

Use the proceeds of the Loans for any purpose other than (a) for working capital and other general corporate purposes of the Loan Parties including the payment of professional fees and expenses, (b) to make adequate protection payments to any Person, to the extent required under the Interim Order and/or the Final Order, (c) to pay the fees and expenses of the Administrative Agent, the Co-Agents and the DIP Lenders, (d) to pay claims in respect of certain pre-petition creditors, including but not limited to employees, taxing authorities and trade vendors in the ordinary course, in each case, to the extent authorized by orders of the Bankruptcy Court acceptable to the Administrative Agent, each Co-Agent and the Required DIP Lenders, and (e) to refinance obligations arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Loan Parties by any Pre-Petition Secured Lender, in each case in accordance with the Agreed Budget.

**8.11    Chapter 11 Claims.**

Incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim, or other Super-Priority Claim or lien which is *pari passu* with or senior to the claims or liens, as the case may be, of the Administrative Agent and the DIP Lenders against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority so to do, except for the Carve-Out and the Permitted Liens under Section 8.01(a) through (p).

**8.12**  **[Reserved.]**

**8.13**  **Amendment and Prepayment of Other Indebtedness.**

(a)  Except in connection with a confirmed plan of reorganization in these Bankruptcy Cases, amend or modify any of the terms of any Indebtedness of any of the Loan Parties arising prior to or after the Petition Date, if such amendment or modification would add or change any terms in a manner adverse to the Loan Parties or the DIP Lenders, or shorten the final maturity or average life to maturity or require any payment to be made sooner than originally scheduled or increase the interest rate applicable thereto; or

(b)  make any payment of any Indebtedness arising prior to the Petition Date except as permitted pursuant to an order of the Bankruptcy Court and set forth in the Agreed Budget or make any voluntary, optional or other non-scheduled payment (the "buyout" price at the end of the term of any Capital Lease or Synthetic Lease being treated hereunder as scheduled), prepayment, redemption, acquisition for value, refund, refinance or exchange of any Indebtedness of such Loan Party arising after the Petition Date (including, without limitation, any interest, premium or other amounts owing in respect thereof), in each case whether or not mandatory, except (i) with respect to Indebtedness under the DIP Loan Documents, or (ii) for payments made pursuant to the Interim Order or the Final Order and in each instance as set forth in the Agreed Budget.

**8.14**  **Organization Documents; Fiscal Year.**

Amend, modify or change its Organization Documents in a manner adverse to the rights of (a) the DIP Lenders or (b) change its fiscal year.

**8.15**  **Ownership of Subsidiaries; Limitations on Guarantors.**

Notwithstanding any other provisions of this Agreement to the contrary:

(a)  Permit any Person (other than the Parent) to own any Capital Stock of the Borrower;

(b)  Organize, create, acquire or permit to exist after the Petition Date any Subsidiaries of the Parent or the Borrower (other than the Loan Parties and the Non-Guarantor Affiliates); or

(c)  Permit Parent to (i) hold any assets or have any liabilities other than (A) the Capital Stock of the Borrower (in the case of the Parent), (B) the liabilities under the DIP Loan Documents and the Pre-Petition Credit Agreement, (C) tax liabilities in the ordinary course of business, (D) corporate, administrative and operating expenses in the ordinary course of business or (E) intercompany payables and receivables in connection with employee stock compensation plans or (ii) engage in any business other than (A) owning the Capital Stock of the Borrower and activities incidental or related thereto (in the case of the Parent), (B) acting as a Guarantor hereunder and pledging its assets to the Administrative

Agent, for the benefit of the DIP Lenders, pursuant to the Collateral Documents to which it is a party and (C) Guaranteeing the Borrower's obligations under the Pre-Petition Credit Agreement and pledging its assets in support of such respective guaranty obligations.

**8.16   Sale Leasebacks.**

Enter into any Sale and Leaseback Transaction.

**8.17   Operating Lease Obligations.**

Enter into any obligations after the Petition Date for the payment of rental under Operating Leases other than in the ordinary course of business of the Loan Parties.

**8.18   Assumption of Executory Contracts and Unexpired Leases.**

Assume any executory contracts (as defined in the Bankruptcy Code) or unexpired leases, or file any motion or pleading to assume such contracts or leases that either (a) are outside of the ordinary course of business of the Loan Parties, or (b) would (if breached) result in a claim entitled to administrative priority in the Bankruptcy Cases in an amount greater than $1,000,000, without the prior written consent of the Required DIP Lenders.

**8.19   Cumulative Net Operating Cash Flow.**

Permit, on a consolidated basis, Cumulative Net Operating Cash Flow of the Borrower and its Subsidiaries to be less than the following amounts measured as of the last day of each of the following respective periods:

| Period | Minimum Cumulative Net Operating Cash Flow (negative) |
|---|---|
| From June 15, 2009 to August 2, 2009 | ($22,731,000) |
| From June 15, 2009 to September 6, 2009 | ($33,909,000) |
| From June 15, 2009 to October 4, 2009 | ($46,305,000) |
| From June 15, 2009 to November 1, 2009 | ($55,451,000) |
| From June 15, 2009 to December 6, 2009 | ($67,902,000) |
| From June 15, 2009 to January 3, 2010 | ($82,594,000) |
| From June 15, 2009 to January 31, 2010 | ($95,933,000) |
| From June 15, 2009 to February 28, 2010 | ($107,502,000) |

| From June 15, 2009 to April 4, 2010 | ($116,779,000) |
| From June 15, 2009 to May 2, 2010 | ($129,554,000) |
| From June 15, 2009 to June 6, 2010 | ($139,328,000) |
| From June 15, 2009 to July 4, 2010 | ($150,333,000) |

**[AMOUNTS SUBJECT TO CONFIRMATION BY FINANCIAL ADVISORS AND BUSINESS REPRESENTATIVES]**

8.20    <u>Cumulative Total Disbursements; Cumulative Total Hard Costs</u>.

(a)    Permit, on a consolidated basis, Cumulative Total Disbursements of the Borrower and its Subsidiaries to exceed the following amounts measured as of the last day of each of the following respective periods:

| Period | Maximum Cumulative Total Disbursements |
|---|---|
| From June 15, 2009 to August 2, 2009 | $32,212,000 |
| From June 15, 2009 to September 6, 2009 | $42,405,000 |
| From June 15, 2009 to October 4, 2009 | $54,412,000 |
| From June 15, 2009 to November 1, 2009 | $67,568,000 |
| From June 15, 2009 to December 6, 2009 | $79,707,000 |
| From June 15, 2009 to January 3, 2010 | $94,343,000 |
| From June 15, 2009 to January 31, 2010 | $110,517,000 |
| From June 15, 2009 to February 28, 2010 | $123,856,000 |
| From June 15, 2009 to April 4, 2010 | $138,330,000 |
| From June 15, 2009 to May 2, 2010 | $151,517,000 |
| From June 15, 2009 to June 6, 2010 | $162,239,000 |
| From June 15, 2009 to July 4, 2010 | $177,664,000 |

(b)     Permit, on a consolidated basis, Cumulative Total Hard Costs of the Borrower and its Subsidiaries to exceed the following amounts measured as of the last day of each of the following respective periods:

| Period | Maximum Cumulative Total Hard Costs |
|---|---|
| From June 15, 2009 to October 4, 2009 | $10,330,000 |
| From June 15, 2009 to January 3, 2010 | $18,931,000 |
| From June 15, 2009 to April 4, 2010 | $37,191,000 |
| From June 15, 2009 to July 4, 2010 | $49,235,000 |

[AMOUNTS SUBJECT TO CONFIRMATION BY FINANCIAL ADVISORS AND BUSINESS REPRESENTATIVES]

**8.21    Revision of Orders.**

Neither the Borrower nor any Guarantor shall at any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim Order or the Final Order except for any modifications and amendments agreed to in writing by Administrative Agent.

**8.22    Use of Cash.**

Use any cash, cash collateral, net cash proceeds from asset sales or the proceeds of any Loan in a manner other than as expressly permitted herein and consistent with the Agreed Budget, or incur or make any other expenditures, outside of the ordinary course of business.

**8.23    Cash and Cash Equivalents.**

At any time during which the aggregate Outstanding Amount of Revolving Loans is greater than zero ($0), permit Borrower or any of the Loan Parties to hold, individually or collectively, net cash and Cash Equivalents (other than restricted cash) in an aggregate amount of more than $25,000,000 for more than three (3) consecutive Business Days. Borrower shall not request any Revolving Loans if, after giving effect to such Revolving Loans, Borrower's and its Subsidiaries' net cash or Cash Equivalents would exceed $25,000,000.

# ARTICLE IX
# COLLATERAL

**9.01**   **Grant of Liens and Security Interests.**

To secure each of its respective Obligations under this Agreement and each other DIP Loan Document, each Loan Party hereby unconditionally grants, assigns, and pledges to the DIP Agent, for the ratable benefit of the DIP Lenders, valid, continuing, enforceable and fully perfected (i) first priority liens and security interests in accordance with Section 364(c)(2) of the Bankruptcy Code in all of such Loan Party's personal property and Real Property which was unencumbered by any Liens as of the Petition Date, (ii) junior liens and security interests in accordance with Section 364(c)(3) of the Bankruptcy Code in all of such Loan Party's personal property and Real Property subject in priority only to the Permitted Liens under Section 8.01(a) through (p) existing thereon as of the Petition Date, and (iii) first priority, senior, priming liens and security interests in accordance with Section 364(d)(1) of the Bankruptcy Code in all such Loan Party's personal property and all Real Property which was encumbered by Liens in favor of the Pre-Petition Secured Lenders as of the Petition Date, in each case whether now owned or hereafter acquired or arising and wherever located, including, without limitation, such Loan Party's right, title and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located:

(a)   all of such Loan Party's Accounts;

(b)   all of such Loan Party's books and records (including all of its records indicating, summarizing or evidencing its assets (including the Collateral) or liabilities, all of its records relating to its business operations or financial condition, and all of its goods or General Intangibles related to such information)("Books");

(c)   all of such Loan Party's Chattel Paper and, in any event, including, without limitation, tangible chattel paper and electronic chattel paper;

(d)   all of such Loan Party's interest with respect to any Deposit Account;

(e)   all of such Loan Party's Equipment and fixtures;

(f)   all of such Loan Party's Inventory;

(g)   all of such Loan Party's Investment Property;

(h)   all of such Loan Party's letter of credit rights, instruments, promissory notes, drafts and documents;

(i)   all of such Loan Party's General Intangibles;

(j)   all of such Loan Party's rights in respect of Supporting Obligations, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments, or Investment Related Property;

(k)     all of such Loan Party's interest with respect to any Commercial Tort Claims;

(l)     all of such Loan Party's interest in the Intellectual Property;

(m)     all of such Loan Party's right, title and interest in all owned or leased Real Properties;

(n)     (i) One hundred percent (100%) (or, if less, the full amount owned by such Loan Party) of the issued and outstanding Capital Stock owned by such Loan Party of each Domestic Subsidiary set forth on Schedule 6.12(b) attached hereto (which represents all Capital Stock held by such Loan Party in any Domestic Subsidiaries of the Borrower) and (ii) sixty-five percent (65%) (or, if less, the full amount owned by such Loan Party) of the issued and outstanding shares of Capital Stock entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) ("Voting Equity") and one hundred percent (100%) (or, if less, the full amount owned by such Loan Party) of the issued and outstanding Capital Stock not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) ("Non-Voting Equity") owned by such Loan Party of each Foreign Subsidiary of the Borrower set forth on Schedule 6.12(b) attached hereto (which represents all Capital Stock held by such Loan Party in any Foreign Subsidiaries of the Borrower), in each case together with the certificates (or other agreements or instruments), if any, representing such Capital Stock, and all options and other rights, contractual or otherwise, with respect thereto (collectively, together with the Capital Stock described in Section 9.01(o) below, the "Pledged Shares"), including the following:

(A)     all shares, securities, membership interests or other equity interests representing a dividend on any of the Pledged Shares, or representing a distribution or return of capital upon or in respect of the Pledged Shares, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder of, or otherwise in respect of, the Pledged Shares; and

(B)     without affecting the obligations of the Loan Parties under any provision prohibiting such action hereunder, in the event of any consolidation or merger involving the issuer of any Pledged Shares and in which such issuer is not the surviving entity, all Capital Stock (in the applicable percentage specified in this Section 9.01(n) above) of the successor entity formed by or resulting from such consolidation or merger.

