

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 27, 2009**

_Craig A. Gargotta_

CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

---------------------------------------------------------------x

In re: :
　:     **Chapter 11**
CRESCENT RESOURCES, LLC, *et al.* , :
　:     **Case No. 09-11507 (CAG)**
　Debtors. :
　:     **Jointly Administered**
---------------------------------------------------------------x

**FINAL ORDER (I) APPROVING DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS TO INCUR POST-PETITION SECURED INDEBTEDNESS; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS PURSUANT TO SECTIONS 105(a), 364(c) AND (d) OF THE BANKRUPTCY CODE; (III) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED LENDERS; (IV) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; AND (V) MODIFYING THE AUTOMATIC STAY**

　　　Upon the motion (the "Motion"), dated June 10, 2009, of Crescent Resources, LLC, Inc. ("Crescent") and its affiliated debtors identified on Schedule 1 attached hereto are debtors in jointly administered chapter 11 cases (the "Cases"), as debtors and debtors in possession (collectively, the "Debtors"), for entry of an order authorizing the Debtors to incur post-petition secured indebtedness that is senior to the claims under the Pre-Petition Credit Agreement (as defined below), and to grant security interests and superpriority claims that are senior to the liens and claims in respect of the Pre-Petition Credit Agreement, pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as

amended, the "Bankruptcy Code") including pursuant to sections 105(a), 361, 362 and 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"); and the Motion having sought the following relief:

(a)    the Court's authorization, pursuant to the Bankruptcy Code, including sections 105(a), 361, and 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) thereof and Rules 2002, 4001, and 9014 of the Bankruptcy Rules, for Crescent to obtain post-petition financing from (and for all of the other Debtors to guaranty Crescent's obligations to) Bank of America, N.A., as administrative agent (the "DIP Agent"), Wachovia Bank, National Association and Five Mile Capital Partners, LLC as co-agents (the "DIP Co-Agents", and collectively with the DIP Agent, the "DIP Agents"), and a syndicate of financial institutions (collectively, the "DIP Lenders") which are party to that certain Post-Petition Loan and Security Agreement, dated as of June 17, 2009 (the "DIP Loan Agreement"), cash advances and other extensions of credit in an aggregate principal sum of up to $110,000,000, plus accrued interest on the aggregate principal amount, consisting of (i) $35,000,000 to be made available to the Debtors in one or more advances as set forth in the DIP Loan Agreement upon the first date practicable following entry of the Interim Order (as defined in paragraph (f) below), and (ii) an additional $75,000,000 to be made available to the Debtors in one or more advances as set forth in the DIP Loan Agreement upon or after the entry of the Final Order (as defined in paragraph (f) below) (collectively, the "DIP Loans"), to fund *inter alia* ongoing working capital and general corporate needs of the Debtors during these chapter 11 cases (the "Cases"), including to pay fees and expenses of the DIP Agent and the DIP Lenders, to pay claims in respect of certain pre-petition creditors to the extent authorized by orders of the Court reasonably acceptable to the DIP Agent and the DIP Lenders, to refinance obligations arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors by any Pre-Petition Secured Lender (as defined below), and to provide adequate protection to the holders of the Debtors' pre-petition secured indebtedness pursuant to that certain First Amended and Restated Credit Agreement, dated as of June 17,

2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Credit Agreement"), together with all security and other documents entered into in connection therewith and as further amended, restated, supplemented or otherwise modified from time to time (collectively, the "Pre-Petition Loan Documents"), among the Debtors, Bank of America, N.A., as Administrative Agent (the "Pre-Petition Bank Agent") and L/C Issuer, together with the other lenders (or their Affiliates) signatory thereto and secured parties referenced therein (collectively with the Pre-Petition Bank Agent, the "Pre-Petition Secured Lenders")[1];

(b)      that, pursuant to the Bankruptcy Code, including sections 364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code, the obligations under the DIP Loan Agreement (the "DIP Obligations") (i) be accorded superpriority status, having priority over any and all administrative expenses in the Cases of the kinds specified in or arising or ordered under the Bankruptcy Code, including under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 of the Bankruptcy Code, except for the Carve-Out Expenses (as defined in paragraph 8 below), and (ii) be secured by first priority security interests in and liens on all of the property, assets or interests in property or assets of the Debtors, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the Debtors' estates (within the meaning of the Bankruptcy Code), including, without limitation, all causes of action, accounts, inventory, chattel paper, contract rights, instruments, documents, general intangibles (including, without limitation, all copyrights, deposit accounts, licensing agreements, patents, trademarks and trade names), machinery and equipment, real property, fixtures, leases, cash, bank accounts and investment property, together with all proceeds, rents, products and profits of any of the foregoing (all of the foregoing, collectively, the "DIP Collateral" but excluding the Excluded Assets (as defined below)), subject and subordinate only to (i) the liens, security interests and other encumbrances on the Debtors' respective assets and properties existing as of the Petition Date (other than liens and security interests in favor of the Pre-Petition Bank Agent and the Pre-

---

[1]  The Pre-Petition Secured Lenders include certain entities that are counterparties under certain Swap Contracts (as defined in the Pre-Petition Credit Agreement) with certain of the Debtors.

Petition Secured Lenders) which are valid, perfected, enforceable and unavoidable (the "Permitted Liens"), and (ii) the Carve-Out Expenses;

(c)       that the Debtors may use cash collateral in which the Pre-Petition Secured Lenders have an interest (as such term is defined in section 363(a) of the Bankruptcy Code, "Cash Collateral") in accordance with the terms of this Final Order, and the granting of adequate protection to the Pre-Petition Secured Lenders for, among other things, such use of Cash Collateral and the Debtors' use, and any resulting diminution in the value, of the Pre-Petition Collateral (as defined below);

(d)       that, pursuant to the applicable provisions of the Bankruptcy Code, including sections 361, 503(b) and 507(b) thereof and the terms of this Final Order, the Pre-Petition Secured Lenders, whose liens and security interests are being primed by the DIP Liens and whose Cash Collateral and Pre-Petition Collateral may be used, sold or leased by the Debtors, be granted the following as adequate protection of their interests (collectively the "Pre-Petition Secured Lenders' Adequate Protection") (i) a superpriority claim having priority over all administrative expenses in the Cases, subject and subordinate only to the Carve-Out Expenses and the Superpriority Claim afforded the DIP Lenders, (ii) replacement liens on the DIP Collateral subject only to the Carve-Out Expenses, the DIP Liens, and the Permitted Liens which are otherwise senior to the liens in favor of the Pre-Petition Secured Lenders, and (iii) payment of costs and expenses of the Pre-Petition Bank Agent and counsel to certain members of an ad hoc steering committee of the Pre-Petition Secured Lenders, including reasonable attorney and advisor fees on a current basis without the need for filing fee applications or fee statements.

(e)       that, pursuant to the Bankruptcy Code, including sections 105 and 362 thereof, the automatic stay of section 362 of the Bankruptcy Code be modified to permit the DIP Lenders to enforce the DIP Liens and to pursue their rights and remedies under the DIP Loan Agreement;

(f)       that, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") be held before this Court to consider entry of an interim order (the "Interim Order") approving the post-petition financing facility on an interim basis, and further requesting that a final hearing (the "Final Hearing") thereafter be held before this Court to consider entry of this final order (the "Final Order")

authorizing on a final basis the financing contemplated by the DIP Loan Agreement, as set forth in the Motion and the DIP Loan Agreement and all other loan documents related thereto (collectively, with the DIP Loan Agreement, the "DIP Loan Documents") and the Cash Collateral use and adequate protection granted to the Pre-Petition Secured Lenders as set forth herein and in the Motion.

IT APPEARING that, pursuant to Bankruptcy Rule 4001(c)(1), notice of the Final Hearing having been given to (i) the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee"), (ii) counsel for the DIP Lenders, (iii) the thirty largest unsecured creditors of the Debtors, (iv) counsel to the Pre-Petition Bank Agent, (v) any other parties requesting such notice, and (vi) any other parties identified on the Affidavits of Service of Donna M. Zeiser, dated June 17 and 18, 2009 (Docket nos. 81 and 82) (collectively, the "Notice Parties"); and the Interim Hearing having been held on June 12, 2009, and the Court having entered the Interim Order on June 15, 2009 (and a corrected version of the Interim Order on June 23, 2009 attaching specified exhibits thereto); and the Final hearing having been held on July 22, 2009; and upon all of the pleadings filed with the Court, and all of the proceedings held before the Court; and upon the record of the Interim Hearing and the Final Hearing; and the Court having noted the appearances of all parties in interest in the record of this Court; and all objections to the relief requested in the Motion having been resolved or overruled by the Court, and after due deliberation and consideration, and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS AND CONCLUDES** that:[2]

A.     Commencement of the Cases. On June 10, 2009 (the "Petition Date") the Debtors filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession, pursuant to Bankruptcy Code sections 1107 and 1108.