Notwithstanding the foregoing, the Pledged Shares shall not include any Capital Stock in a Joint Venture to the extent that the terms and provisions of a written agreement, document or instrument in effect on the date hereof creating or evidencing such property or any rights relating thereto expressly prohibit the granting of a security interest therein or condition the granting of a security interest therein on the consent of a third party whose consent has not been obtained or would cause, or allow a third party to cause, the forfeiture of such property upon the granting of a security interest therein (other than to

the extent that any such requirement or restriction would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of Revised Article 9 of the UCC (or any successor provision or provisions)); provided, however, that if such prohibition or the condition requiring such consent relates only to the foreclosure of a security interest or the exercise of other rights or remedies upon a default, then a security interest in such property shall be deemed to be granted by this Agreement subject to the condition that the consent of such third party is obtained by the Administrative Agent prior to foreclosure or exercising of its other rights or remedies hereunder as to which such consent is required; provided, further, that

(A)   In the event of the termination or elimination of any prohibition or the requirement for any consent contained in any applicable Law, agreement, document or instrument to the extent sufficient to permit any such Capital Stock to become Collateral hereunder, or upon the granting of any such consent, or waiving or terminating any requirement for such consent, a security interest in such Capital Stock shall be automatically and simultaneously granted hereunder in such Capital Stock, and the Capital Stock automatically and simultaneously shall be deemed to be assigned and pledged to the Administrative Agent and shall be included as Collateral hereunder;

(B)   The foregoing limitations on the security interests created hereby shall not apply to the extent any such prohibition on the creation of a security interest is rendered ineffective under the UCC or other applicable Laws.

(o)      (i)   One hundred percent (100%) (or, if less, the full amount owned by such Loan Party) of the issued and outstanding Capital Stock owned by such Loan Party of any Person that hereafter becomes a Domestic Subsidiary of the Borrower and (ii) sixty-five percent (65%) (or, if less, the full amount owned by such Loan Party) of the Voting Equity and one hundred percent (100%) (or, if less, the full amount owned by such Loan Party) of the Non-Voting Equity owned by such Loan Party of any Person that hereafter becomes a Foreign Subsidiary of the Borrower, including the certificates (or other agreements or instruments) representing such Capital Stock.

(p)      all of the Proceeds, products, Accessions or substitutions, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering or relating to any of the foregoing.

All of the foregoing, and any other assets or property of any Loan Party in which the DIP Agent or the DIP Lenders shall be granted a Lien, shall be referred to collectively as the "Collateral".

## 9.02   Preservation of Collateral and Perfection of Liens.

Each Loan Party shall, at the request of the Administrative Agent, promptly execute and deliver all financing statements, security agreements, pledge agreements, deeds of trust, mortgages, leasehold mortgages, bailee letters, amendments thereto, or other documents (and pay

the cost of filing or recording the same in all public offices deemed reasonably necessary by the Administrative Agent), in form reasonably satisfactory to the Administrative Agent, to perfect and maintain the Liens on the Collateral granted by each Loan Party to the Administrative Agent for the benefit of the DIP Lenders, or to otherwise protect and preserve the Collateral and the Liens thereon or to enforce the Administrative Agent's Liens on the Collateral. Each Loan Party shall make appropriate entries upon its Books and records disclosing the Administrative Agent's Lien on the Collateral.

9.03    [Reserved].
9.04    **Certain Bankruptcy Matters Regarding Collateral**

(a)      Except to the extent provided otherwise in the Interim Order or the Final Order (as applicable), each Loan Party hereby agrees that the Obligations shall (i) constitute superpriority allowed administrative expense claims in the Bankruptcy Cases having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against such Grantors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person, subject, as to priority, only to the Carve-Out and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, subject only to the Carve-Out and, to the extent provided in the Order or the Final Order (as applicable), shall not be subject to claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b)      The Administrative Agent's Liens and the administrative expense claim priority granted pursuant to clause (a) above have been independently granted by the DIP Loan Documents, and may be independently granted by other DIP Loan Documents heretofore or hereafter entered into. The Collateral Agent's Liens and the administrative expense claim priority granted pursuant to clause (a) above, this Agreement, the Interim Order, the Final Order and the other DIP Loan Documents supplement each other, and the grants, priorities, rights and remedies of the DIP Lenders and the Administrative Agent hereunder and thereunder are cumulative. In the event of a direct conflict between the Interim Order or the Final Order, on the one hand, and any other DIP Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)      Notwithstanding anything to the contrary contained herein or elsewhere:

(i)      The Administrative Agent's Liens on Collateral of the Loan Parties shall be deemed valid and perfected by entry of the Interim Order and the Final Order, as the case may be, which entry of the Interim Order shall have occurred on or prior to the Closing Date. The Administrative Agent and the DIP Lenders shall not be required to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral of any of the Loan Parties or to take any other action in order to validate, render enforceable or perfect the Liens on Collateral of any of the Loan Parties granted by or pursuant to this Agreement, the Interim Order, the Final Order or any other DIP Loan

Document. If the Administrative Agent or the Required DIP Lenders shall, in its or their sole discretion, from time to time elect to file, register or publish any such financing statements, mortgages, hypothecs, notices of Lien or similar instruments, take possession of any Collateral of any of the Loan Parties or take any other action to validate, render enforceable or perfect all or any portion of the Administrative Agent's Liens on Collateral of the Loan Parties, all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date of entry of the Interim Order is entered.

(ii)     The Liens, lien priorities, superpriority administrative expense claims and other rights and remedies granted to the Administrative Agent and the DIP Lenders pursuant to this Agreement, the Interim Order, the Final Order or the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the administrative expense claim priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by any Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Bankruptcy Cases, or by any other act or omission whatsoever. Without limiting the generality of the foregoing, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(A)     except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Bankruptcy Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any DIP Lender or the Administrative Agent against any Loan Party in respect of any Obligation;

(B)     the Administrative Agent's Liens on Collateral of the Loan Parties shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

(C)     the Administrative Agent's Liens on the Collateral of the Loan Parties shall continue to be valid, enforceable and perfected without the need for the Administrative Agent or any DIP Lender to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments or to otherwise perfect the Administrative Agent's Liens under applicable non-bankruptcy law.

(d)     The Administrative Agent, on behalf of the DIP Lenders, hereby agrees that so long as the Maturity Date shall not have occurred or the Administrative Agent shall not have exercised any remedies as a result of a Default or Event of Default, the Loan Parties shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §§ 330 & 331, as the same are due and payable and such payments shall not reduce the Carve-Out. During the continuance of a Default or Event of Default under this Agreement, the Interim Order or the Final Order, as the case may be, any payments actually made to any professionals in accordance with the

Agreed Budget during such continuance shall reduce the Professional Expenses Cap on a dollar-for-dollar basis.

**9.05    Title, Perfection and Priority.**

Each Loan Party represents and warrants that it has good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens, except for (i) the security interest granted to the Pre-Petition Secured Lenders and (ii) other Permitted Liens, and has full power and authority to grant to the Administrative Agent the security interest in such Collateral pursuant hereto.

**9.06    Deposit Accounts.**

Each Loan Party represents and warrants that all of such Loan Party's Deposit Accounts and lock boxes are listed on Schedule 9.06.

**9.07    Exact Names.**

Each Loan Party represents and warrants that such Loan Party's name in which it has executed this Agreement is the exact name as it appears in such Loan Party's organizational documents, as amended, as filed with such Loan Party's jurisdiction of organization. Except as otherwise set forth on Schedule 9.07, no Loan Party has, during the past five years, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any acquisition.

**9.08    Letter-of-Credit Rights and Chattel Paper.**

Each Loan Party represents and warrants that Schedule 9.08 lists all Letter-of-Credit Rights and Chattel Paper of such Loan Party. All action by such Loan Party necessary or desirable to protect and perfect the Administrative Agent's Lien on each item listed on Schedule 9.08 (including the delivery of all originals and the placement of a legend on all Chattel Paper as required hereunder) has been duly taken, such that the Administrative Agent will at all times have a fully perfected security interest in the Collateral listed on Schedule 9.08.

**9.09    Accounts and Chattel Paper.**

Each Loan Party represents and warrants that:

(a)    The names of the obligors, amounts owing, due dates and other information with respect to its Accounts and Chattel Paper are and will be correctly stated in all records of such Loan Party relating thereto and in all invoices with respect thereto furnished to the Administrative Agent by such Loan Party from time to time.

(b)    With respect to its Accounts, (i) there are no setoffs, claims or disputes existing or asserted with respect thereto and such Loan Party has not made any agreement

with any account debtor for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of any account debtor from liability therefor, or any deduction therefrom except a discount or allowance allowed by such Loan Party in the ordinary course of its business for prompt payment and disclosed to the Administrative Agent; (ii) to such Loan Party's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on such Loan Party's books and records and any invoices and statements with respect thereto; (iii) such Loan Party has not received any notice of proceedings or actions which are threatened or pending against any account debtor which might result in any adverse change in such account debtor's financial condition; and (iv) such Loan Party has no knowledge that any account debtor is unable generally to pay its debts as they become due.

(c)     In addition, with respect to all of its Accounts, (i) the amounts shown on all invoices and statements with respect thereto are actually and absolutely owing to such Loan Party as indicated thereon and are not in any way contingent; (ii) no payments have been or shall be made thereon except payments immediately delivered as required of this Agreement; and (iii) to such Loan Party's knowledge, all account debtors have the capacity to contract.

## 9.10    <u>Filing Requirements</u>.

None of the Collateral owned by it is of a type covered by a certificate of title or for which security interests or liens may be perfected by filing under any federal statute except for (a) certain vehicles and (b) Intellectual Property owned by such Loan Party and described in <u>Schedule 6.16</u>. The legal description, county and street address of each Property on which any Fixtures are located is set forth in <u>Schedules 6.19(a)</u> and <u>(b)</u>, together with the name and address of the record owner of each such Property.

## 9.11    <u>No Financing Statements, Security Agreements</u>.

Each Loan Party represents and warrants that no financing statement, security agreement, mortgage, deed of trust or deed to secure debt describing all or any portion of the Collateral which has not lapsed or been terminated naming such Loan Party as debtor has been filed or is of record in any jurisdiction except for (a) financing statements, security agreements or Mortgage Instruments naming the Administrative Agent as the secured party, and (b) financing statements, security agreements, mortgages, deeds of trust or deeds to secure debt concerning Liens in favor of the Pre-Petition Secured Lenders and other Permitted Liens.