B.     Jurisdiction and Notice. The Court has jurisdiction over these Cases, the parties and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

core proceeding as defined in 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought herein include sections 105, 361, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (d). Venue of the Cases in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The notice given by the Debtors of the Motion, the relief requested therein and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

C.    The Pre-Petition Credit Agreement.    Pursuant to the terms of the Pre-Petition Credit Agreement, the Pre-Petition Secured Lenders have made pre-petition extensions of credit and other financial accommodations to Crescent and the applicable Debtors[3] from time to time. The Debtors acknowledge and agree that the applicable Debtors are indebted to the Pre-Petition Secured Lenders in respect of outstanding and contingent obligations in the approximate principal amount of at least $1,494,377,346 on the Petition Date, plus outstanding obligations under secured swap contracts with certain of the Pre-Petition Secured Lenders totaling not less than $27,154,794.51, plus additional fees, costs, interest, and reimbursable expenses. The Debtors acknowledge and agree that, in order to secure this indebtedness, Crescent and the other applicable Debtors entered into the Pre-Petition Loan Documents with the Pre-Petition Secured Lenders, pursuant to which the Pre-Petition Bank Agent, on behalf of the Pre-Petition Secured Lenders, was granted a first priority lien on, and security interest in, among other things, (i) substantially all of the real property and improvements owned by Crescent and its wholly-owned direct and indirect subsidiaries, (ii) Crescent's equity interests in such subsidiaries, and (iii) certain assets of non-wholly owned joint venture entities affiliated with the Debtors, and the proceeds and recoveries of the foregoing (collectively, the "Pre-Petition Collateral" as more particularly described in the Pre-Petition Loan Documents). In the ordinary course of business of Crescent and its subsidiaries, Crescent provided working capital to its subsidiaries and affiliated entities, made available from the financing under the Pre-Petition Credit Agreement, to support their operations, and Crescent's

---

[3] The Debtors which are "Credit Parties" (as a Borrower or Guarantor) under the Pre-Petition Loan Documents are identified on Schedule 2 attached to this Final Order.

subsidiaries guaranteed the borrowings and other credit extensions under the Pre-Petition Credit Agreement in recognition of their reliance upon and use of the funds made available under this facility.

D.     <u>Purpose and Necessity of Financing</u>.  Good cause has been shown for entry of this Final Order.  The relief requested in the Motion is, subject to the terms and conditions hereof, necessary, essential and appropriate for the continued operation of the Debtors' businesses and the preservation of their estates and of going concern values.  The Debtors require the financing and the use of Cash Collateral described in the Motion to fund, among other things, the Debtors' cash requirements, including, without limitation, working capital and general corporate needs.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense and are unable to obtain other financing under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than the DIP Loan Agreement and the other DIP Loan Documents.  A loan facility in the amount provided by the DIP Loan Agreement and the other DIP Loan Documents is unavailable to the Debtors generally without their granting to the DIP Lenders, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the following:  (i) superpriority administrative claims having priority over any and all administrative expenses under the Bankruptcy Code, including the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, (ii) the liens and security interests on the DIP Collateral as security for all such DIP Obligations, including, without limitation, liens and security interests which prime the liens or claims of the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders.  After considering all alternatives, the Debtors have concluded that this loan facility and consensual use of Cash Collateral represent the best working capital financing available to the Debtors.  Given the current capital market conditions, alternative financing may not be available to the Debtors at all and will not be available on terms more favorable than set forth in the DIP Loan Documents.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the

Debtors' estates and their creditors, so that the business need for the Debtors to be operating under normal business terms may be met.

E.     <u>Good Faith Bargaining</u>. The DIP Loan Agreement, the DIP Loan Documents and the use of Cash Collateral have been negotiated in good faith and at arm's-length between the Debtors, the DIP Agents, the DIP Lenders, the Pre-Petition Bank Agent, and Pre-Petition Secured Lenders ( the DIP Agents, the DIP Lenders, the Pre-Petition Bank Agent, and the Pre-Petition Secured Lenders collectively, the "<u>Post-Petition Lending Parties</u>"). Any DIP Loans extended and other financial accommodations, including the use of Cash Collateral, made to the Debtors by the Post-Petition Lending Parties pursuant to the Interim Order, the Final Order or the DIP Loan Agreement shall have been extended by the Post-Petition Lending Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code. The terms of the DIP Loan Documents, and the adequate protection granted to the Pre-Petition Secured Lenders, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute fair consideration and value.

F.     <u>Agreed Budget</u>. The Debtors have represented that the Agreed Budget (as defined in the DIP Loan Agreement), is achievable and will allow the Debtors to operate in the Cases as a going concern. The Post-Petition Lending Parties are relying upon the Debtors' compliance with the Agreed Budget in accordance with the Interim Order and this Final Order in determining to enter into DIP Loan Documents and authorize the use of Cash Collateral. A summary of the Agreed Budget is attached hereto as <u>Exhibit "A"</u> for informational purposes.

G.     <u>Consensual Use of Cash Collateral</u>. Pre-Petition Secured Lenders holding a majority of the Pre-Petition Loan Obligations (as defined below) have instructed the Pre-Petition Bank Agent not to oppose the Debtors' use of the Pre-Petition Secured Lenders' Cash Collateral in the ordinary course of business in accordance with the Agreed Budget, subject to the express terms and conditions set forth in the Final Order.

H.    Debtors' Stipulations and Waivers Regarding the Pre-Petition Secured Lenders' Interests.
In consideration of the Debtors' use of the Pre-Petition Secured Lenders' Cash Collateral, the Debtors
stipulate and acknowledge that:

(1)    the Pre-Petition Loan Documents entered as of June 17, 2008 (and as amended,
modified or supplemented from time to time thereafter), between and among, *inter alia*, the
Debtors, the Pre-Petition Secured Lenders, and the Pre-Petition Bank Agent create legal, valid
and binding obligations of the applicable Debtors, enforceable in accordance with their terms
(other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy
Code);

(2)    as of the Petition Date, the outstanding balance due and owing under the
revolving credit facility of the Pre-Petition Credit Agreement was comprised of $294,128,277.00
in principal plus $4,593,814.30 in accrued and unpaid interest; the outstanding balance due and
owing under the term loan facility of the Pre-Petition Credit Agreement was comprised of
$1,197,000,000.00 in principal plus $24,788,649.51 in accrued and unpaid interest; the
outstanding face amount of undrawn letters of credit issued under the Pre-Petition Credit
Agreement (the "Pre-Petition Letters of Credit") equaled $3,249,069.00 and accrued and unpaid
letter of credit fees incurred in connection therewith equaled $148,987.25; and the outstanding
termination amounts of swap obligations arising under Swap Contracts (as defined in the Pre-
Petition Credit Agreement) equaled $27,154,794.51; plus in each case, other accrued and unpaid
fees, costs and reimbursable expenses (collectively, the "Pre-Petition Loan Obligations");

(3)    the liens and security interests held by the Pre-Petition Bank Agent on behalf of
itself and the Pre-Petition Secured Lenders with respect to the Pre-Petition Loan Documents are
valid, enforceable, properly perfected and non-avoidable;

(4)    the Debtors (i) waive any claim, counterclaim, recoupment, setoff or defense of
any kind or nature which would in any way affect the validity, priority, enforceability and non-
avoidability of the Pre-Petition Loan Obligations owing under the Pre-Petition Loan Documents

or any of the Pre-Petition Secured Lenders' liens, claims or security interests, or, reduce or affect the obligations of the Debtors to pay any of the Pre-Petition Bank Agent's or the Pre-Petition Secured Lenders' claims; and (ii) further waive any offsets, defenses, claims, or counterclaims against the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders, or their respective officers, directors, employees, attorneys, representatives, parent, affiliates, predecessors, successors, or assigns, whether known or unknown, at law or in equity, from the beginning of the world through this date arising under the Pre-Petition Loan Documents. These waivers shall be binding on the Debtors and any of their successors-in-interest and assigns but are subject to the provisions contained in decretal paragraph 18 below

I. <u>Additional Stipulations of the Debtors</u>. The Debtors acknowledge, represent, and stipulate, and the Court hereby finds and concludes that:

(1) subject to the entry of this Final Order, the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents;

(2) there are no other pre-petition liens or security interests in the DIP Collateral except for the liens securing the Pre-Petition Loan Obligations and the Permitted Liens; and

(3) the Agreed Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in the ordinary course of business in connection with the operation of their businesses for the period set forth in the Agreed Budget.