## 9.12    <u>Pledged Shares</u>.

(a)     Each Loan Party represents and warrants that:

(i)     <u>Schedule 6.12(b)</u> sets forth a complete and accurate list of the Pledged Shares. Each Loan Party is the record and beneficial owner of the Pledged Shares listed

on Schedule 6.12(b) as being owned by such Loan Party, free and clear of any Liens, except for the security interests granted to (i) the "Administrative Agent" under the Pre-Petition Credit Agreement and (ii) the Administrative Agent hereunder. Each Loan Party further represents and warrants that (i) with respect to any certificates delivered to the Administrative Agent representing Capital Stock, either such certificates are Securities as defined in Article 8 of the UCC as a result of actions by the issuer or otherwise or, if such certificates are not Securities, such Loan Party has so informed the Administrative Agent so that the Administrative Agent may take steps to perfect its security interest therein as a General Intangible, (ii) all Pledged Shares held by a securities intermediary is covered by a control agreement among such Loan Party, the securities intermediary and the Administrative Agent pursuant to which the Administrative Agent has Control, (iii) none of the Pledged Shares owned by such Loan Party has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (iv) there are existing no options, warrants, calls or commitments of any character whatsoever relating to such Pledged Shares or which obligate the issuer of any Capital Stock included in the Pledged Shares to issue additional Capital Stock, and (v) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any governmental authority or any other Person is required for the pledge by such Loan Party of such Pledged Shares pursuant to this Agreement or for the execution, delivery and performance of this Agreement by such Loan Party, or for the exercise by the Administrative Agent of the voting or other rights provided for in this Agreement or for the remedies in respect of the Pledged Shares pursuant to this Agreement, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(ii)     Except as set forth in Schedule 6.12(b), such Loan Party owns 100% of the issued and outstanding Capital Stock which constitute Pledged Shares owned by it and none of the Pledged Shares which represents Indebtedness owed to such Loan Party is subordinated in right of payment to other Indebtedness or subject to the terms of an indenture.

(b)     Each Loan Party agrees that:

(i)     If any issuer of Capital Stock constituting Pledged Shares issues additional Capital Stock to any Loan Party, such Loan Party shall promptly notify the Administrative Agent of such issuance of Capital Stock and such Capital Stock shall promptly be deposited with the Administrative Agent and pledged to the Administrative Agent for itself and for the benefit of the Administrative Agent in accordance with this Agreement.

(ii)     Such Loan Party will permit any registerable Pledged Shares owned by it to be registered in the name of the Administrative Agent or its nominee at any time at the option Administrative Agent. Without limiting the foregoing, Each Loan Party agrees that such Loan Party will permit the Administrative Agent from time to time to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities or other types of Pledged Shares owned by it

not represented by certificates to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Pledged Shares not represented by certificates and all rollovers and replacements therefor to reflect the Lien of the Administrative Agent granted pursuant to this Security Agreement. With respect to any Pledged Shares owned by it, such Loan Party will take any actions necessary to cause (a) the issuers of uncertificated securities which are Pledged Shares and (b) any securities intermediary which is the holder of any such Pledged Shares, to cause the Administrative Agent to have and retain control over such Pledged Shares. Without limiting the foregoing, such Loan Party will, with respect to any such Pledged Shares held with a securities intermediary, cause such securities intermediary to enter into a control agreement with the Administrative Agent, in form and substance satisfactory to the Administrative Agent, giving the Administrative Agent control.

(c)     In addition to other powers of attorney contained herein, each Loan Party hereby designates and appoints the Administrative Agent, on behalf of the holders of the Obligations, and each of its designees or agents, as attorney-in-fact of such Loan Party, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence and during the continuation of an Event of Default:

(i)     to demand, collect, settle, compromise and adjust, and give discharges and releases concerning the Pledged Shares, all as the Administrative Agent may reasonably deem appropriate;

(ii)     to commence and prosecute any actions at any court for the purposes of collecting any of the Pledged Shares and enforcing any other right in respect thereof;

(iii)     to defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as the Administrative Agent may reasonably deem appropriate;

(iv)     to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Pledged Shares;

(v)     to direct any parties liable for any payment in connection with any of the Pledged Shares to make payment of any and all monies due and to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct;

(vi)     to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Pledged Shares;

(vii)     to sign and endorse any drafts, assignments, proxies, stock powers, verifications, notices and other documents relating to the Pledged Shares;

(viii)   to execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, security and pledge agreements, affidavits, notices and other agreements, instruments and documents that the Administrative Agent may reasonably deem appropriate in order to perfect and maintain the security interests and liens granted in this Agreement and in order to fully consummate all of the transactions contemplated therein;

(ix)   to exchange any of the Pledged Shares or other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issuer thereof and, in connection therewith, deposit any of the Pledged Shares with any committee, depository, transfer agent, registrar or other designated agency upon such terms as the Administrative Agent may reasonably deem appropriate;

(x)   to vote for a shareholder resolution, or to sign an instrument in writing, sanctioning the transfer of any or all of the Pledged Shares into the name of the Administrative Agent or one or more of the holders of the Obligations or into the name of any transferee to whom the Pledged Shares or any part thereof may be sold pursuant to this Article X; and

(xi)   to do and perform all such other acts and things as the Administrative Agent may reasonably deem appropriate or convenient in connection with the Pledged Shares.

This power of attorney is a power coupled with an interest and shall be irrevocable for so long as any of the Obligations shall remain outstanding and until all of the commitments relating thereto shall have been terminated. The Administrative Agent shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Administrative Agent herein, and shall not be liable for any failure to do so or any delay in doing so. The Administrative Agent shall not be liable for any act or omission or for any error of judgment or any mistake of fact or law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence or willful misconduct. This power of attorney is conferred on the Administrative Agent solely to protect, preserve and realize upon its security interest in the Pledged Shares.

(b)   During the period when any Event of Default shall have occurred and be continuing, if any Loan Party fails to perform any agreement or obligation with respect to any Pledged Shares, the Administrative Agent itself may perform, or cause performance of, such agreement or obligation, and the expenses of the Administrative Agent incurred in connection therewith shall be payable by the Loan Parties on a joint and several basis.

(c)   The Administrative Agent may from time to time assign the Pledged Shares and any portion thereof in connection with its resignation as Administrative Agent pursuant to Article XI, and the assignee shall be entitled to all of the rights and remedies of the Administrative Agent hereunder in relation thereto.

(d)    Other than the exercise of reasonable care to assure the safe custody of the Pledged Shares while being held by the Administrative Agent hereunder and as required by applicable law, the Administrative Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Loan Parties shall be responsible for preservation of all rights in the Pledged Shares, and the Administrative Agent shall be relieved of all responsibility for the Pledged Shares upon surrendering it or tendering the surrender of it to the Loan Parties.  The Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Shares in its possession if such Pledged Shares is accorded treatment substantially equal to that which the Administrative Agent accords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the Administrative Agent shall not have responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Pledged Shares, whether or not the Administrative Agent has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with respect to any of the Pledged Shares.

(e)    Voting Rights in Respect of the Pledged Shares.

(i)    So long as no Event of Default of which Loan Party has or reasonably should have knowledge shall have occurred and be continuing, to the extent permitted by law, each Loan Party may exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Pledged Shares of such Loan Party or any part thereof for any purpose not inconsistent with the terms of this Agreement; and

(ii)    Upon the occurrence and during the continuance of an Event of Default of which Loan Party has or reasonably should have knowledge, all rights of a Loan Party to exercise the voting and other consensual rights that it would otherwise be entitled to exercise pursuant to clause (i) of this subsection shall cease and all such rights shall thereupon become vested in the Administrative Agent, which shall then have the sole right to exercise such voting and other consensual rights.

(f)    Dividend Rights in Respect of the Pledged Shares.

(i)    So long as no Event of Default of which Loan Party has occurred and be continuing and subject to Section 9.01(n) hereof, each Loan Party may receive and retain any and all dividends (other than stock dividends and other dividends described in Section 9.01(n) hereof)) or interest paid in respect of the Pledged Shares, to the extent such dividends are allowed under Section 8.06.

(ii)    Upon the occurrence and during the continuance of an Event of Default:

(A)    all rights of a Loan Party to receive the dividends and interest payments that it would otherwise be authorized to receive and retain pursuant to clause (i) of this subsection shall cease and all such rights shall thereupon be vested in the Administrative Agent, which shall then have

the sole right to receive and hold as Collateral such dividends and interest payments; and

(B)     all dividends and interest payments that are received by a Loan Party contrary to the provisions of clause (A) of this subsection shall be received in trust for the benefit of the Administrative Agent, shall be segregated from other property or funds of such Loan Party, and shall be forthwith paid over to the Administrative Agent in the exact form received, to be held by the Administrative Agent as further collateral security for the Obligations.

**9.13**     **Collateral Records; Authorization to File Financing Statements; Further Assurances; Etc.**

Each Loan Party agrees that:

(a)     Collateral Records. Such Loan Party will maintain complete and accurate books and records with respect to the Collateral owned by it, and furnish to the Administrative Agent updates with respect to Schedules 6.12(b) and (c), 6.16, 6.19(a) and (b), 9.06, 9.07, 9.08 and 9.10 hereto in accordance with Section 9.13(c) and such other such reports relating to such Collateral as the Administrative Agent shall from time to time reasonably request.

(b)     Authorization to File Financing Statements; Ratification. Such Loan Party hereby authorizes the Administrative Agent to file, and if requested will deliver to the Administrative Agent, all financing statements and other documents and take such other actions as may from time to time be requested by the Administrative Agent in order to maintain a perfected security interest in and, if applicable, Control of, the Collateral owned by such Loan Party. Any financing statement filed by the Administrative Agent may be filed in any filing office in any UCC jurisdiction and may (i) indicate such Loan Party's Collateral (1) as all assets of the Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC or such jurisdiction, or (2) by any other description which reasonably approximates the description contained in this Security Agreement, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether such Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party and (B) in the case of a financing statement filed as a fixture filing or indicating such Loan Party's Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Such Loan Party also agrees to furnish any such information to the Administrative Agent promptly upon request. Such Loan Party also ratifies its authorization for the Administrative Agent to have filed in any UCC jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(c)     Further Assurances.  Such Loan Party will, if so requested by the Administrative Agent, furnish to the Administrative Agent, as often as the Administrative Agent reasonably requests, statements and schedules further identifying and describing the Collateral owned by it and such other reports and information in connection with its Collateral as the Administrative Agent may reasonably request, all in such detail as the Administrative Agent may specify.  Such Loan Party also agrees to take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of the Administrative Agent in its Collateral and the priority thereof against any Lien not expressly permitted hereunder.  Each Loan Party agrees to deliver to the Administrative Agent supplements with respect to the information set forth in Schedules 6.12(b) and (c), 6.16, 6.19(a) and (b), 9.06, 9.07, 9.08 and 9.10 promptly after obtaining information which would require a material correction of or addition to any such Schedule.

(d)     Disposition of Collateral.  Such Loan Party will not sell, lease or otherwise dispose of the Collateral owned by it except as allowed under this Agreement.

(e)     Other Financing Statements.  Such Loan Party will not authorize the filing of any financing statement naming it as debtor covering all or any portion of the Collateral owned by it, except as permitted by this Agreement.  Such Loan Party acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of the Administrative Agent, subject to such Loan Party's rights under Section 9-509(d)(2) of the UCC.

(f)     Compliance with Terms.  Such Loan Party will perform and comply with all obligations in respect of the Collateral owned by it and all agreements to which it is a party or by which it is bound relating to such Collateral.

(g)     Electronic Chattel Paper.  Such Loan Party shall take all steps necessary to grant the Administrative Agent Control of all Electronic Chattel Paper in accordance with the UCC and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

**9.14    Equipment.**

Each Loan Party agrees that:

(a)     Maintenance of Goods.  Such Loan Party will do all things necessary to maintain, preserve, protect and keep its Equipment in good repair and working condition, except for ordinary wear and tear in respect of the Equipment.

(b)     Equipment.  Such Loan Party shall promptly inform the Administrative Agent of any additions to or deletions from its Equipment which individually exceed $50,000.  Such Loan Party shall not permit any Equipment to become a fixture with respect to real property or to become an accession with respect to other personal property

with respect to which real or personal property the Administrative Agent does not have a Lien. Such Loan Party will not, without the Administrative Agent's prior written consent, alter or remove any identifying symbol or number on any of such Loan Party's Equipment constituting Collateral.