NOW, based upon the Motion of the Debtors and the record before this Court, and good cause appearing thereof,

**IT IS ORDERED, ADJUDGED AND DECREED** that:

(1) <u>Disposition</u>. The Motion is GRANTED on a final basis, and any objections thereto that have not previously been withdrawn are hereby overruled. Subject to the terms hereof, this Final Order is

valid immediately and is fully effective upon its entry. The credit facility and use of Cash Collateral authorized hereunder shall expire, and the DIP Loans made hereunder will mature and be due and payable upon the Termination Date (as defined below).

**Approval of DIP Loans, Granted Priming Liens and Superpriority Claims.**

(2) <u>Borrowing Authorization</u>. The DIP Loan Agreement is hereby approved on a final basis. Upon the execution and delivery of the DIP Loan Documents, the DIP Loan Documents (and all other documents executed in connection therewith and orders entered in connection therewith) shall constitute and are hereby deemed to be the legal, valid and binding obligations of the Debtors party thereto and of their respective estates, enforceable against each such Debtor and estate in accordance with the DIP Loan Documents. No obligation, payment, transfer or grant of security under the DIP Loan Documents, the Interim Order, or this Final Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under applicable law (including, without limitation, section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim. The Debtors are immediately authorized to obtain the DIP Loans, pursuant to the terms of the DIP Loan Agreement, the DIP Loan Documents, and this Final Order, in the aggregate principal amount outstanding not to exceed at any time $110,000,000. In addition, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services, including, without limitation, any automated clearing house fund transfers provided to or for the benefit of the Debtors by any DIP Lender or any affiliate of any DIP Lender, and the Debtors' obligations with respect thereto, whether incurred or arising prior to or after the Petition Date, shall constitute "Obligations" within the meaning of the DIP Loan Agreement; <u>provided</u>, <u>however</u>, that nothing herein shall require any DIP Lender or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(3) <u>Compensation for DIP Lenders</u>. Crescent as borrower under the DIP Loan Documents shall timely pay the fees and compensation provided for in the DIP Loan Documents, including, without limitation, (i) the Commitment Fee of 3.50% of the maximum principal amount of the DIP Loans, (ii) the fees and expenses of the DIP Agents, due and payable on the Closing Date, (iii) the fees and expenses of

Banc of America Securities, LLC and Wachovia Capital Partners, LLC as arrangers and syndicators of the DIP Loans under that certain fee letter dated as of June 2, 2009 among Bank of America, N.A. and Crescent, and (iv) the fees, costs and expenses reimbursable under the DIP Loan Agreement by the Debtors to the DIP Agents.

(4)    Other Fees and Expenses of the DIP Agents.   The Debtors shall promptly, following receipt of a written invoice, reimburse the DIP Agents for their respective costs, fees (including reasonable attorneys' fees), charges, and expenses incurred under or in connection with the DIP Loan Documents and the Cases, whether incurred pre-petition or post-petition, and reimbursable under the DIP Loan Documents.  None of such costs, fees, charges, and expenses shall be subject to Court approval and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application or fee statement with the Court; provided that the Court shall have jurisdiction to determine any dispute concerning such invoices and the DIP Agents shall deliver statements of fees and expenses incurred to the Creditors' Committee (as defined below) and the U.S. Trustee; provided further that the U.S. Trustee and the Creditors' Committee shall have a period of ten (10) days after receipt of such statements to file with the Court any objection to such fees and expenses, with service of such objection being made upon the Debtors, the DIP Agents, and the party whose fees and expenses are the subject of such objection, and unless such dispute is resolved consensually among the parties, it shall be subject to a hearing and determination by the Court concerning the reasonableness of such fees and expenses. Pending any such determination of the Court, the Debtors shall not pay the portion of such fees and expenses which are the subject of such objection but shall pay all such fees and expenses which are not subject to any such objection and all fees and expenses for which no objection is timely filed during such ten-day period.

(5)    Power to Execute Necessary Documents.   The Debtors are expressly authorized and empowered to enter into and deliver, inter alia, the DIP Loan Documents.  The Debtors are authorized and empowered to perform all of their obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing

provided for in this Final Order. The Debtors are authorized and empowered to perform and do all acts that may be required in connection with the DIP Loan Documents, including, without limitation, the payment of charges, fees and the reimbursement of present and future reasonable costs and expenses, including but not limited to reasonable attorneys' fees and legal expenses paid or incurred by the DIP Agents in connection with the DIP Loan Agreement, all of which unpaid fees, commissions, costs and expenses shall be included and constitute part of the principal amount of the DIP Loans, and be secured by the DIP Collateral as and to the extent provided for in this Final Order. The DIP Loan Documents shall constitute valid and binding obligations of the Debtors, their estates, successors, and assigns in accordance with their terms, subject to the terms of this Final Order. Without limiting the generality of the foregoing, each Debtor is authorized to enter and perform one or more amendments, waivers consents or other modifications to and under the DIP Loan Documents, in each case in such form as the Debtors, the DIP Agent and the DIP Lenders may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents; provided, however, that a copy of any such amendment or other modification shall be filed by the Debtors with the Court and served by the Debtors on the U.S. Trustee and the respective counsel to the Creditors Committee and the Pre-Petition Bank Agent, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such modification or amendment. If any such party timely objects to such proposed modification or amendment, then such modification or amendment shall only be permitted pursuant to an order of this Court.

(6)     Superpriority Claims for DIP Lenders. The DIP Lenders are hereby granted, pursuant to sections 364(c) of the Bankruptcy Code, an allowed superpriority administrative expense claim (together with the superpriority administrative expense claim granted to the DIP Lenders under the Interim Order, the "Superpriority Claim"), having priority over any and all administrative expenses of the kinds specified in or arising or ordered under the Bankruptcy Code, including under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject

only to the payment of the Carve-Out Expenses to the extent specifically provided herein. The Superpriority Claim granted to the DIP Lenders under this Interim Order and under the DIP Loan Documents shall continue in this and in any superseding case under the Bankruptcy Code until all of the DIP Obligations have been indefeasibly satisfied in full and all lending commitments related thereto have been terminated. No claims having an administrative priority superior to or *pari passu* with the Superpriority Claim shall be granted while any portion of the DIP Obligations remains outstanding, absent the express written consent of the DIP Agents.

(7)     <u>Priming and Other Liens on the DIP Collateral</u>.  As security for the DIP Obligations, and as more fully described in the DIP Loan Documents, the DIP Agent, for its own benefit and the benefit of the DIP Lenders, is hereby granted (effective as of the Petition Date and without the necessity of the execution or filing by the Debtors of a security agreement, financing statements, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office or Copyright Office, mortgages, control agreements, landlord lien waivers, licensee consents or otherwise or the giving of notices to any account debtors or other third parties), the following security interests and liens (collectively, the "<u>DIP Liens</u>") in the DIP Collateral (but excluding in each category the Excluded Assets):

(a)     <u>First Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien upon all pre- and post-petition DIP Collateral, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens.

(b)     <u>Liens Priming Pre-Petition Secured Lenders' Lien</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest and lien upon all pre- and post-petition DIP Collateral, including, without limitation, the Cash Collateral, whether existing on the Petition Date or thereafter acquired, that is subject to the existing liens presently securing the Pre-Petition Loan Obligations.

Such security interests and liens shall be senior in all respects to the interests in such property of the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders (including, without limitation, the Replacement Liens (as defined below)), but shall not be senior to any valid, perfected and unavoidable liens or other encumbrances, if any, on such property existing immediately prior to the Petition Date and senior to the liens in favor of the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders.

(c)    Liens Junior to Certain Other Liens.    Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition DIP Collateral (other than the property described in clauses (a) and (b) immediately above), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, which security interests and liens in favor of the DIP Agent on behalf of the DIP Lenders are junior to such valid, perfected and unavoidable liens.

(d)    Excluded Assets.    The following are "Excluded Assets": customer deposits and other third party funds held by the Debtors in escrow (it being understood and agreed that the Debtors' respective interests in such deposits or funds shall not constitute Excluded Assets) and products and proceeds thereof.

For the avoidance of doubt, the DIP Liens hereunder extend to and include, but are not limited, to: (i) those items and types of property in which security interests may be created under Article 9 of the Uniform Commercial Code; (ii) those items and types of property not governed by Article 9 of the Uniform Commercial Code, including, without limitation, licenses issued by any federal or state regulatory authority, any leasehold or other real property interests or intellectual property; and (iii) the products and proceeds of any of the foregoing. The DIP Liens shall not (a) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, or (b) hereafter (other than pursuant to the Final Order) be subordinated to or made

*pari passu* with any other lien or security interest arising after the Petition Date, under section 364(d) of the Bankruptcy Code or otherwise.