**9.15    Delivery of Instruments, Securities, Chattel Paper and Documents.**

Each Loan Party agrees that such Loan Party will (a) deliver to the Administrative Agent immediately upon execution of this Security Agreement the originals of all Chattel Paper, Securities (to the extent certificated) and Instruments constituting Collateral owned by it (if any then exist), (b) hold in trust for the Administrative Agent upon receipt and immediately thereafter deliver to the Administrative Agent any such Chattel Paper, Securities and Instruments constituting Collateral, (c) upon the Administrative Agent's request, deliver to the Administrative Agent (and thereafter hold in trust for the Administrative Agent upon receipt and immediately deliver to the Administrative Agent) any Document evidencing or constituting Collateral and (d) upon the Administrative Agent's request, deliver to the Administrative Agent a duly executed amendment to this Agreement, in form and substance reasonably acceptable to the Administrative Agent (each such amendment, an "Amendment"), pursuant to which such Loan Party will pledge such additional Collateral. Such Loan Party hereby authorizes the Administrative Agent to attach each Amendment to this Agreement and agrees that all additional Collateral owned by it set forth in such Amendments shall be considered to be part of the Collateral.

**9.16    [Reserved].**

**9.17    [Reserved].**

**9.18    Intellectual Property.**

Each Loan Party agrees that:

Such Loan Party will use its best efforts to secure all consents and approvals necessary or appropriate for the assignment to or benefit of the Administrative Agent of any License held by such Loan Party and to enforce the security interests granted hereunder.

(a)    Such Loan Party shall notify the Administrative Agent immediately if it knows or has reason to know that any application or registration relating to any Patent, Trademark or Copyright which is material to the conduct of Loan Party's business (now or hereafter existing) may become abandoned or dedicated to the public, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) regarding such Loan Party's ownership of any Patent, Trademark or Copyright material to the conduct of Loan Party's business, its right to register the same, or to keep and maintain the same.

(b)     In no event shall such Loan Party, either directly or through any agent, employee, licensee or designee, file an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving the Administrative Agent written notice thereof within thirty days of the date the application is filed, and, upon request of the Administrative Agent, such Loan Party shall execute and deliver any and all security agreements as the Administrative Agent may request to evidence the Administrative Agent's security interest on such Patent, Trademark or Copyright, and the General Intangibles of such Loan Party relating thereto or represented thereby.

(c)     Such Loan Party shall take all actions necessary or reasonably requested by the Administrative Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of its Patents, Trademarks and Copyrights (now or hereafter existing), including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings, unless the Loan Party shall determine that such Patent, Trademark or Copyright is not material to the conduct of such Loan Party's business.

(d)     Such Loan Party shall, unless it shall reasonably determine that such Patent, Trademark or Copyright is not material to the conduct of its business or operations, promptly pursue remedies for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as the Administrative Agent shall deem appropriate under the circumstances to protect such Patent, Trademark or Copyright.

## 9.19   Commercial Tort Claims.

Each Loan Party agrees that such Loan Party shall promptly, and in any event within five Business Days after the same is acquired by it, notify the Administrative Agent of any commercial tort claim (as defined in the UCC) for a dollar amount expected to be in excess of $50,000 acquired by it and, unless the Administrative Agent otherwise consents, such Loan Party shall enter into an amendment to this Agreement, in form and substance reasonably acceptable to the Administrative Agent, granting to Administrative Agent a security interest in such commercial tort claim.

## 9.20   Letter-of-Credit Rights.

Each Loan Party agrees that if such Loan Party is or becomes the beneficiary of a letter of credit, it shall promptly, and in any event within five Business Days after becoming a beneficiary, notify the Administrative Agent thereof and cause the issuer and/or confirmation bank to (i) consent to the assignment of any Letter-of-Credit Rights to the Administrative Agent and (ii) agree to direct all payments thereunder to the Administrative Agent for application in accordance with this Agreement, all in form and substance reasonably satisfactory to the Administrative Agent.

**9.21    Federal, State or Municipal Claims.**

Each Loan Party agrees that such Loan Party will promptly notify the Administrative Agent of any Collateral which constitutes a claim against the United States government or any state or local government or any instrumentality or agency thereof, the assignment of which claim is restricted by federal, state or municipal law.

**9.22    No Interference.**

Each Loan Party agrees that such Loan Party agrees that it will not interfere with any right, power and remedy of the Administrative Agent provided for in this Article IX or otherwise in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Administrative Agent of any one or more of such rights, powers or remedies.

**9.23    Insurance.**

Each Loan Party agrees that:

(a)    In the event any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", such Loan Party shall purchase and maintain flood insurance on such Collateral (including any personal property which is located on any real property leased by such Loan Party within a "Special Flood Hazard Area"). The amount of flood insurance required by this Section shall be in an amount equal to the lesser of the Aggregate Commitments or the total replacement cost value of the Collateral located in such Special Flood Hazard Area.

(b)    All insurance policies required hereunder and under Section 7.07 shall name the Administrative Agent as an additional insured or as Administrative Agent's loss payee, as applicable, and shall contain Administrative Agent's loss payable clauses or mortgagee clauses, through endorsements in form and substance satisfactory to the Administrative Agent, which provide that: (i) all proceeds thereunder with respect to any Collateral shall be payable to the Administrative Agent; (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (iii) such policy and Administrative Agent's loss payable or mortgagee clauses may be canceled, amended, or terminated only upon at least thirty days prior written notice given to the Administrative Agent.

(c)    All premiums on any such insurance shall be paid when due by such Loan Party, and copies of the policies delivered to the Administrative Agent. If such Loan Party fails to obtain any insurance as required by this Section, the Administrative Agent may obtain such insurance at the Borrowers' expense.

## 9.24   Cash Management.

Each Loan Party agrees that such Loan Party will provide to the Administrative Agent, upon the Administrative Agent's request, a deposit account control agreement (in form and substance acceptable to the Administrative Agent) duly executed on behalf of each financial institution holding a deposit account of such Loan Party.

## 9.25   Assigned Contracts.

Each Loan Party agrees that, to the extent requested by the Administrative Agent, such Loan Party will use its best efforts to secure all consents and approvals necessary or appropriate for the assignment to or for the benefit of the Administrative Agent of any Assigned Contract held by such Loan Party and to enforce the security interests granted hereunder. Such Loan Party shall fully perform all of its obligations under each of its Assigned Contracts, and shall enforce all of its rights and remedies thereunder, in each case, as it deems appropriate in its business judgment; provided however, that such Loan Party shall not take any action or fail to take any action with respect to its Assigned Contracts which would cause the termination of an Assigned Contract. Without limiting the generality of the foregoing, such Loan Party shall take all action necessary or appropriate to permit, and shall not take any action which would have any materially adverse effect upon, the full enforcement of all indemnification rights under its Assigned Contracts. Such Loan Party shall notify the Administrative Agent in writing, promptly after such Loan Party becomes aware thereof, of any event or fact which could give rise to a material claim by such Loan Party for indemnification under any of such Loan Party's Assigned Contracts, and shall diligently pursue such right and report to the Administrative Agent on all further developments with respect thereto. Upon the occurrence of and during the continuance of an Event of Default, the Administrative Agent may directly enforce such right in its own or such Loan Party's name and may enter into such settlements or other agreements with respect thereto as the Administrative Agent, as applicable, shall determine. In any suit, proceeding or action brought by the Administrative Agent under any Assigned Contract for any sum owing thereunder or to enforce any provision thereof, such Loan Party shall indemnify and hold the Administrative Agent harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaims, recoupment, or reduction of liability whatsoever of the obligor thereunder arising out of a breach by such Loan Party of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing from such Loan Party to or in favor of such obligor or its successors. All such obligations of such Loan Party shall be and remain enforceable only against such Loan Party and shall not be enforceable against the Administrative Agent. Notwithstanding any provision hereof to the contrary, such Loan Party shall at all times remain liable to observe and perform all of its duties and obligations under its Assigned Contracts, and the Administrative Agent's exercise of any of its rights with respect to the Collateral shall not release such Loan Party from any of such duties and obligations. The Administrative Agent shall not be obligated to perform or fulfill any of such Loan Party's duties or obligations under its Assigned Contracts or to make any payment thereunder, or to make any inquiry as to the nature or sufficiency of any payment or property received by it thereunder or the sufficiency of performance by any party thereunder, or to present or file any claim, or to take any action to collect or enforce any performance, any payment of any amounts, or any delivery of any property.

**9.26    [Reserved].**

**9.27    Ordinary Course Sale; Release of Mortgage Instrument; Cooperation.**

In connection with any Ordinary Course Sale with respect to any Real Property that is subject to a Mortgage Instrument, the Administrative Agent shall release the Lien of such Mortgage Instrument in the Collateral described therein (including, without limitation, any personal property Collateral relating to the Real Property subject to such Ordinary Course Sale), subject to the following requirements:

(a)    Borrower shall have provided (A) written notice substantially in the form of Exhibit I-1 to the Administrative Agent of any such intended Ordinary Course Sale at least five (5) Business Days prior to the effective date of such Ordinary Course Sale, which notice shall include (I) a copy of the final signed purchase agreement and a certification concerning the purchase price for such Real Property subject to such Ordinary Course Sale, (II) the intended effective date of such Ordinary Course Sale, (III) the identities of the parties to the purchase contract, a representation that the purchaser is a bona-fide third party purchaser, and (IV) a certification that no Default or Event of Default then exists or would be caused as a result of such Ordinary Course Sale, and (B) an execution version of a Lien release (each, a "Release") as may be required for the applicable title insurance company to provide the purchaser under such Ordinary Course Sale with a title insurance policy that deletes any exception related to the applicable Mortgage Instrument in connection with such disposition.

(b)    Promptly following receipt by the Administrative Agent of such written notice and other diligence materials meeting the requirements of clause (a) above, the Administrative Agent will use commercially reasonable efforts to deliver to the applicable title insurance company an executed original of the Release, together with an escrow instruction letter substantially in the form of Exhibit I-2 authorizing the recording of such Release in connection with such Ordinary Course Sale.

## ARTICLE X
## EVENTS OF DEFAULT AND REMEDIES

**10.01    Events of Default.**

Any of the following shall constitute an Event of Default:

(a)    Non-Payment. Any Loan Party fails to pay when and as required to be paid herein, any amount of principal of any Loan or any L/C Obligation, any interest on any Loan or on any L/C Obligation, any fee due hereunder or any other amount payable hereunder or under any other DIP Loan Document; or

(b)     <u>Specific Covenants</u>.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 7.01, 7.02, 7.03, 7.05, 7.07, 7.10, 7.11, 7.13, 7.14, 7.15, 7.16 or 7.17, Article VIII, or Section 9.23; or

(c)     <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above or otherwise in this Section 10.01) contained in any DIP Loan Document on its part to be performed or observed and such failure continues for 10 days after any Responsible Officer of any Loan Party obtains knowledge of such failure; or

(d)     <u>Representations and Warranties</u>.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein or in any other DIP Loan Document, or in any document or certificate delivered pursuant hereto or thereto shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     <u>Cross-Default</u>.  Any Loan Party (A) fails to perform or observe (beyond the applicable grace period with respect thereto, if any) any Contractual Obligation arising after the Petition Date if such failure would reasonably be expected to have a Material Adverse Effect, (B) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness incurred after the Petition Date having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (C) fails to observe or perform any other agreement or condition relating to any Indebtedness described in the foregoing clause (B) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs which is not stayed by the filing of the Bankruptcy Cases, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded other than, in each case, where such action is stayed by the filing of the Bankruptcy Cases; or

(f)     <u>Failure to Conduct Business.</u>  If any Loan Party is enjoined, restrained or in any way prevented by court order (other than an order of the Bankruptcy Court approved by the Required DIP Lenders) from continuing to conduct all or any material part of its business affairs; or

(g)     <u>Enforceability of Liens</u>.   If this Agreement or any other DIP Loan Document that purports to create a Lien shall, for any reason, fail or cease to create a valid and perfected first priority Lien on or security interest in the Collateral, subject only to (i) the Permitted Liens under Section 8.01(a) through (p) and (ii) the Carve-Out; or