(8)    <u>Carve-Out Expenses</u>. "Carve-Out Expenses" shall mean:

(a)    amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court (the "<u>UST/Clerk's Fees</u>"); and

(b)    all allowed fees and expenses (exclusive of success fees or transaction fees of similar type or nature) of attorneys, accountants, and other professionals retained in these Cases ("<u>Priority Professional Expenses</u>") pursuant to sections 327 and 1103 of the Bankruptcy Code by the Debtors and by the official committee of unsecured creditors appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors' Committee</u>") in an aggregate amount not to exceed (i) the lesser of (x) the amount of such unpaid Priority Professional Expenses outstanding and incurred prior to the occurrence of an Event of Default (as defined in the DIP Loan Agreement), inclusive of any holdbacks required by the Court, and (y) the budgeted amount of Priority Professional Expenses set forth in the Agreed Budget for such corresponding periods (but only to the extent not disbursed in accordance with the Agreed Budget), <u>plus</u> (ii) $2,500,000, <u>plus</u> (iii) an amount up to $100,000 for the reasonable fees and expenses of a chapter 7 trustee and any professional retained by such trustee (collectively, the "<u>Professional Expense Cap</u>"); <u>provided</u> that any payments actually made to such professionals or incurred by a chapter 7 trustee (subject to the limitation set forth herein) under sections 330 or 331 of the Bankruptcy Code or any other provision of the Bankruptcy Code or order of the Bankruptcy Court after the occurrence of an Event of Default (and during the continuance of such an Event of Default) on account of fees and expenses actually incurred after the occurrence of an Event of Default shall reduce the Professional Expense Cap on a dollar-for-dollar basis. Notwithstanding the foregoing, the Carve-Out Expenses shall not include, and the DIP Loans, the Cash Collateral, proceeds of DIP Obligations or other Collateral shall not be used for, the payment or reimbursement of, any fees or disbursements of the Debtors, the Creditors'

Committee or any trustee appointed in these Cases, or any substantial contribution expenses, any associated professional compensation, or any compensation for substantial contribution, incurred in connection with the assertion and prosecution (as opposed to the investigation) of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief commencing or prosecuting any action (whether arising under state law, the Bankruptcy Code or other federal law) (A) asserting claims against any of the DIP Agents or the DIP Lenders with respect to the liens and security interests securing, or any payment received on account of, the DIP Obligations of the Debtors; (B) asserting claims against the Pre-Petition Bank Agent or any of the Pre-Petition Secured Lenders with respect to the liens and security interests securing, or any payment received on account of, the Pre-Petition Loan Obligations or other obligations of the Debtors under the Interim Order or the Final Order; (C) invalidating, disallowing, recharacterizing, setting aside, avoiding or subordinating in whole or in part, or taking or attempting to take any other action to render unenforceable the DIP Agents' or the DIP Lenders' claims, liens and security interests in the DIP Collateral granted by the Debtors pursuant to the DIP Loan Documents, the Interim Order, or the Final Order; (D) invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part or taking or attempting to take any other action to render unenforceable, the Pre-Petition Secured Lenders' claims, liens, Replacement Liens and security interests in the Pre-Petition Collateral or the DIP Collateral pursuant to the Pre-Petition Loan Documents, the Interim Order or the Final Order; provided, however, that up to $100,000 of the Professional Expense Cap may be expended in the aggregate by the Creditors' Committee or its counsel investigating any of the matters referred to in clauses B and D above.[4]

---

[4] The DIP Loan Agreement includes in the definition of "Carve-Out" the fees, expenses and amounts described in the definition of "Carve-Out Expenses" in paragraph 8(a) and (b) of the Interim Order. With the entry of the Final Order, the definition of "Carve-Out Expenses" has been revised to increase (i) the amount of the fees and expenses of the Creditors' Committee allocable to the investigation

(c)     Nothing contained in this paragraph 8 shall (i) be construed to exempt those attorneys, accountants, and other professionals retained in these Cases pursuant to sections 327 and 1103 of the Bankruptcy Code by the Debtors and by the Creditors' Committee hereafter receiving interim compensation payments or reimbursement of expenses from compliance with any Court-approved procedure for compensation or otherwise from applicable provisions of bankruptcy law, including but not limited to requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and when applicable, any subsequent order of this Court requiring that such payments be disgorged, (ii) be construed as consent to the allowance of any fees and expenses referred to above, or (iii) be construed to affect any right of the Post-Petition Lending Parties to object to the reasonableness of such amounts.

(d)     For the avoidance of doubt, the provision for payment of the Carve-Out Expenses set for herein is co-extensive with, and not in addition to, the "Carve-Out" provided under the DIP Loan Agreement. Upon the payment of the Carve-Out Expenses described in this Order, there shall be no additional carve-out arising or existing in any of the DIP Collateral or any of the Pre-Petition Collateral senior to the respective interests of the DIP Agents, the DIP Lenders, the Pre-Petition Bank Agent, or the Pre-Petition Secured Lenders.

(9)     <u>Limitation Upon Additional Surcharges</u>. In consideration of the treatment and priority afforded the Carve-Out Expenses hereunder, neither the DIP Collateral, the Pre-Petition Collateral, nor the Post-Petition Lending Parties shall be subject to any surcharge, pursuant to sections 506(c) or 105(a) of the Bankruptcy Code or otherwise, of the Debtors or any other party in interest without the prior written consent of the Post-Petition Lending Parties, and no consent to a charge against the DIP Collateral, the Pre-Petition Collateral, or the Post-Petition Lending Parties pursuant to sections 506(c) or

---

of the liens and claims of the Pre-Petition Secured Lenders from $75,000.00 to $100,000.00, and (ii) the amount of the fees and expenses of a chapter 7 trustee from $50,000.00 to $100,000.00. Subject to entry of the Final Order, the definition of "Carve-Out" appearing in section 1.01 of the DIP Loan Agreement shall be deemed amended to increase such amounts to conform to the corresponding amounts in the definition of Carve-Out Expenses in paragraph 8(a) and (b) hereof.

105(a) of the Bankruptcy Code shall be implied from any action, inaction, or acquiescence by the Post-Petition Lending Parties in these Cases, including but not limited to the funding and use of Cash Collateral, on an interim basis, of the Debtors' ongoing operations by the Post-Petition Lending Parties. In no event shall the DIP Lenders or the Pre-Petition Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Pre-Petition Collateral without their consent.

(10) _Automatic Perfection of Liens._ The liens and priority granted to the DIP Agent on behalf of the DIP Lenders pursuant to the Interim Order, this Final Order and the DIP Loan Documents, and the Replacement Liens granted to the Pre-Petition Bank Agent on behalf of the Pre-Petition Secured Lenders, with respect to property of the Debtors' estates shall be perfected by operation of law as of the Petition Date. The Post-Petition Lending Parties shall not be required to enter into or to obtain any control agreement, landlord waivers, mortgagee waivers, bailee waivers or warehouseman waivers or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take possession or take any other action in order to validate and to perfect the security interests and liens granted pursuant to the Interim Order or this Final Order. If the Post-Petition Lending Parties, independently or collectively, in their sole discretion respectively, choose to obtain consents from any licensor or similarly situated party in interest, to file financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such security interests and liens: (i) all such documents shall be deemed to have been recorded and filed as of the Petition Date; and (ii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder. In lieu of obtaining such consents or filing such financing statements, notices of lien or similar instruments, the Post-Petition Lending Parties may, in their sole discretion respectively but subject to decretal paragraph 15 hereof, choose to file a true and complete copy of this Final Order in any place at which any such

instruments would or could be filed, and such filing shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded as of the Petition Date.  To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the DIP Liens and Replacement Liens, or otherwise would impose filing or registration requirements or fees and charges with respect thereto, such law is hereby preempted to the maximum extent permitted by the United States Constitution, the Bankruptcy Code, other applicable federal law, and the judicial power of the United States Bankruptcy Court.