(h)    Judgments.  There is entered against any Loan Party (i) any one or more final judgments or orders for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal, the filing of the Bankruptcy Cases or otherwise, is not in effect; or

(i)    ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)    Invalidity of DIP Loan Documents; Guaranty.  (i) Any DIP Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any DIP Loan Document; or any Loan Party denies that it has any or further liability or obligation under any DIP Loan Document, or purports to revoke, terminate or rescind any DIP Loan Document; or (ii) the Guaranty given by the Guarantor hereunder or any provision thereof shall cease to be in full force and effect, or the Guarantor hereunder or any Person acting by or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations under its Guaranty, or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to its Guaranty; or

(k)    Change of Control.  A Change of Control occurs; or

(l)    Dissolution or Liquidation.  Any Loan Party voluntarily or involuntarily dissolves or is dissolved, liquidates or is liquidated, or files a motion with the Bankruptcy Court seeking authorization to dissolve or liquidate; or

(m)    Final Order; Interim Order.  The Bankruptcy Court fails to enter a Final Order acceptable to the DIP Lenders in their sole discretion within 45 days of the entry of the Interim Order, or the Bankruptcy Court reverses, vacates or stays the effectiveness of either the Interim Order or the Final Order; or

(n)    Certain Orders.  An order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (or any of the Loan Parties shall file an application or motion for entry of an order) (i) appointing a trustee under Section 1104 of

the Bankruptcy Code, (ii) appointing a responsible officer or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, or (iii) dismissing or converting any of the Bankruptcy Cases to a Chapter 7 case (other than with respect to any Loan Party for which the Required DIP Lenders have consented to the filing of, or the conversion of such Loan Party's Bankruptcy Case to, a Chapter 7 case); or

(o)    <u>Non-Compliance with the Final Order or the Interim Order</u>.  Any Loan Party fails or neglects to comply in any material respect with any provision of the Final Order or the Interim Order, as applicable; or

(p)    <u>Failure to File Plan; Filing of Unapproved Plan</u>.  Borrower shall fail to file an Acceptable Plan with the Bankruptcy Court within 240 days after the Petition Date, or a chapter 11 plan of reorganization or liquidation (other than an Acceptable Plan) is filed with the Bankruptcy Court by any of the Loan Parties (or by any other party with the support of any of the Loan Parties) that provides the DIP Lenders with any treatment with respect to the Obligations other than payment in full in cash on the effective date of such plan; or

(q)    <u>Entry of Unapproved Order</u>.  An order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (i) to revoke, reverse, stay for a period in excess of ten days, vacate, or rescinding the Interim Order or the Final Order, or (ii) to amend, modify or supplement any provision of the Interim Order or the Final Order without the prior written consent of the Administrative Agent, each Co-Agent and the Required DIP Lenders, or (iii) to grant or permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any of the Loan Parties, equal or superior to the priority of the Administrative Agent and the DIP Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations only to the extent set forth in the definition of Carve-Out, or (iv) to grant or permit the grant of a Lien on the Collateral (other than a Permitted Lien); or

(r)    <u>Relief from the Automatic Stay</u>.  The Bankruptcy Court enters an order granting relief from the automatic stay to the holder or holders of any security interest (other than the Administrative Agent or the DIP Lenders) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any Guarantors which have an aggregate value in excess of $2,000,000 (other than with respect to assets of such Loan Parties for which the Required DIP Lenders have consented to such relief);

(s)    <u>Unenforceability of the Interim Order, Final Order or DIP Loan Documents</u>.  Any provision of the Interim Order, the Final Order, this Agreement or any other DIP Loan Document shall for any reason cease to be valid or binding or enforceable against any of the Loan Parties, or any of the Loan Parties shall so state in writing; or any of the Loan Parties shall commence or join in any legal proceeding to

contest in any manner that the Interim Order, the Final Order, this Agreement or any other DIP Loan Document constitutes a valid and enforceable agreement or any of the Loan Parties shall commence or join in any legal proceeding to assert that it has no further obligation or liability under the Interim Order, the Final Order, this Agreement or any other DIP Loan Document;

(t)     Motion against the DIP Lenders.  Any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (1) disallow in whole or in part any of the Obligations arising under this Agreement or any other DIP Loan Document, (2) disallow in whole or in part any of the Indebtedness owed by the Loan Parties under the Pre-Petition Credit Agreement, or (3) challenge the validity and enforceability of the liens or security interests granted or confirmed herein or in the Interim Order or the Final Order in favor of the DIP Lenders or the Pre-Petition Secured Lenders, respectively; or

(u)     Prohibited Payment.  Any of the Loan Parties shall make any payment (as adequate protection or otherwise) on account of any claim or Indebtedness arising prior to the Petition Date without the prior written consent of the Administrative Agent, each Co-Agent, and the Required DIP Lenders, other than any such payments (i) in respect of accrued payroll and related expenses as of the Petition Date, and (ii) in respect of certain creditors, in each case to the extent authorized, required or permitted in the "first day orders" or other orders of the Bankruptcy Court reasonably satisfactory to the Administrative Agent, each Co-Agent, and the Required DIP Lenders; or

(v)     Sale of All or Substantially All Assets.  The Debtors' filing of a motion, application or other pleading seeking the approval of the sale, without the consent of the Administrative Agent, each Co-Agent, the L/C Issuer and the Required DIP Lenders, of all or substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Bankruptcy Cases or otherwise, that does not provide for payment in full of the Obligations and the termination of the Aggregate Commitments of the DIP Lenders; or

(w)     Certain Actions.  Unless waived by the Administrative Agent, each Co-Agent, the L/C Issuer and the Required DIP Lenders (in their sole discretion), the commencement of a suit or action against the Administrative Agent or any DIP Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without being dismissed, enjoined or stayed for 35 days after service thereof on such Administrative Agent or DIP Lender, that asserts or seeks by or on behalf of the Borrower, the United States Environmental Protection Agency, any state environmental protection or health and safety agency, any official committee in the Bankruptcy Cases or any other party in interest in the Bankruptcy Cases, (i) a claim in excess of an amount deemed by the Administrative Agent, each Co-Agent, the L/C Issuer and the Required DIP Lenders (in their sole discretion) to be material, (ii) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the Administrative Agent

or any DIP Lender under the DIP Loan Documents to any other claim, (iii) would otherwise have a Material Adverse Effect on the business, assets, operations or condition (financial or otherwise) of the Borrower and its Subsidiaries, taken as a whole, or (iv) have a Material Adverse Effect on the rights and remedies of the Administrative Agent or any DIP Lender under any DIP Loan Document, or the collectability of all or any portion of the Obligations.

**10.02    Remedies Upon Event of Default.**

(a)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Interim Order and, if applicable, the Final Order, if any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required DIP Lenders, take any or all of the following actions:

(i)    declare the commitment of each DIP Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other DIP Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(iii)    require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to 105% of the then Outstanding Amount thereof) or cause to be issued back to back letters of credit having a stated amount equal to the greater of (a) an amount, as determined by the Administrative Agent and the L/C Issuer, equal to the face amount of all such Letters of Credit plus the sum of all projected contractual obligations of the Borrower to the Administrative Agent and the L/C Issuer and the DIP Lenders thereunder through the expiration dates of such Letters of Credit, and (b) 105% of the Outstanding Amount of all L/C Obligations, each in form and substance and issued by an issuer satisfactory in all respects to the Administrative Agent and the L/C Issuer; provided, to the extent that the Borrower and the Guarantors fail to furnish such Cash Collateral or cause to be issued such back to back letters of credit, the Administrative Agent shall be authorized immediately to debit any accounts of the Loan Parties maintained with the Administrative Agent;

(iv)    implement the Default Rate with respect to all outstanding Loans and other amounts then due and payable by the Loan Parties under the DIP Loan Documents;

(v)    set-off any amounts held for the account of the Loan Parties as Cash Collateral or in any accounts maintained with the Administrative Agent, either Co-Agent, any other DIP Lender, or any of their respective Affiliates

(vi)    exercise on behalf of itself, the DIP Lenders and the L/C Issuer any or all rights and remedies available to it, the DIP Lenders and the L/C Issuer under the DIP Loan Documents or otherwise available at law or in equity;

provided, that with respect to items (v) and (vi) above, the Administrative Agent shall provide the Borrowers (with a copy to counsel for any official committee of unsecured creditors appointed in the Bankruptcy Cases (or to the Loan Parties' twenty (20) largest creditors in the event no such committee has been appointed or is in existence) and the United States Trustee for the Western District of Texas with five (5) Business Days' prior written notice; and provided, further, that upon receipt of the notice referred to in the immediately preceding clause, the Loan Parties may continue to make ordinary course disbursements from such accounts referred to in (v) above to the extent and at the times set forth in the Agreed Budget, but may not withdraw or disburse any other amounts from such account (in any hearing after the giving effect of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing).

(b)    Upon the occurrence and during the continuance of an Event of Default, the automatic stay arising pursuant to Bankruptcy Code section 362 shall be vacated and terminated in accordance with the Interim Order or the Final Order, as applicable, so as to permit the Administrative Agent and the DIP Lenders full exercise of all of their rights and remedies based on the occurrence of an Event of Default, including, without limitation, all of their rights and remedies with respect to the Collateral.  With respect to the Administrative Agent's, the DIP Lenders' and the L/C Issuer's exercise of their rights and remedies, the Loan Parties agree and warrant as follows:

(i)    the Borrower and each Guarantor waive and, release, and shall be enjoined from attempting to contest, delay, or otherwise dispute the exercise by the Administrative Agent, the DIP Lenders and the L/C Issuer of their rights and remedies before the Bankruptcy Court or otherwise; except only as expressly stated in subparagraph (ii) of this paragraph; and

(ii)    when the Administrative Agent, the DIP Lenders or the L/C Issuer seek to enforce their rights and remedies based on an Event of Default, and if the Borrower or any Guarantor disputes that an Event of Default has occurred, the Borrower and each such Guarantor will be entitled to file an emergency motion with the Bankruptcy Court disputing whether an Event of Default has occurred. Unless otherwise agreed in writing by Administrative Agent, any such motion shall be heard within five (5) Business Days after it is filed, subject to the availability of the Bankruptcy Court.  At the hearing on the emergency motion, the only issue that will be heard by the Bankruptcy Court will be whether an Event of Default has occurred and has not been cured, and, if an Event of Default has occurred and has not been cured, the Administrative Agent and the DIP Lenders will be entitled to continue to exercise all of their rights and remedies without the necessity of any further notice or order.  Furthermore, nothing herein shall be construed to impose or reimpose any stay or injunction of any kind against the Administrative Agent, the DIP Lenders or the L/C Issuer.

(c)     If an Event of Default has occurred and is continuing:  (i) the Administrative Agent shall have for the benefit of the DIP Lenders and the L/C Issuer, in addition to all other rights of the Administrative Agent, the DIP Lenders and the L/C Issuer, the rights and remedies of a secured party under the UCC; (ii) the Administrative Agent may, at any time, take possession of the Collateral and keep it on the premises of any Loan Party, at no cost (including any charge pursuant to Section 506(c) of the Bankruptcy Code) to the Administrative Agent, any DIP Lender or the L/C Issuer, or remove any part of it to such other place or places as the Administrative Agent may desire, or the Borrower and the other Loan Parties shall, upon the Administrative Agent's demand, at the Borrower's cost, assemble the Collateral and make it available to the Administrative Agent at a place or places reasonably convenient to the Administrative Agent; and (iii) the Administrative Agent may sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable, in its reasonable discretion, and may, if the Administrative Agent deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale without giving a new notice of sale.  Without in any way requiring notice to be given in the following manner, the Loan Parties agree that any notice by the Administrative Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to the Loan Parties if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt to the Borrower, at least five (5) Business Days prior to such action to the Borrower's address specified herein.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Administrative Agent or the DIP Lenders receive payment, and if the buyer defaults in payment, the Administrative Agent may resell the Collateral without further notice to the Borrower or any Guarantor.  In the event the Administrative Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Loan Party irrevocably waives:  (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Administrative Agent retain possession and not dispose of any Collateral until after trial or final judgment.  The Loan Parties agree that the Administrative Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.  The Administrative Agent is hereby granted a license or other right to use, without charge, the Loan Parties' labels, patents, copyrights, name, trade secrets, trade names, trademarks, and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and the Loan Parties' rights under all licenses and all franchise agreements shall inure to the Administrative Agent's benefit for such purpose.  The proceeds of sale shall be applied first to all expenses of sale, including attorneys' fees, and then to the Obligations.  After the Obligations have been Fully Satisfied, the Administrative Agent will return any excess proceeds of the Collateral to the Borrower or the applicable Guarantor as directed by the Bankruptcy Court.  The Loan Parties shall remain liable for any deficiency.