## Adequate Protection of Pre-Petition Secured Lenders' Interests

(11)    Authorization to Use Pre-Petition Secured Lenders' Cash Collateral.  For so long as the Debtors remain in compliance with the terms of this Final Order and no Termination Event (as defined below) has occurred, the Debtors are hereby authorized to use the Pre-Petition Secured Lenders' Cash Collateral in accordance with and subject to the terms and conditions of this Final Order.  The Debtors' right to use the Pre-Petition Secured Lenders' Cash Collateral shall commence on the date of the entry of the Interim Order and expire on earliest to occur of:  (i) the termination of the Aggregate Commitments (as defined in the DIP Loan Agreement); (ii) the fifth (5th) business day following the delivery of written notice to the Debtors by the DIP Agents of any breach or default by the Debtors of the terms and provisions of the DIP Loans, DIP Loan Documents or this Final Order, which breach or default has not been waived by the DIP Lenders; (iii) the fifth (5th) business day following the delivery of written notice to the Debtors by the Pre-Petition Bank Agent of the failure to make any payment to or for the Pre-Petition Bank Agent on behalf of itself or the Pre-Petition Secured Lenders as required by this Final Order, provided, however, that such payment default has not been cured within three (3) business days after the delivery of such notice; (iv) the conversion of the Cases to a chapter 7 case or appointment of a trustee or examiner with expanded powers (each such event described in (i) through (iv) above being a "Termination Event" and each such date being the "Termination Date").  In no event shall the Debtors be authorized to use the Pre-Petition Secured Lenders' Cash Collateral for any purposes or under any terms

other than those set forth herein, in the Agreed Budget, or as may otherwise be approved by this Court following notice and hearing as may be required.

(12)    <u>Pre-Petition Secured Lenders' Adequate Protection</u>.  The Pre-Petition Bank Agent and Pre-Petition Secured Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral to the extent that there is a diminution in the value of the Pre-Petition Bank Agent's and Pre-Petition Secured Lenders' interest in the Pre-Petition Collateral from and after the Petition Date resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and the Pre-Petition Collateral, the priming of the Pre-Petition Bank Agent's liens and security interests in the Pre-Petition Collateral pursuant to the DIP Loan Documents, the Interim Order and this Final Order, and the imposition of the automatic stay.  As adequate protection for such diminution from and after the Petition Date, the Pre-Petition Bank Agent, for itself and on behalf of the Pre-Petition Secured Lenders, is hereby granted, valid, perfected and enforceable security interests (the "<u>Replacement Liens</u>") equivalent to a lien granted under section 364(c) of the Bankruptcy Code in and upon all of the assets of the Debtors comprising the DIP Collateral, in existence prior to the Petition Date or created after the Petition Date, including, without limitation, all of the Debtors' accounts, contract rights, rents, inventory, machinery and equipment, licenses, general intangibles, real property, fixtures, and such other property of the Debtors whether such property was owned on the Petition Date or thereafter created, acquired or arising, and all improvements, additions and extensions thereto, all replacement thereof, all books and records with respect thereto and all products and proceeds of the foregoing.  The Replacement Liens shall be subject only to (i) the DIP Liens, (ii) the Permitted Liens, and (iii) the Carve-Out Expenses.

(a)    The Replacement Liens granted herein:  (i) are and shall be in addition to all security interests, liens and rights of set-off existing in favor of the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders on the Petition Date; (ii) are and shall be valid, perfected, enforceable and effective as of the Petition Date without any further action by the Debtors, the Pre-Petition Bank Agent, or the Pre-Petition Secured Lenders, and without the necessity of the

execution, filing or recordation of any financing statements, security agreements, vehicle lien applications, filings with the United States Patent and Trademark Office, mortgages or other documents; (iii) shall secure the payment of indebtedness to the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders, as the case may be, in an amount equal to any diminution in value of the Pre-Petition Secured Lenders' cash collateral or any other Pre-Petition Collateral (including after-acquired property); (iv) shall not be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; and (v) shall not hereafter be subordinated to or made *pari passu* with any other lien or security interest arising after the Petition Date, under section 364(d) of the Bankruptcy Code or otherwise, absent the consent of the Pre-Petition Bank Agent and the holders of a majority of the Pre-Petition Loan Obligations.

(b)     In addition to the Replacement Liens granted to the Pre-Petition Bank Agent on behalf of itself and the Pre-Petition Secured Lenders, the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders are hereby granted a superpriority administrative expense claim under sections 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code (together with the superpriority administrative expense claim granted to the Pre-Petition Secured Lenders under the Interim Order, the "Pre-Petition Secured Lenders' Superpriority Claims") for the amount by which adequate protection afforded herein for any diminution of value of the Pre-Petition Secured Lenders' Cash Collateral from and after the Petition Date or any other Pre-Petition Collateral proves to be inadequate. Such Pre-Petition Secured Lenders' Superpriority Claims shall be allowed and have priority over all other costs and expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, and shall be subject only to the Carve Out Expenses and the Superpriority Claims granted to the DIP Lenders.

(c)     As further adequate protection for the Debtors' use of Pre-Petition Secured Lenders' Cash Collateral and other Pre-Petition Collateral, the Debtors shall promptly pay to (1)

the Pre-Petition Bank Agent (or as it shall direct) all actual and reasonable fees, costs and out-of-pocket expenses of the Pre-Petition Bank Agent, including, without limitation, reasonable fees, costs and out-of-pocket expenses of counsel for the Pre-Petition Bank Agent (including local counsel), (2) Wachovia Bank, National Association, and Five Mile Capital Partners, LLC (or as each shall direct), as leaders of an ad hoc steering committee of the Pre-Petition Secured Lenders, all actual and reasonable fees, costs and out-of-pocket expenses of their respective counsel (Milbank, Tweed, Hadley & McCloy and Paul, Hastings, Janofsky and Walker (and local counsel for such firms to the extent required by local rule)), and (3) Capstone Advisory Group, LLC, all of its actual and reasonable fees, costs and out-of-pocket expenses incurred as a financial advisor on behalf of the Pre-Petition Bank Agent, in each case incurred pre-petition or post-petition, without the need for compliance with the U.S. Trustee guidelines or filing any further application or statement with this Court; _provided_ that the Court shall have jurisdiction to determine any dispute concerning such invoices and the Pre-Petition Secured Lenders shall deliver statements of fees and expenses incurred to the Creditors' Committee and the U.S. Trustee; _provided_ further that the U.S. Trustee and the Creditors' Committee shall have a period of ten (10) days after receipt of such statements to file with the Court any objection to such fees and expenses, with service of such objection being made upon the Debtors, the DIP Agents, the Pre-Petition Agent and the party whose fees and expenses are the subject of such objection, and unless such dispute is resolved consensually among the parties, it shall be subject to a hearing and determination by the Court concerning the reasonableness of such fees and expenses.    Pending any such determination of the Court, the Debtors shall not pay the portion of such fees and expenses which are the subject of such objection but shall pay all such fees and expenses which are not subject to any such objection and all fees and expenses for which no objection is timely filed during such ten-day period.

(d)    As further adequate protection for the Debtors' use of Pre-Petition Secured Lenders' Cash Collateral and other Pre-Petition Collateral, the Debtors shall be prohibited from

completing, in a single transaction or series of related transactions, any Dispositions (as defined in the DIP Loan Agreement) with an aggregate purchase price in excess of $30,000,000, without the prior written approval of the "Required Lenders" as defined in the Pre-Petition Credit Agreement.

(e)    As further adequate protection for the Debtors' use of Pre-Petition Secured Lenders' Cash Collateral and other Pre-Petition Collateral, unless previously expired or terminated by separate order of the Court, the Debtors' exclusive periods under section 1121 of the Bankruptcy Code to file and solicit acceptances in respect thereof will terminate to allow the Pre-Petition Secured Lenders to file a chapter 11 plan if the Debtors have failed to file a chapter 11 plan within 180 days after the Petition Date; provided, however, that the "Required Lenders" as defined in the Pre-Petition Credit Agreement may elect, in their sole discretion, to extend by written direction such deadline for the Debtors to file a plan by providing written notice of their election to counsel for the Debtors, counsel to the Creditors Committee, and the U.S. Trustee.

(f)    Except with respect to the DIP Liens contemplated in the Interim Order and in this Final Order, the Debtors shall not seek to grant, from and after the Petition Date, any liens or security interests in any of the Pre-Petition Collateral or the DIP Collateral, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which are senior to or made pari passu with the liens of the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders in the Pre-Petition Collateral or the Collateral.

(g)    In view of the complexity of these Cases, the volume and extensive nature of the documentation evidencing the claims, liens and security interests in favor of the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders, and the Debtors' acknowledgment of and stipulations regarding such claims, liens and security interests as set forth in Paragraphs C and H above, the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders shall be relieved of the obligation or requirement to file in any of the Cases any proof of claim or proofs of claim asserting any of the Pre-Petition Loan Obligations, and the Pre-Petition Bank Agent shall be

deemed to have timely filed in each of the Cases a master proof of claim on behalf of the Pre-Petition Secured Lenders, as their respective interests appear, in the amount of at least $1,551,063,591.57 (plus accrued and unpaid fees, costs and reimbursable expenses) against the respective applicable Debtors listed on Schedule 2 to this Final Order (comprised of the components identified in Paragraph H above), and the Pre-Petition Bank Agent may file any supplemental proofs of claim amending, modifying or supplementing such claim as it determines in its reasonable discretion. The Pre-Petition Bank Agent shall provide to counsel to the Creditors Committee and, upon reasonable request, to counsel to any other parties in interest, copies of the Pre-Petition Loan Documents.