(d)     Upon the occurrence of an Event of Default and during the continuation thereof, without limiting the generality of this Article X, the Administrative Agent may, in its sole discretion, sell or otherwise dispose of or realize upon the Pledged Shares, or any part thereof, in

one or more parcels, at public or private sale, at any exchange or broker's board or elsewhere, at such price or prices and on such other terms as the Administrative Agent may deem commercially reasonable, for cash, credit or for future delivery or otherwise in accordance with applicable law. To the extent permitted by law, any holder of the Obligations may in such event, bid for the purchase of such securities. Each Loan Party agrees that, to the extent notice of sale shall be required by law and has not been waived by such Loan Party, any requirement of reasonable notice shall be met if notice, specifying the place of any public sale or the time after which any private sale is to be made, is personally served on or mailed, postage prepaid, to such Loan Party, in accordance with the notice provisions of <u>Section 12.02</u> of the Credit Agreement at least ten days before the time of such sale. The Administrative Agent shall not be obligated to make any sale of Pledged Shares of such Loan Party regardless of notice of sale having been given. The Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(e)     Upon the occurrence of an Event of Default and during the continuation thereof, the Loan Parties recognize that the Administrative Agent may deem it impracticable to effect a public sale of all or any part of the Pledged Shares or any of the securities constituting Pledged Shares and that the Administrative Agent may, therefore, determine to make one or more private sales of any such Pledged Shares to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such Pledged Shares for their own account, for investment and not with a view to the distribution or resale thereof. Each Loan Party acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms that might have been obtained at a public sale and, notwithstanding the foregoing, agrees that, to the extent permitted by applicable law, such private sale shall be deemed to have been made in a commercially reasonable manner and that the Administrative Agent shall have no obligation to delay sale of any such Pledged Shares for the period of time necessary to permit the issuer of such Pledged Shares to register such Pledged Shares for public sale under the Securities Act. Each Loan Party further acknowledges and agrees that any offer to sell such Pledged Shares that has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation in the financial community of New York, New York (to the extent that such offer may be advertised without prior registration under the Securities Act of 1933 as amended), or (ii) made privately in the manner described above shall be deemed to involve a "public sale" under the UCC, notwithstanding that such sale may not constitute a "public offering" under the Securities Act of 1933 as amended, and the Administrative Agent may, in such event, bid for the purchase of such Pledged Shares.

(f)     To the extent permitted under applicable law, in addition to the rights and remedies hereunder, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, after providing the notices required by Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of applicable law of the relevant jurisdiction, accept or retain all or any portion of the Pledged Shares in satisfaction of the Obligations. Unless and until the Administrative Agent shall have provided such notices, however, the Administrative Agent shall not be deemed to have accepted or retained any Pledged Shares in satisfaction of any Obligations for any reason.

**10.03  Application of Funds.**

After the acceleration of the Obligations as provided for in <u>Section 10.02(b)</u>, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and the Co-Agents and amounts payable under <u>Article III</u>) payable to the Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the DIP Lenders (including fees, charges and disbursements of counsel to the respective DIP Lenders and the L/C Issuer and amounts payable under <u>Article III</u>), ratably among them in proportion to the respective amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees and interest on the Loans, L/C Borrowings and other Obligations, ratably among the DIP Lenders and the L/C Issuer in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

<u>Fourth</u>, to the payment of that portion of the Obligations constituting unpaid principal of the Loans, L/C Borrowings, or arising under Treasury Management Agreements, and to Cash Collateralize to the extent of 105% of the undrawn amounts of Letters of Credit, ratably among such parties in proportion to the respective amounts described in this clause <u>Fourth</u> held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by order of the Bankruptcy Court.

The Loan Parties shall remain liable for any deficiency. Subject to <u>Section 2.03(c)</u>, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause <u>Fourth</u> above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

**ARTICLE XI**
**ADMINISTRATIVE AGENT**

**11.01  Appointment and Authority.**

Each of the DIP Lenders and the L/C Issuer hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other DIP Loan

Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the DIP Lenders and the L/C Issuer, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

**11.02  Rights as a DIP Lender.**

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a DIP Lender as any other DIP Lender and may exercise the same as though it were not the Administrative Agent and the term "DIP Lender" or "DIP Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the DIP Lenders.

**11.03  Exculpatory Provisions.**

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other DIP Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other DIP Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be expressly provided for herein or in the other DIP Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any DIP Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other DIP Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required DIP Lenders (or such other number or percentage of the

DIP Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.01 and 10.02) or (ii) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a DIP Lender or the L/C Issuer.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other DIP Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other DIP Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article V or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**11.04  Reliance by Administrative Agent.**

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a DIP Lender or the L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such DIP Lender or the L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such DIP Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**11.05  Delegation of Duties.**

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other DIP Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

**11.06   Resignation of Administrative Agent.**

The Administrative Agent may at any time give notice of its resignation to the DIP Lenders, the L/C Issuer and the Borrower.  Upon receipt of any such notice of resignation, the Required DIP Lenders shall have the right to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the DIP Lenders and the L/C Issuer, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if the Administrative Agent shall notify the Borrower and the DIP Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other DIP Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each DIP Lender and the L/C Issuer directly, until such time as the Required DIP Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other DIP Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other DIP Loan Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Any resignation by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as L/C Issuer.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, (b) the retiring L/C Issuer shall be discharged from all of its duties and obligations hereunder or under the other DIP Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

**11.07   Non-Reliance on Administrative Agent and Other DIP Lenders.**

Each DIP Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other DIP Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each DIP Lender and the L/C Issuer also

acknowledges that it will, independently and without reliance upon the Administrative Agent or any other DIP Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other DIP Loan Document or any related agreement or any document furnished hereunder or thereunder.

### 11.08  No Other Duties, Etc.

Anything herein to the contrary notwithstanding, none of the Arrangers, the Documentation Agent, or other agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other DIP Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Co-Agent, a DIP Lender or the L/C Issuer hereunder.

### 11.09  Administrative Agent May File Proofs of Claim.

The Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered

(a)  to file and prove an administrative claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the DIP Lenders, the L/C Issuer and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the DIP Lenders, the L/C Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the DIP Lenders, the L/C Issuer and the Administrative Agent under Sections 2.03(i) and (j), 2.08 and 12.04) allowed in the Bankruptcy Cases or other applicable proceedings; and

(b)  to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any trustee, custodian, receiver, assignee, liquidator, sequestrator or other similar official in the Bankruptcy Cases or any other proceeding is hereby authorized by each DIP Lender and the L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the DIP Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.08 and 12.04.

**11.10  Collateral and Guaranty Matters.**

The DIP Lenders and the L/C Issuer irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien on any Property granted to or held by the Administrative Agent under any DIP Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations outstanding under the DIP Loan Documents (other than contingent indemnification obligations) and the expiration or termination of all Letters of Credit, (ii) that is transferred or to be transferred as part of or in connection with any Disposition permitted hereunder or under any other DIP Loan Document, or (iii) subject to Section 12.01, if approved, authorized or ratified in writing by the Required DIP Lenders; and

## ARTICLE XII
## MISCELLANEOUS

**12.01  Amendments, Etc.**

(a)  General.  No amendment or waiver of any provision of this Agreement or any other DIP Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by each of the Loan Parties and the Required DIP Lenders, or, the case of any other DIP Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Parties that are parties thereto and consented to in writing by the Required DIP Lenders, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that:

(i)  no such amendment, waiver or consent shall, without the written consent of each DIP Lender directly affected thereby:

(A)  extend or increase the Commitment of any DIP Lender (or reinstate any Commitment terminated pursuant to Section 10.02) (it being understood and agreed that a waiver of any condition precedent set forth in Section 5.02 or of any Default or Event of Default or mandatory reduction in the Commitments shall not constitute a change in the terms of any Commitment of any DIP Lender);

(B)  except to the extent otherwise provided in Section 5.03(b), postpone any date fixed by any DIP Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the DIP Lenders (or any of them) thereunder;

(C)  reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or any fees or other amounts payable under any DIP Loan Document; provided, however, that only the consent of the Required DIP Lenders shall be necessary to amend the definition of "Default

Rate" or to waive any obligation of the Borrower to pay interest or Letter of Credit Fees at the Default Rate;

(D)     change Section 2.12 or Section 10.03 in a manner that would alter the pro rata sharing of payments required thereby;

(E)     change any provision of this Section or the definition of "Required DIP Lenders" or "Super-Majority Lenders" or any other provision hereof specifying the number or percentage of DIP Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder;

(F)     (i) release all or substantially all of the Collateral and (ii) release all or substantially all of the value of the Guaranty;

(G)     release the Borrower from its obligations under the DIP Loan Documents;

(ii)     without the consent of DIP Lenders holding in the aggregate at least a majority of the Revolving Commitments (or if the Revolving Commitments have been terminated, the outstanding Revolving Loans and participations (whether funded or not) in any L/C Obligations (and/or participations therein)), for purposes of determining whether the conditions precedent set forth in Section 5.02(b) shall have been satisfied in respect of any proposed Credit Extension, (A) no Default or Event of Default may be waived and (B) no amendment, waiver or consent of Section 7.03(a), Section 7.11, or Article VIII shall be effective;

(iii)     without the consent of DIP Lenders holding in the aggregate at least a majority of the unfunded Term Loan Commitment or the outstanding Term Loan (and/or participations therein) and without the consent of DIP Lenders holding in the aggregate at least a majority of the Revolving Commitments (or if the Revolving Commitments have been terminated, the outstanding Revolving Loans and participations (whether funded or not) in any L/C Obligations (and/or participations therein)), (i) amend, change, waive, discharge or terminate Section 10.03 so as to alter the manner of application of any payment in respect of the Obligations or proceeds of Collateral or (ii) amend, change, waive, discharge or terminate Section 2.04(b)(v) so as to alter the manner of application of proceeds of any mandatory prepayment required by Section 2.04(b)(i), (ii), (iii) or (iv);

(iv)     without the consent of (i) DIP Lenders holding a majority of the Revolving Commitments (or if the Revolving Commitments have been terminated, the outstanding Revolving Loans (and participations in any L/C Obligations)) and (ii) DIP Lenders holding at least a majority of the unfunded Term Loan Commitment or the outstanding Term Loan (and participations therein), impose any greater restriction on the ability of any DIP Lender to assign any of its rights or obligations hereunder (it being understood that, for purposes of this clause (iv), the aggregate amount of each DIP Lender's risk participation

and funded participation in L/C Obligations shall be deemed to be held by such DIP Lender);

(v) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer in addition to the DIP Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it;

(vi) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the DIP Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other DIP Loan Document; and

(vii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

(b) <u>Defaulting DIP Lenders</u>. Notwithstanding anything to the contrary herein, no Defaulting DIP Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such DIP Lender may not be increased or extended without the consent of such DIP Lender.

(c) <u>Voting Rights of DIP Lenders During Bankruptcy Proceedings</u>. Notwithstanding the fact that the consent of all the DIP Lenders is required in certain circumstances as set forth above, each DIP Lender is entitled to vote as such DIP Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each DIP Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein.