(13)     Limitations under Section 552(b) of the Bankruptcy Code. The Pre-Petition Liens and the Replacement Liens extend to rents and proceeds and at no time during the Cases shall the limitation permitted by Bankruptcy Code Section 552(b), based on the equities of the case, on the extension of the liens and Replacement Liens granted to the Pre-Petition Secured Lenders' Lien to cover proceeds of the Pre-Petition Collateral provided by such section be imposed on or against the Pre-Petition Bank Agent, the Pre-Petition Secured Lenders or the Pre-Petition Collateral.

(14)     Information Available to Pre-Petition Bank Agent. The Debtors shall furnish to the counsel of the Pre-Petition Bank Agent, for the benefit of the Pre-Petition Secured Lenders, such financial and other information as the Pre-Petition Bank Agent shall reasonably request including, but not limited to, the following:

(a)     Simultaneously with their filing, any financial information and pleadings filed with the Bankruptcy Court;

(b)     All reports required to be provided to any of the DIP Agents under the DIP Loan Agreement; and

(c)     All financial information and reports prepared by the Debtors, as required by the Bankruptcy Court or by the Operating Guidelines and Reporting Requirements of the U.S. Trustee's Office.

(15)    <u>Forbearance by Pre-Petition Secured Lenders</u>. So long as any of the DIP Obligations remain outstanding (other than contingent indemnity obligations as to which no claim has been asserted) or the DIP Lenders have any Commitment (as defined in the DIP Loan Agreement), the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders shall (a) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Pre-Petition Loan Documents, the Interim Order or this Final Order, or otherwise exercise any remedies against any DIP Collateral, (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents (as defined in the DIP Loan Agreement), and (c) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interest in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the Interim Order or this Final Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date.

(16)    <u>Reservation of Rights</u>. Except as expressly provided herein, nothing contained in the Interim Order or this Final Order (including, without limitation, the authorization of the Debtors' use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Pre-Petition Bank Agent, any Pre-Petition Secured Lender, any DIP Agent, or any DIP Lender including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law.

### **Additional General Provisions**

(17)    <u>Automatic Stay Modified</u>. Subject only to the provisions of the DIP Loan Documents, the automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified to the extent necessary so as to permit the DIP Lenders:

(a)    upon the occurrence and continuation of an Event of Default or a default by the Debtors of any of their obligations under this Final Order, after giving five (5) business days' fax

or hand-delivery written notice (the "Notice Period") to the Debtors, their counsel, counsel for any Creditors' Committee appointed in these Cases, the Pre-Petition Bank Agent on behalf of the Pre-Petition Secured Lenders, and the United States Trustee: (1) all of the DIP Obligations shall become immediately due and payable; (2) the automatic stay under section 362 of the Bankruptcy Code and any other restrictions on the enforcement of the DIP Liens shall be deemed vacated and modified with respect to the DIP Lenders for the purpose of exercising all of their rights and remedies under the DIP Loan Documents and at law, this Final Order or applicable law, including foreclosing or otherwise enforcing the DIP Liens on any or all of the DIP Collateral, and the DIP Lenders shall be and hereby are authorized, in their discretion, to take any and all action and remedies which they deem appropriate to effectuate these rights and remedies; provided that the Debtors have not obtained an order of this Court (following notice to the DIP Lenders and a hearing) re-imposing the automatic stay upon the DIP Lenders within the Notice Period. The Debtors shall have the burden of proof at any hearing on such request and the only issues that may be raised or addressed at such hearing is whether a default hereunder or an Event of Default under the DIP Loan Documents exist. Subject to the Debtors' right in the foregoing sentence, the Debtors shall cooperate with the DIP Lenders in connection with any enforcement action by such parties by, among other things, (i) providing access to their premises to representatives of the DIP Lenders, (ii) providing the DIP Lenders access to their books and records, (iii) performing all other obligations set forth in this Final Order and/or the DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Collateral until the DIP Lenders can make adequate provision to protect and safeguard the DIP Collateral, and the Debtors shall not otherwise interfere or encourage others to interfere with the DIP Lenders' enforcement of their rights;

(b)      upon the occurrence of an Event of Default or a default by the Debtors of any of their obligations under this Final Order (subject to any applicable grace periods), DIP Lenders

shall have no obligation to lend or advance any additional funds to the Debtors, or provide other financial accommodations to the Debtors;

(c)     this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Final Order and relating to the application, re-imposition or continuance of the automatic stay arising pursuant to section 362(a) of the Bankruptcy Code, or other injunctive relief requested; and

(d)     upon the occurrence of an Event of Default or a default by the Debtors of any of their obligations under this Final Order, the DIP Lenders, may, without providing any prior notice thereof, immediately charge interest at the default rate set forth in the DIP Loan Agreement, and the DIP Lenders shall have no further obligation to provide financing under the DIP Loan Documents or this Final Order.

(18)    Effect of Stipulations on Third Parties.    Subject to the reservations of rights set forth in this paragraph, the Debtors' stipulations and admissions contained in paragraph H of this Final Order concerning the Pre-Petition Secured Lenders shall be binding upon the Debtors and their successors and assigns in all circumstances. Notwithstanding anything herein to the contrary, until the earlier of (i) one hundred (100) days after the Petition Date or (ii) the confirmation of a plan of reorganization or liquidation in these Cases, the Creditors' Committee shall be entitled to investigate the validity, perfection and enforceability of the Pre-Petition Bank Agent's liens and security interests held on behalf of itself and the Pre-Petition Secured Lenders and the Pre-Petition Loan Obligations, or to assert any other claims or causes of action against the Pre-Petition Bank Agent and Pre-Petition Secured Lenders (the "Investigation Termination Date"). If the Creditors' Committee determines that there may be a challenge to the liens or claims of the Pre-Petition Secured Lenders by the Investigation Termination Date, upon five (5) business days' written notice to the Debtors and the Pre-Petition Secured Lenders, the Creditors' Committee shall be permitted to file and prosecute an adversary proceeding related thereto, and shall have only until the Investigation Termination Date to file such adversary proceeding on behalf of the Debtors' estates setting forth the basis of any such challenge, claim or cause of action. If such action is not filed on or before the

Investigation Termination Date (or such other later date as extended by the written consent of the Debtors and the Pre-Petition Bank Agent), the stipulations and waivers contained in paragraph H of this Final Order, and any consideration granted as adequate protection for the Pre-Petition Secured Lenders in this Final Order, shall be irrevocably binding on the Creditors' Committee and all parties in interest in these Cases without further action by any party or this Court; provided further that any stipulations and waivers contained in paragraph H of this Final Order which are not specifically challenged in any such action shall nonetheless be binding and preclusive despite the initiation of an action challenging other stipulations and waivers. During the period from the initiation of any such adversary proceeding by the Creditors Committee challenging the liens or claims of the Pre-Petition Secured Lenders through and until the entry of a final, non-appealable order in favor of the Creditors Committee sustaining its challenge in such timely filed adversary proceeding, the stipulations and waivers of the Debtors provided herein, and the relief afforded the Pre-Petition Secured Lenders herein, shall continue to be binding and effective. Unless the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders and the Debtors each consents in writing to an extension, the Investigation Termination Date may not be extended.

(19) Successors and Assigns. The DIP Loan Agreement, the other DIP Loan Documents and the provisions of this Final Order shall be binding upon the Pre-Petition Bank Agent, the Pre-Petition Secured Lenders, the DIP Agents, the DIP Lenders (as applicable with respect to each of the foregoing), the Debtors and their respective successors and assigns, including any trustee appointed in these Cases, and shall inure to the benefit of the Pre-Petition Bank Agent, the Pre-Petition Secured Lenders, the DIP Agents, the DIP Lenders, the Debtors and their respective successors and assigns.

(20) Binding Nature of Agreement. Each of the DIP Loan Documents to which the Debtors are and will become a party shall constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms. The rights, remedies, powers, privileges, liens and priorities of the DIP Lenders provided for in this Final Order and in any other DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in these Cases or in any subsequent case under the

Bankruptcy Code unless and until the DIP Obligations have first been indefeasibly paid in full in cash and all related commitments have been terminated.