**12.02  Notices. Effectiveness of Electronic Communications.**

(a) <u>Notices Generally</u>. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i) if to any Loan Party, the Administrative Agent or the L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 12.02</u>; and

(ii) if to any other DIP Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have

been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)  Electronic Communications.  Notices and other communications to the DIP Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any DIP Lender or the L/C Issuer pursuant to Article II if such DIP Lender or the L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)  The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE LOAN PARTY MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE LOAN PARTY MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE LOAN PARTY MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any DIP Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of Loan Party Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any DIP Lender, the L/C Issuer or

any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of the Loan Parties, the Administrative Agent and the L/C Issuer may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other DIP Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent and the L/C Issuer.  In addition, each DIP Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such DIP Lender.

(e)     Reliance by Administrative Agent, L/C Issuer and DIP Lenders.  The Administrative Agent, the L/C Issuer and the DIP Lenders shall be entitled to rely and act upon any notices (including telephonic Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, the L/C Issuer, each DIP Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

## 12.03   No Waiver; Cumulative Remedies; Enforcement.

No failure by any DIP Lender, the L/C Issuer or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other DIP Loan Document, the authority to enforce rights and remedies hereunder and under the other DIP Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 10.02 for the benefit of all the DIP Lenders and the L/C Issuer; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) the L/C Issuer from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer) hereunder and under the other DIP Loan Documents, (c) any DIP Lender from exercising setoff rights in accordance with Section 12.08 (subject to the terms

of Section 2.12), or (d) any DIP Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party in the Bankruptcy Cases; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other DIP Loan Documents, then (i) the Required DIP Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 10.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.12, any DIP Lender may, with the consent of the Required DIP Lenders, enforce any rights and remedies available to it and as authorized by the Required DIP Lenders.

**12.04  Expenses; Indemnity; Damage Waiver.**

(a)  <u>Costs and Expenses</u>.  The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and the Co-Agents), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other DIP Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iii) all out-of-pocket expenses incurred by the Administrative Agent, any DIP Lender or the L/C Issuer (including the fees, charges and disbursements of any counsel for the Administrative Agent and each Co-Agent, any DIP Lender or the L/C Issuer), in connection with the enforcement or protection of its rights and the monitoring of the Collateral (A) in connection with any of the DIP Loan Documents, including its rights under this Section, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit, and (iv) without limiting the generality of the foregoing, all reasonable fees and expenses of any financial advisory or accounting firm retained by or for the benefit of the Administrative Agent, at the direction of the Required DIP Lenders, in connection with the review, analysis, appraisal, valuation or restructuring of the Loan Parties or their respective Properties. The Borrower's obligation to pay all such costs, expenses and charges includes, without limitation, any such costs, expenses and charges that accrue after any conversion of the Bankruptcy Cases to proceedings administered under Chapter 7 of the Bankruptcy Code.

(b)  <u>Indemnification by the Borrower</u>.  The Borrower shall indemnify the Administrative Agent and each Co-Agent (and any sub-agent thereof), each DIP Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of any DIP Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder, the consummation of the transactions contemplated thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration

of this Agreement and the other DIP Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any real Property owned or operated by any Loan Party, or any Environmental Liability arising from any act or omission of any Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE**; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations under any of the DIP Loan Documents, if any Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     Reimbursement by DIP Lenders.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the L/C Issuer or any Related Party of any of the foregoing, each DIP Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the L/C Issuer or such Related Party, as the case may be, such DIP Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or L/C Issuer in connection with such capacity. The obligations of the DIP Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, none of the Loan Parties shall assert, and each of the Loan Parties hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any DIP Loan Document or any agreement or instrument contemplated thereby, the transactions contemplated thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with any of the DIP Loan Documents or the transactions contemplated except to the extent that such damages are caused by the gross negligence or willful misconduct of such Indemnified Party or a breach in bad faith of such Indemnified Party's obligations under any DIP

Loan Document (in each case as determined in a final and nonappealable judgment by a court of competent jurisdiction).

(e) <u>Payments</u>. All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f) <u>Survival</u>. The agreements in this Section shall survive the resignation of the Administrative Agent and/or the L/C Issuer, as applicable, the replacement of any DIP Lender, the termination of the Aggregate Revolving Commitments and the repayment, satisfaction or discharge of all the Obligations.

## 12.05 **Payments Set Aside.**

To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent, the L/C Issuer or any DIP Lender, or the Administrative Agent, the L/C Issuer or any DIP Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared avoidable, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the L/C Issuer or such DIP Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with the Bankruptcy Cases or any proceeding under Chapter 7 of the Bankruptcy Code or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each DIP Lender and the L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the DIP Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

## 12.06 **Successors and Assigns.**

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder (other than in connection with a transaction permitted by this Agreement) without the prior written consent of the Administrative Agent and each DIP Lender, and no DIP Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in any DIP Loan Document, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated

hereby, the Related Parties of each of the Administrative Agent, the L/C Issuer and the DIP Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  <u>Assignments by DIP Lenders</u>.  Any DIP Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this subsection (b), participations in L/C Obligations) at the time owing to it); <u>provided</u> that

(i)  except in the case of an assignment of the entire remaining amount of the assigning DIP Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a DIP Lender or an Affiliate of a DIP Lender or an Approved Fund with respect to a DIP Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Revolving Commitments are not then in effect, the outstanding principal balance of the Loans of the assigning DIP Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 in the case of an assignment of Revolving Loans and $1,000,000 in the case of an assignment of Term Loans unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); <u>provided</u>, <u>however</u>, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)  each partial assignment shall be made as an assignment of a proportionate part of all the assigning DIP Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not apply to rights in respect of the Term Loan;

(iii)  any assignment of a Revolving Commitment must be approved by the Administrative Agent and the L/C Issuer (such approval not to be unreasonably withheld or delayed) unless the Person that is the proposed assignee is itself a DIP Lender currently holding a Revolving Commitment (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and

(iv)  the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500, and the Eligible Assignee, if it shall not be a DIP Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this

Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a DIP Lender under this Agreement, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning DIP Lender's rights and obligations under this Agreement, such DIP Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u>, and <u>12.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee DIP Lender. Any assignment or transfer by a DIP Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such DIP Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)     <u>Register</u>. The Administrative Agent shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the DIP Lenders, and the Commitments of, and principal amounts of the Loans and L/C Obligations owing to, each DIP Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the DIP Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a DIP Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by each of the Borrower and the L/C Issuer at any reasonable time and from time to time upon reasonable prior notice. In addition, at any time that a request for a consent for a material or other substantive change to the DIP Loan Documents is pending, any DIP Lender may request and receive from the Administrative Agent a copy of the Register.

(d)     <u>Participations</u>. Any DIP Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such DIP Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such DIP Lender's participations in L/C Obligations) owing to it); <u>provided</u> that (i) such DIP Lender's obligations under this Agreement shall remain unchanged, (ii) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the DIP Lenders and the L/C Issuer shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a DIP Lender sells such a participation shall provide that such DIP Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such DIP Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to <u>Section 12.01</u> that affects such Participant. Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections</u>

3.01, 3.04 and 3.05 to the same extent as if it were a DIP Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a DIP Lender, provided such Participant agrees to be subject to Section 2.12 as though it were a DIP Lender.

(e)  Limitation on Participation Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable DIP Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign DIP Lender if it were a DIP Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 3.01(e) as though it were a DIP Lender.

(f)  Certain Pledges.  Any DIP Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such DIP Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such DIP Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such DIP Lender as a party hereto.

(g)  Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)  Resignation as L/C Issuer after Assignment.  Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Commitment and Loans pursuant to subsection (b) above, Bank of America may, upon 30 days' notice to the Borrower and the DIP Lenders, resign as L/C Issuer. In the event of any such resignation as L/C Issuer, the Borrower shall be entitled to appoint from among the DIP Lenders a successor L/C Issuer hereunder; provided, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of Bank of America as L/C Issuer. If Bank of America resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the DIP Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)). Upon the appointment of a successor L/C Issuer, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make

other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

**12.07  Treatment of Certain Information; Confidentiality.**

Each of the Administrative Agent, the DIP Lenders and the L/C Issuer agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other DIP Loan Document or any action or proceeding relating to this Agreement or any other DIP Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any DIP Lender, the L/C Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

For purposes of this Section, "Information" means all information received from any Loan Party relating to any Loan Party or any of their respective businesses, other than any such information that is available to the Administrative Agent, any DIP Lender or the L/C Issuer on a nonconfidential basis prior to disclosure by the Loan Parties, provided that, in the case of information received from the Loan Parties after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the DIP Lenders and the L/C Issuer acknowledges that (a) the Information may include material non-public information concerning the Loan Parties, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**12.08 Set-off.**

Subject to Section 10.02, if an Event of Default shall have occurred and be continuing, each DIP Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such DIP Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under any of the DIP Loan Documents to such DIP Lender or the L/C Issuer, irrespective of whether or not such DIP Lender or the L/C Issuer shall have made any demand under such DIP Loan Documents and although such obligations of such Loan Party may be contingent or unmatured or are owed to a branch or office of such DIP Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each DIP Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such DIP Lender, the L/C Issuer or their respective Affiliates may have. Each DIP Lender and the L/C Issuer agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application

**12.09 Interest Rate Limitation.**

Notwithstanding anything to the contrary contained in any DIP Loan Document, the interest paid or agreed to be paid under the DIP Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any DIP Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the applicable Loan Parties. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a DIP Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**12.10 Counterparts; Integration; Effectiveness.**

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other DIP Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 5.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature

page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

## 12.11 Survival of Representations and Warranties.

All representations and warranties made hereunder and in any other DIP Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each DIP Lender, regardless of any investigation made by the Administrative Agent or any DIP Lender or on their behalf and notwithstanding that the Administrative Agent or any DIP Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until such time as the Obligations under the DIP Loan Documents have been Fully Satisfied.

## 12.12 Governing Law.

**THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND THE UNITED STATES BANKRUPTCY CODE.**

## 12.13 Waiver of Jury Trial.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY OF THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 12.14 Termination.

The Administrative Agent shall be permitted to execute and deliver written evidence of the termination of this Agreement (including the Guaranty) and the other DIP Loan Documents and the release of all security interests created hereunder or under any of the other Collateral Documents at such time as the Obligations have been Fully Satisfied, and the Administrative Agent shall have no obligation or duty to notify any Person that is not at such time a DIP Lender (or an Affiliate thereof) of the termination of the DIP Loan Documents (including the Guaranty) and release of such security interests.

**12.15   USA PATRIOT Act Notice.**

Each DIP Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any DIP Lender) hereby notifies each Loan Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such DIP Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the Act. Each Loan Party shall, promptly following a request by the Administrative Agent or any DIP Lender, provide all documentation and other information that the Administrative Agent or such DIP Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**12.16   Subordination of Intercompany Debt.**

Each of the Loan Parties agrees that all intercompany Indebtedness among any of the Loan Parties (the "Intercompany Debt") is subordinated in right of payment, to the prior payment in full of all Obligations. In the event that any Loan Party receives any payment of any Intercompany Debt at a time when such payment is prohibited by this Section 12.16, such payment shall be held by such Loan Party, in trust for the benefit of, and shall be paid forthwith over and delivered, upon written request, to, the Administrative Agent.