(21)  Subsequent Reversal or Modification.  This Final Order is entered pursuant to section 364 of the Bankruptcy Code, granting the Post-Petition Lending Parties all protection afforded by the Bankruptcy Code, including protection under Bankruptcy Code section 364(e).  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such action will not affect (i) the validity of any obligation, indebtedness or liability incurred post-petition hereunder or under the Interim Order by the Debtors to any of the Post-Petition Lending Parties prior to the date of receipt of written notice to the Post-Petition Lending Parties, of the effective date of such action; or (ii) the validity and enforceability of any lien, claim, superpriority or other protection authorized or created hereby or under the Interim Order or pursuant to the DIP Loan Documents in favor of any of the Post-Petition Lending Parties.  Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by the Debtors to the Post-Petition Lending Parties, and any lien, security interest, and superpriority claim granted by the Debtors in accordance with the Interim Order or this Final Order, prior to written notice to the Post-Petition Lending Parties of the effective date of such action shall be governed in all respects by the original provisions of the Interim Order or the Final Order (as applicable), and Post-Petition Lending Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code and granted herein with respect to all such indebtedness, obligations, liabilities, liens, security interests, and superpriority claims.

(22)  No Waiver.  This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that the Post-Petition Lending Parties may have to bring or be heard on any matter brought before this Court.

(23)  Sale/Dismissal.  The Debtors shall not seek or support any motion or other application for entry of an order dismissing or converting any of the Cases under section 1112 of the Bankruptcy Code, or appointing a chapter 11 trustee or an examiner with expanded powers, unless and until the DIP Obligations shall have been paid indefeasibly in full in cash, and all commitments thereunder have been

terminated. The Debtors shall not seek or support any motion or other application for entry of an order providing for the sale of substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code unless, upon the closing of such transaction, all DIP Obligations and Pre-Petition Loan Obligations shall be paid indefeasibly in full in cash and completely satisfied, or the DIP Lenders, the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders expressly consent in writing to any such transaction or the entry of such an order by the Court. If an order converting or dismissing any of these Cases under sections 105 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (a) the DIP Liens and Superpriority Claims granted to the DIP Lenders pursuant to the Interim Order, this Final Order and the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties in interest and shall maintain their priorities as provided in this Final Order until all DIP Obligations and indebtedness owing to the DIP Lenders under the DIP Loan Documents shall have been paid in full in cash and the DIP Lenders' obligations and commitments to make DIP Loans shall have been terminated, (b) the Pre-Petition Secured Lenders' Superpriority Claims and Replacement Liens granted to the Pre-Petition Bank Agent and the Pre-Petition Secured Lenders pursuant to the Interim Order, this Final Order, and the Pre-Petition Loan Documents, as the case may be, shall continue in full force and effect and shall remain binding on all parties in interest and shall maintain their priorities as provided in this Final Order, and (c) this Court shall retain jurisdiction, notwithstanding such conversion or dismissal, for purposes of enforcing the liens, security interests and superpriority administrative expense status of the DIP Lenders and the Pre-Petition Secured Lenders, as the case may be, referred to in clauses (a) and (b) above.

(24)    Priority of Terms. To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, the Motion, the Interim Order, or any other order of this Court, or any other agreements and the express terms and provisions of this Final Order, the terms and provisions of this Final Order shall govern.

(25)    No Lender Control of Debtors' Operations. By accepting the Agreed Budget submitted by the Debtors and by taking any other actions pursuant to this Order, the Post-Petition Lending Parties

shall not be deemed (i) to be in control of the operations or any liquidation of the Debtors; or (ii) to be acting as a "responsible person" or an "owner or operator", as such terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal or state statute, with respect to the operation, management, or any liquidation of the Debtors.

# # #

# EXHIBIT A

## SUMMARY OF AGREED BUDGET

Crescent Resources LLC
DIP Budget

| (in $000s) | 1 Fcst.[1] Jun-09 | 2 Fcst. Jul-09 | 3 Fcst. Aug-09 | 4 Fcst. Sep-09 | 5 Fcst. Oct-09 | 6 Fcst. Nov-09 | 7 Fcst. Dec-09 | 8 Fcst. Jan-10 | 9 Fcst. Feb-10 | 10 Fcst. Mar-10 | 11 Fcst. Apr-10 | 12 Fcst. May-10 | 13 Fcst. Jun-10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance (Book)** | $ 5,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 5,000 |
| Total Cash Inflows | 4,059 | 5,746 | 839 | 1,500 | 35,473 | 1,220 | 1,764 | 13,824 | 1,841 | 6,610 | 17,140 | 2,403 | 19,201 | 111,620 |
| Operating Cash Outflows | (10,680) | (14,952) | (7,678) | (7,395) | (8,705) | (9,488) | (10,754) | (11,302) | (10,615) | (10,072) | (9,079) | (8,660) | (11,038) | (130,419) |
| Project Level / Corp. Debt Service | (1,029) | - | - | (933) | - | - | (3) | (83) | (3) | (818) | - | - | (897) | (3,765) |
| Restructuring Disbursements | (1,375) | (6,596) | (5,118) | (5,618) | (5,974) | (3,278) | (3,578) | (4,439) | (2,538) | (3,098) | (3,821) | (1,910) | (2,830) | (50,173) |
| DIP Loan Interest and Fees | (2,100) | (3,749) | (349) | (1,425) | (648) | (643) | (582) | (735) | (820) | (812) | (1,007) | (1,000) | (1,064) | (14,933) |
| Total Disbursements | (15,184) | (25,296) | (13,146) | (15,371) | (15,328) | (13,409) | (14,917) | (16,559) | (13,976) | (14,800) | (13,907) | (11,569) | (15,829) | (199,290) |
| Total Net Cash Flow | (11,125) | (19,550) | (12,307) | (13,871) | 20,145 | (12,189) | (13,152) | (2,735) | (12,135) | (8,190) | 3,234 | (9,166) | 3,372 | (87,671) |
| DIP Borrowings (Repayments) | 16,125 | 19,550 | 12,307 | 13,871 | (20,145) | 12,189 | 13,152 | 2,735 | 12,135 | 8,190 | (3,234) | 9,166 | (3,372) | 92,671 |
| **Ending Cash Balance (Book)** | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 |

[1] - The Bankruptcy filing is expected to occur on June 10, 2009; therefore, the month of June 2009 in the DIP Budget is a partial month comprised of the period June 15 to July 5, 2009.

## Schedule 1

CRESCENT HOLDINGS, LLC
1780, LLC
BLACK FOREST ON LAKE JAMES, LLC
CAMP LAKE JAMES, LLC
CAROLINA CENTERS, LLC
CITALL DEVELOPMENT, LLC
CLEAN WATER OF NC, LLC
CLUB CAPITAL, LLC
CLUB ENTERPRISES, LLC
CORNERSTONE PLAZA, LLC
CRESCENT 210 BARTON SPRINGS, LLC
CRESCENT COMMUNITIES N.C., LLC
CRESCENT COMMUNITIES REALTY, LLC
CRESCENT COMMUNITIES S.C., LLC
CRESCENT LAKEWAY MANAGEMENT, LLC
CRESCENT LAKEWAY, LLC
CRESCENT LAND & TIMBER, LLC
CRESCENT REALTY ADVISORS, LLC
CRESCENT REALTY, LLC
CRESCENT RIVER, LLC
CRESCENT ROUGH HOLLOW, LLC
CRESCENT SOUTHEAST CLUB, LLC
CRESCENT YACHT CLUB, LLC
CRESCENT/FLORIDA, LLC
CRESCENT/GEORGIA, LLC
CRESCENT/RGI CAPITAL, LLC
FALLS COVE DEVELOPMENT, LLC
HIDDEN LAKE CRESCENT, LLC
MCNINCH-HILL INVESTMENTS, L.L.C.
MILFORD ESTATES, LLC
OLD WILDLIFE CLUB, LLC
OLDFIELD, LLC
PANAMA CITY DEVELOPMENT, LLC
PARKSIDE DEVELOPMENT, LLC
PIEDMONT ROW DEVELOPMENT, LLC
SEDDON PLACE DEVELOPMENT, LLC
SPRINGFIELD CRESCENT, LLC
STONEWATER BAY PROPERTIES, LLC
STRATFORD ON HOWARD DEVELOPMENT, LLC
SUGARLOAF COUNTRY CLUB, LLC
SUGARLOAF PROPERTIES, LLC
SUGARLOAF REALTY, LLC
THE FARMS, LLC
THE OLDFIELD REALTY COMPANY, LLC
THE RIVER CLUB REALTY, LLC
THE RIVER COUNTRY CLUB, LLC
THE RETREAT ON HAW RIVER, LLC
THE SANCTUARY AT LAKE WYLIE, LLC
TUSSAHAW DEVELOPMENT, LLC