[The remainder of this page has been left blank intentionally.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

THE BORROWER:  **CRESCENT RESOURCES, LLC,**
a Georgia limited liability company


By:_____

Name:_____

Title:_____


THE GUARANTORS:  **CRESCENT HOLDINGS, LLC,**
a Delaware limited liability company

By:_____

Name:_____

Title:_____


**1780, LLC
BLACK FOREST ON LAKE JAMES, LLC
CAMP LAKE JAMES, LLC
CAROLINA CENTERS, LLC
CITALL DEVELOPMENT, LLC
CLEAN WATER OF NC, LLC
CLUB CAPITAL, LLC
CLUB ENTERPRISES, LLC
CORNERSTONE PLAZA, LLC
CRESCENT 210 BARTON SPRINGS, LLC
CRESCENT COMMUNITIES N.C., LLC
CRESCENT COMMUNITIES REALTY, LLC
CRESCENT COMMUNITIES S.C., LLC
CRESCENT LAKEWAY MANAGEMENT, LLC
CRESCENT LAKEWAY, LLC
CRESCENT LAND & TIMBER, LLC
CRESCENT REALTY ADVISORS, LLC
CRESCENT REALTY, LLC
CRESCENT RIVER, LLC
CRESCENT ROUGH HOLLOW, LLC
CRESCENT SOUTHEAST CLUB, LLC
CRESCENT YACHT CLUB, LLC
CRESCENT/FLORIDA, LLC**

CRESCENT/GEORGIA, LLC
CRESCENT/RGI CAPITAL, LLC
FALLS COVE DEVELOPMENT, LLC
HIDDEN LAKE CRESCENT, LLC
MCNINCH-HILL INVESTMENTS, L.L.C.
MILFORD ESTATES, LLC
OLD WILDLIFE CLUB, LLC
OLDFIELD, LLC
PANAMA CITY DEVELOPMENT, LLC
PARKSIDE DEVELOPMENT, LLC
PIEDMONT ROW DEVELOPMENT, LLC
SEDDON PLACE DEVELOPMENT, LLC
SPRINGFIELD CRESCENT, LLC
STONEWATER BAY PROPERTIES, LLC
STRATFORD ON HOWARD DEVELOPMENT, LLC
SUGARLOAF COUNTRY CLUB, LLC
SUGARLOAF PROPERTIES, LLC
SUGARLOAF REALTY, LLC
THE FARMS, LLC
THE OLDFIELD REALTY COMPANY, LLC
THE RIVER CLUB REALTY, LLC
THE RIVER COUNTRY CLUB, LLC
THE RETREAT ON HAW RIVER, LLC
THE SANCTUARY AT LAKE WYLIE, LLC
TUSSAHAW DEVELOPMENT, LLC
TWO LAKE PONY FARM, LLC
CLT DEVELOPMENT, LLC
CRESCENT POTOMAC YARD, LLC
CRESCENT TWIN CREEKS, LLC
CRESCENT/ARIZONA, LLC
PALMETTO BLUFF INVESTMENTS, LLC
TWIN CREEKS MANAGEMENT, LLC
PARK/MARSH, LLC
CRESCENT MULTIFAMILY CONSTRUCTION, LLC
CHAPEL COVE AT GLENGATE, LLC
NINE CORPORATE CENTRE HOLDING COMPANY,
LLC
THE RANCH AT THE RIM, LLC

By:     CRESCENT RESOURCES, LLC, its sole Member

        By:     _____
                Kevin H. Lambert, Chief Financial Officer

**BALLANTYNE PROPERTIES, LLC**

By:    CRESCENT RESOURCES, LLC, Member

      By:    _____
              Kevin H. Lambert, Chief Financial Officer

By:    CLT DEVELOPMENT, Member

      By:    CRESCENT RESOURCES, LLC, its sole Member

            By:    _____
                    Kevin H. Lambert, Chief Financial Officer

**CAROLINA CENTERS LLC**

By:    CRESCENT RESOURCES, LLC, Member

      By:    _____
              Kevin H. Lambert, Chief Financial Officer

By:    CLT DEVELOPMENT, Member

      By:    CRESCENT RESOURCES, LLC, its sole Member

            By:    _____
                    Kevin H. Lambert, Chief Financial Officer

**CRESCENT POTOMAC PROPERTIES, LLC**

**FP REAL ESTATE ONE, LLC**

By:    CRESCENT/ARIZONA, LLC, its sole Member

      By:    CRESCENT RESOURCES, LLC, its sole Member

            By:    _____
                    Kevin H. Lambert, Chief Financial Officer

**HEADWATERS DEVELOPMENT LIMITED PARTNERSHIP**

By:     PALMETTO BLUFF DEVELOPMENT, LLC, its General Partner

     By:     PALMETTO BLUFF INVESTMENTS, LLC, its sole Member

         By:     CRESCENT RESOURCES, LLC, its sole Member

            By: _____

               Kevin H. Lambert, Chief Financial Officer

By:     CLT DEVELOPMENT, LLC, its Limited Partner

     By:     CRESCENT RESOURCES, LLC, its sole Member

         By: _____

           Kevin H. Lambert, Chief Financial Officer

**MAY RIVER FOREST, LLC**

By:     PALMETTO BLUFF DEVELOPMENT, LLC, its sole Member

     By:     PALMETTO BLUFF INVESTMENTS, LLC, its sole Member

         By:     CRESCENT RESOURCES, LLC, its sole Member

            By: _____

               Kevin H. Lambert, Chief Financial Officer

**MAY RIVER GOLF CLUB, LLC**

By: PALMETTO BLUFF DEVELOPMENT, LLC, its sole Member

    By: PALMETTO BLUFF INVESTMENTS, LLC, its sole Member

        By: CRESCENT RESOURCES, LLC, its sole Member

            By: _____

            Kevin H. Lambert, Chief Financial Officer

**NEW RIVERSIDE, LLC**

By: PALMETTO BLUFF INVESTMENTS, LLC, its sole Member

    By: CRESCENT RESOURCES, LLC, its sole Member

        By: _____

        Kevin H. Lambert, Chief Financial Officer

**PALMETTO BLUFF CLUB, LLC**
**PALMETTO BLUFF LODGE, LLC**
**PALMETTO BLUFF REAL ESTATE COMPANY, LLC**

By: PALMETTO BLUFF DEVELOPMENT, LLC, its sole Member

    By: PALMETTO BLUFF INVESTMENTS, LLC, its sole Member

        By: CRESCENT RESOURCES, LLC, its sole Member

            By: _____

            Kevin H. Lambert, Chief Financial Officer

**PALMETTO BLUFF UPLANDS, LLC**

By: PALMETTO BLUFF INVESTMENTS, LLC, its sole Member

    By: CRESCENT RESOURCES, LLC, its sole Member

        By: _____

        Kevin H. Lambert, Chief Financial Officer

**SAILVIEW PROPERTIES, LLC**

By:    CRESCENT RESOURCES, LLC, Member

       By:    _____
                Kevin H. Lambert, Chief Financial Officer

By:    CLT DEVELOPMENT, Member

       By:    CRESCENT RESOURCES, LLC, its sole Member

              By:    _____
                       Kevin H. Lambert, Chief Financial Officer

**THE POINT ON NORMAN, LLC**

By:    CRESCENT RESOURCES, LLC, Member

       By:    _____
                Kevin H. Lambert, Chief Financial Officer

By:    CLT DEVELOPMENT, Member

       By:    CRESCENT RESOURCES, LLC, its sole Member

              By:    _____
                       Kevin H. Lambert, Chief Financial Officer

**TWIN CREEKS HOLDINGS, LTD.**

By:    TWIN CREEKS MANAGEMENT, LLC, its General Partner

       By:    CRESCENT RESOURCES, LLC, its sole Member

              By:    _____
                       Kevin H. Lambert, Chief Financial Officer

By:    CRESCENT TWIN CREEKS, LLC, its Limited Partner

       By:    CRESCENT RESOURCES, LLC, its sole Member

              By:    _____
                       Kevin H. Lambert, Chief Financial Officer

**TWIN CREEKS OPERATING CO., LP**

By:     TWIN CREEKS MANAGEMENT, LLC, its General
        Partner

By:     CRESCENT RESOURCES, LLC, its sole Member

        By: _____
        Kevin H. Lambert, Chief Financial Officer

By:     TWIN CREEKS PROPERTY, LTD., its Limited Partner

By:     TWIN CREEKS MANAGEMENT, LLC, its General
        Partner

        By:     CRESCENT RESOURCES, LLC, its sole
                Member

                By: _____
                Kevin H. Lambert, Chief Financial Officer

By:     CRESCENT TWIN CREEKS, LLC, its Limited Partner

        By:     CRESCENT RESOURCES, LLC, its sole
                Member

                By: _____
                Kevin H. Lambert, Chief Financial Officer

**PALMETTO BLUFF DEVELOPMENT, LLC**

By:     PALMETTO BLUFF INVESTMENTS, LLC, its sole Member

        By:     CRESCENT RESOURCES, LLC, its sole Member

                By: _____
                Kevin H. Lambert, Chief Financial Officer

**TWIN CREEKS PROPERTY, LTD.**

By:     TWIN CREEKS MANAGEMENT, LLC, its General Partner

        By:     CRESCENT RESOURCES, LLC, its sole Member

                By: _____
                Kevin H. Lambert, Chief Financial Officer

By:     CRESCENT TWIN CREEKS, LLC, its Limited Partner

By:    CRESCENT RESOURCES, LLC, its sole Member

By:    _____
Kevin H. Lambert, Chief Financial Officer


## HAMMOCK BAY CRESCENT, LLC

By:    CRESCENT RESOURCES, LLC, its sole Member

By:    _____
Kevin H. Lambert, Chief Financial Officer

## LANDMAR MANAGEMENT, LLC

By:    CRESCENT RESOURCES, LLC, its sole Member

By:    _____
Kevin H. Lambert, Chief Financial Officer

## LANDMAR GROUP, LLC

By:    LANDMAR MANAGEMENT, LLC, its Manager

By:    CRESCENT RESOURCES, LLC, its sole Member and Manager

By:    _____
Kevin H. Lambert, Chief Financial Officer

## GULF SHORES WATERWAY DEVELOPMENT, LLC

By:    GULF SHORES WATERWAY DEVELOPMENT HOLDINGS, LLC, its Manager

By:    CRESCENT RESOURCES, LLC, its sole Member and Manager

By:    _____
Kevin H. Lambert, Chief Financial Officer

## BARTRAM CRESCENT DEVELOPMENT, LLC

By:    CRESCENT RESOURCES, LLC, its sole Member

By:    _____
Kevin H. Lambert, Chief Financial Officer

## BRIDGEWATER LAKELAND DEVELOPERS, LLC
## BROOKSVILLE EAST DEVELOPERS, LLC
## COLBERT LANE COMMERCIAL, LLC

**GRAND HAVEN DEVELOPERS, LLC**
**HAMPTON LAKES, LLC**
**HAWK'S HAVEN SPONSOR, LLC**
**LAKE GEORGE DEVELOPERS, LLC**
**LIGHTHOUSE HARBOR DEVELOPERS, LLC**
**NORTH HAMPTON, LLC**
**OSPREY DEVELOPMENT, LLC**
**ROBERTS ROAD, LLC**
**THE RESERVE, LLC**
**TROUT CREEK DEVELOPERS, LLC**
**WINDING RIVER, LLC**

By:      LANDMAR GROUP, LLC, its sole Member

By:      LANDMAR MANAGEMENT, LLC, its Manager

   By:      CRESCENT RESOURCES, LLC, its sole Member and
            Manager

      By:      _____
               Kevin H. Lambert, Chief Financial Officer


**HAWK'S HAVEN JOINT DEVELOPMENT, LLC**

By:      HAWK'S HAVEN SPONSOR, LLC, its sole Member

By:      LANDMAR GROUP, LLC, its sole Member

By:      LANDMAR MANAGEMENT, LLC, its Manager

   By:      CRESCENT RESOURCES, LLC, its sole Member and
            Manager

      By:      _____
               Kevin H. Lambert, Chief Financial Officer

**ADMINISTRATIVE AGENT:**        **BANK OF AMERICA, N.A.,** as Administrative
                                 Agent

                                 By: _____
                                 Name:
                                 Title:


**L/C ISSUER:**                  **BANK OF AMERICA, N.A.,** as L/C Issuer


                                 By: _____
                                 Name:
                                 Title:


**DIP LENDERS:**                 **BANK OF AMERICA, N.A.**


                                 By: _____
                                 Name:
                                 Title:

                                 **[FIVE MILE CAPITAL PARTNERS]**

                                 By: _____
                                 Name:
                                 Title:


                                 **[ADDITIONAL DIP LENDERS]**


                                 [signatures ended]