TWO LAKE PONY FARM, LLC
CLT DEVELOPMENT, LLC
CRESCENT POTOMAC YARD, LLC
CRESCENT TWIN CREEKS, LLC
CRESCENT/ARIZONA, LLC
PALMETTO BLUFF INVESTMENTS, LLC
TWIN CREEKS MANAGEMENT, LLC
PARK/MARSH, LLC
CRESCENT MULTIFAMILY CONSTRUCTION, LLC
CHAPEL COVE AT GLENGATE, LLC
NINE CORPORATE CENTRE HOLDING COMPANY, LLC
THE RANCH AT THE RIM, LLC
BALLANTYNE PROPERTIES, LLC
CAROLINA CENTERS LLC
CRESCENT POTOMAC PROPERTIES, LLC
FP REAL ESTATE ONE L.L.C.
HEADWATERS DEVELOPMENT LIMITED PARTNERSHIP
MAY RIVER FOREST, LLC
MAY RIVER GOLF CLUB, LLC
NEW RIVERSIDE, LLC
PALMETTO BLUFF CLUB, LLC
PALMETTO BLUFF LODGE, LLC
PALMETTO BLUFF REAL ESTATE COMPANY, LLC
PALMETTO BLUFF UPLANDS, LLC
SAILVIEW PROPERTIES, LLC
THE POINT ON NORMAN, LLC
TWIN CREEKS HOLDINGS, LTD.
TWIN CREEKS OPERATING CO., LP
PALMETTO BLUFF DEVELOPMENT, LLC
TWIN CREEKS PROPERTY, LTD.
HAMMOCK BAY CRESCENT, LLC
LANDMAR MANAGEMENT, LLC
LANDMAR GROUP, LLC
GULF SHORES WATERWAY DEVELOPMENT, LLC
BARTRAM CRESCENT DEVELOPMENT, LLC
BRIDGEWATER LAKELAND DEVELOPERS, LLC
BROOKSVILLE EAST DEVELOPERS, LLC
COLBERT LANE COMMERCIAL, LLC
GRAND HAVEN DEVELOPERS, LLC
HAMPTON LAKES, LLC
HAWK'S HAVEN SPONSOR, LLC
LAKE GEORGE DEVELOPERS, LLC
LIGHTHOUSE HARBOR DEVELOPERS, LLC
NORTH HAMPTON, LLC
OSPREY DEVELOPMENT, LLC
ROBERTS ROAD, LLC
THE RESERVE, LLC
TROUT CREEK DEVELOPERS, LLC
WINDING RIVER, LLC
HAWK'S HAVEN JOINT DEVELOPMENT, LLC
CHAPARRAL PINES INVESTORS, L.L.C.

**CHAPARRAL PINES MANAGEMENT, L.L.C.**

## Schedule 2

CRESCENT RESOURCES, LLC
CRESCENT HOLDINGS, LLC
1780, LLC
BLACK FOREST ON LAKE JAMES, LLC
CAMP LAKE JAMES, LLC
CAROLINA CENTERS, LLC
CITALL DEVELOPMENT, LLC
CLEAN WATER OF NC, LLC
CLUB CAPITAL, LLC
CLUB ENTERPRISES, LLC
CORNERSTONE PLAZA, LLC
CRESCENT 210 BARTON SPRINGS, LLC
CRESCENT COMMUNITIES N.C., LLC
CRESCENT COMMUNITIES REALTY, LLC
CRESCENT COMMUNITIES S.C., LLC
CRESCENT LAKEWAY MANAGEMENT, LLC
CRESCENT LAKEWAY, LLC
CRESCENT LAND & TIMBER, LLC
CRESCENT REALTY ADVISORS, LLC
CRESCENT REALTY, LLC
CRESCENT RIVER, LLC
CRESCENT ROUGH HOLLOW, LLC
CRESCENT SOUTHEAST CLUB, LLC
CRESCENT YACHT CLUB, LLC
CRESCENT/FLORIDA, LLC
CRESCENT/GEORGIA, LLC
CRESCENT/RGI CAPITAL, LLC
FALLS COVE DEVELOPMENT, LLC
GREEN FIELDS INVESTMENTS, LLC
HIDDEN LAKE CRESCENT, LLC
MCNINCH-HILL INVESTMENTS, L.L.C.
MILFORD ESTATES, LLC
OLD WILDLIFE CLUB, LLC
OLDFIELD, LLC
PANAMA CITY DEVELOPMENT, LLC
PARKSIDE DEVELOPMENT, LLC
PIEDMONT ROW DEVELOPMENT, LLC
SEDDON PLACE DEVELOPMENT, LLC
SPRINGFIELD CRESCENT, LLC
STONEWATER BAY PROPERTIES, LLC
STRATFORD ON HOWARD DEVELOPMENT, LLC
SUGARLOAF COUNTRY CLUB, LLC
SUGARLOAF PROPERTIES, LLC
SUGARLOAF REALTY, LLC
THE FARMS, LLC
THE OLDFIELD REALTY COMPANY, LLC
THE PARKS AT MEADOWVIEW, LLC
THE PARKS OF BERKELEY, LLC
THE RIVER CLUB REALTY, LLC

THE RIVER COUNTRY CLUB, LLC
THE RETREAT ON HAW RIVER, LLC
THE SANCTUARY AT LAKE WYLIE, LLC
TUSSAHAW DEVELOPMENT, LLC
TWO LAKE PONY FARM, LLC
CLT DEVELOPMENT, LLC
CRESCENT POTOMAC YARD, LLC
CRESCENT TWIN CREEKS, LLC
CRESCENT/ARIZONA, LLC
PALMETTO BLUFF INVESTMENTS, LLC
TWIN CREEKS MANAGEMENT, LLC
PARK/MARSH, LLC
CRESCENT MULTIFAMILY CONSTRUCTION, LLC
CHAPEL COVE AT GLENGATE, LLC
NINE CORPORATE CENTRE HOLDING COMPANY, LLC
THE RANCH AT THE RIM, LLC
BALLANTYNE PROPERTIES, LLC
CAROLINA CENTERS LLC
CRESCENT POTOMAC GREENS, LLC
CRESCENT POTOMAC PLAZA, LLC
CRESCENT POTOMAC PROPERTIES, LLC
CRESCENT POTOMAC YARD DEVELOPMENT, LLC
FP REAL ESTATE ONE, L.L.C.
HEADWATERS DEVELOPMENT LIMITED PARTNERSHIP
MAY RIVER FOREST, LLC
MAY RIVER GOLF CLUB, LLC
NEW RIVERSIDE, LLC
PALMETTO BLUFF CLUB, LLC
PALMETTO BLUFF LODGE, LLC
PALMETTO BLUFF REAL ESTATE COMPANY, LLC
PALMETTO BLUFF UPLANDS, LLC
SAILVIEW PROPERTIES, LLC
THE POINT ON NORMAN, LLC
TWIN CREEKS HOLDINGS, LTD.
TWIN CREEKS OPERATING CO., LP
PALMETTO BLUFF DEVELOPMENT, LLC
TWIN CREEKS PROPERTY, LTD.
HAMMOCK BAY CRESCENT, LLC
LANDMAR MANAGEMENT, LLC
LANDMAR GROUP, LLC
CLUB VILLAS DEVELOPERS, LLC
GULF SHORES WATERWAY DEVELOPMENT, LLC
BARTRAM CRESCENT DEVELOPMENT, LLC
BRIDGEWATER LAKELAND DEVELOPERS, LLC
BROOKSVILLE EAST DEVELOPERS, LLC
COLBERT LANE COMMERCIAL, LLC
GRAND HAVEN DEVELOPERS, LLC
GRAND WOODS DEVELOPERS, LLC
HAMPTON LAKES, LLC
HAMPTON RIDGE DEVELOPERS, LLC
HAWK'S HAVEN SPONSOR, LLC

LAKE GEORGE DEVELOPERS, LLC
LIGHTHOUSE HARBOR DEVELOPERS, LLC
NORTH HAMPTON, LLC
OSPREY DEVELOPMENT, LLC
RIVER PARADISE, LLC
ROBERTS ROAD, LLC
THE RESERVE, LLC
TROUT CREEK DEVELOPERS, LLC
WINDING RIVER, LLC
HAWK'S HAVEN DEVELOPERS, LLC
HAWK'S HAVEN GOLF COURSE COMMUNITY DEVELOPERS, LLC
HAWK'S HAVEN JOINT DEVELOPMENT, LLC