

**SIGNED this 22nd day of July, 2011.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-11507-CAG |
| | § | |
| CRESCENT RESOURCES, LLC | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |
| | § | |

### MEMORANDUM OPINION REGARDING THE CRESCENT RESOURCES LITIGATION TRUST'S MOTION FOR TURNOVER

Crescent Resources, LLC, Crescent Holdings, LLC, and their affiliated debtors and debtors in possession (collectively "Crescent Resources," "Crescent," or "Debtors"), filed a petition under Chapter 11 of the Bankruptcy Code on June 10, 2009. Prior to filing for bankruptcy, Crescent was a real estate development and management organization which developed, owned, leased, managed, and sold real estate since 1969. On December 20, 2010, this Court signed the Order Confirming Debtors' Revised Second Amended Joint Plan of Reorganization (docket no. 1534).

On July 28, 2009, the Court signed the Order Granting the Application to Employ Robinson, Bradshaw & Hinson, P.A. as Special Counsel to the Debtors *Nunc Pro Tunc* (docket

no. 240).  As will be discussed below, part of the reason for granting the application was due to Robinson, Bradshaw & Hinston, P.A.'s ("RBH") pre-petition relationship with the Debtors as presented in the Application to Employ (docket no. 24).  On September 3, 2010, the Crescent Resources Litigation Trust (the "Trust") filed an adversary complaint against Duke Energy Corporation, *et al*. (docket no. 1224).  The complaint alleges that the 2006 transaction which created Crescent Resources, LLC rendered the Debtors insolvent.  As will also be discussed below, the Trust alleges that the 2006 transaction which created Crescent Resources, LLC involved Crescent Resources borrowing approximately $1.5 billion, using the assets of Crescent Resources as collateral.  Crescent Resources then transferred $1.187 billion of those loan proceeds to its parent, Duke Ventures, LLC ("Duke").  The Trust alleges that this transaction left Crescent Resources insolvent and the complaint seeks return of the $1.187 billion under, *inter alia*, theories of state law fraudulent transfers.  On September 16, 2010, the Litigation Trust filed a Motion to Compel Turnover of Client Files (docket no. 1257).  The motion sought documents held by RBH that related to work done by RBH for the Debtors.  RBH responded that they were concerned about Duke's confidentiality rights in the requested documents as a sole or joint client of RBH.  Since the date the Motion to Compel Turnover was filed, there have been months of status conferences and proceedings that have unduly slowed the process.  On January 21, 2011, in a meeting held in the Court's chambers between representatives from the Trust and Duke Energy, it was agreed that the parties would take a step back from the turnover issues and instead focus on whether, as a matter of law, Duke has any right to assert a privilege as to the RBH files.  This agreement was memorialized in an order by the Court entered on January 25, 2011 (docket no. 1656).

The Court held a hearing on February 17, 2011 to consider whether Duke has any right to assert a privilege as to the RBH files, and if so, which of the 345 files in question. At the hearing, representatives for the Trust, Duke, and RBH appeared. After the hearing, several matters were taken under advisement. The main issues to be considered (a) who bears the burden to establish whether a privilege exists; (b) whether Duke, the Trust, or both can claim certain files are privileged; and (c) if it is determined that Duke and the Trust are joint clients in some of the files, whether those files can be used against third parties.

The Court has reviewed the briefs of the Trust and Duke[1] and has considered the arguments and evidence of counsel. Based on the foregoing, the Court finds that (1) the Trust has met its burden of showing it is a joint client with respect to the 2006 Duke Transaction matter; (2) the Trust has met its burden of showing it is entitled to both the pre- and post-transaction files, while Duke has not met its burden in showing it was a joint client with respect to those files; and (3) The Trust may not use the jointly-privileged files in matters with third parties but can use the files in matters between Duke and The Trust.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (H) on which this Court can enter a final judgment.[2] This matter is referred to the Court under the District's Standing Order of Reference. Venue is proper under 28 U.S.C. §§ 1408 and 1409. The

---

[1] Additionally, representatives from RBH filed a Response to Motion for Entry of Attached Orders (docket no. 1478). This Response applies to the Trust's Motion for Entry of Attached Orders (docket no. 1472), which has been declared moot by this Court on February 17, 2011 (docket no. 1738). As RBH's response applies to a moot motion, it is not considered here.

[2] The Court has received the recent letter briefs filed by Duke and the Trust in this case (docket nos. 2277 & 2279). These are not filed pleadings with the Court. Nonetheless, the Court has read them and is of the opinion, at this point, that **Stern v. Marshall**, 564 U.S. __, 131 S.Ct. 2594 (June 23, 2011) should be applied narrowly. The facts and issues in **Stern** do not relate to matters under consideration of the Court. The Court therefore finds that **Stern** does not apply to this case.

following represents the Court's findings of fact and conclusions of law made pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

### BACKGROUND OF DEBTOR

In the 1960s, Duke Energy Corporation acquired approximately 300,000 acres of land in rural areas of North and South Carolina (the "Legacy Land"). Beginning in 1969, Duke Energy Corporation contributed the Legacy Land to Crescent Resources' predecessor-in-interest, Crescent Land and Timber Company. Since then, Crescent developed, owned, leased, managed, and sold real estate. Prior to September 2006, Crescent Resources, LLC was a wholly owned indirect subsidiary of Duke Energy Corporation. Duke Energy Corporation wholly owned Duke Capital, LLC, which wholly owned Duke Ventures, LLC, which wholly owned Crescent Resources. Over the years, the Crescent Enterprise branched out into additional geographic areas and acquired additional properties, primarily through exchanges of the Legacy Land properties. The core of Crescent Resources' business was to take large parcels of real estate, install extensive infrastructure and capital-intensive amenities, and then sell the lots to homebuilders or individuals. Crescent Resources eventually expanded geographically and into the development of commercial and retail projects. Customarily, Crescent Resources created single-purpose entities for each of its developments, and as a result, in 2006, Crescent Resources operated roughly 100 projects through approximately 120 entities.[3]

On September 7, 2006, a Formation and Sale Agreement was entered into by Duke Ventures, LLC, Crescent Resources, and several Morgan Stanley real estate investment entities whereby the parties agreed that: (a) Crescent Resources had, pre-transaction, an enterprise value of $2.075 billion; (b) Duke would form Crescent Holdings and contribute its equity interest in Crescent Resources to Crescent Holdings; (c) Crescent Resources would enter into the 2006

---

[3] Many of which are Debtors in these proceedings.

Credit Agreement (defined below) from which $1.187 billion in term loan proceeds would be distributed to Crescent Holdings, with Crescent Holdings then distributing such proceeds directly to Duke; (d) Morgan Stanley Real Estate Fund ("Morgan Stanley") would purchase 49% of the membership interests in Crescent Holdings from Duke for $414 million; and (e) Crescent Holdings would enter into an employment agreement with Arthur W. Fields which provided, among other things, for the issuance to Mr. Fields of 2% of the membership interest in Crescent Holdings (the "2006 Duke Transaction" or "Project Galaxy").

Contemporaneous with the 2006 Duke Transaction, Crescent Holdings and certain of its subsidiaries entered into that certain Credit Agreement (the "2006 Credit Agreement") among Bank of America, N.A. as administrative agent and collateral agent, the lenders' party thereto from time to time as lenders, Crescent Resources as the borrower, and Crescent Holdings and certain of its subsidiaries as guarantors, whereby Crescent Resources received: (a) $1.225 billion in term loan proceeds; (b) a $200 million unfunded revolving credit commitment; and (c) a letter of credit subfacility commitment not to exceed $100 million. From the proceeds of the $1.225 billion in term loans, $1.187 billion was distributed to Duke as described above, with such proceeds being ultimately distributed to its parent, Duke Capital, LLC. As a continuation of the 2006 Duke Transaction, liens were granted to the Debtor's pre-petition lenders on depository accounts in 2007, and mortgages on real property of Crescent Resources and certain subsidiaries were created in 2008. It is this transaction which the Litigation Trust alleges put $1.6 billion in cash into the pockets of Duke and simultaneously rendered the Debtors insolvent.

## THE PLAN

On March 31, 2010, Debtors filed their Revised Second Amended Disclosure Statement (docket no. 879) and their Revised Second Amended Joint Plan of Reorganization (docket no.

880).  The Plan includes approximately 120 joint debtors and accounts for billions of dollars in assets and liabilities.  The Court entered an Order Confirming Debtors' Revised Second Amended Joint Plan of Reorganization on December 20, 2010 (docket no. 1534).

The Plan called for the establishment of a Litigation Trust pursuant to a Litigation Trust Agreement.  The purpose of the Litigation Trust was to pursue causes of action which the Debtor could have asserted, including avoidance actions and other claims arising outside of the ordinary course of business of the Debtors.  The Litigation Trust Agreement also transferred from the Reorganized Debtor to the Litigation Trust all rights and interests to any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications associated with the Litigation Trust claims.  The assets acquired by the Litigation Trust would then go to creditors of the Debtor.

### TURNOVER

On September 16, 2010, the Trust filed a Motion to Compel Turnover of Client Files held by RBH (docket no. 1257).  In the motion, the Trust requests all documents in RBH's control that relate to any one or more of the Debtors.  The Trust stated that it had requested six specific categories of documents: (i) all of RBH's invoices (with supporting detail) for pre-petition work preformed for the Debtors (and any correspondence or other documents relating thereto); (ii) all engagement letters between RBH and any one or more of the Debtors; (iii) all conflict waiver letters (and any correspondence or other documents relating thereto) in which a conflict waiver is sought from one or more of the Debtors; (iv) any and all files relating to the origins, execution and closing of the 2006 transactions between and among the Debtors, Duke Energy and its affiliates, Bank of America and its affiliates, and Morgan Stanley and its affiliates; (v) any contact lists or working group lists for the 2006 Duke Transaction and related transactions in

2007 and 2008; and (vi) RBH's invoices to Duke in connection with the 2006 Duke Transaction. RBH gave the Trust no documents and instead referred the matter to outside counsel. It was in these negotiations for turnover between the Trust and RBH that RBH first proposed teleconferences to discuss, *inter alia*, Duke's confidentiality rights in the requested documents. Since this motion, there have been months of status conferences, hearings, motions, etc. on the issue. (*See e.g.* docket nos. 1281, 1317, 1318, 1446, 1472, 1478, 1605, 1609, 1612, 1617, 1626, 1630, 1638).

> Section 542(a) of the Bankruptcy Code provides as follows:

> Except, as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Section 542(e) of the Bankruptcy Code provides as follows:

> Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accounting, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

As the Trust is the successor-in-interest to the Debtors, the Trust argues that they are the holder of Debtors' attorney-client privilege and have the right to review these files from RBH. Duke and RBH disagree. The Trust argues that it needs these files to successfully pursue their litigation against Duke as well as to defend claims and claims objections against the Debtor.

On January 26, 2011, the Court entered an order putting a stop to the back and forth nature of this dispute in order to hold a hearing on the question of whether, as a matter of law, Duke has any right to assert a privilege as to the RBH files (docket no. 1656). The parties filed

briefs and responses in support of their position and the Court held a hearing on February 17, 2011.

## THE DOCUMENTS AT ISSUE

At the hearing on February 17, 2011, stipulations were made by both Duke and the Trust as to the status of certain disputed files. The Court entered an order based on what it believed was the best representation of what was stipulated to by both parties (docket no. 1804). That Order contains a spreadsheet detailing the contents of the 345 files at issue (the "RBH Spreadsheet"). The parties break the files down into three main areas: pre-2006 files, post-2006 files, and files related to Project Galaxy.[4] The pre-2006 files are those files opened before the 2006 Duke Transaction, when Duke was still the parent company of Crescent Resources. By and large, the Court has already determined, through stipulations of the parties, that Duke and the Trust, as successor-in-interest to the Crescent Resources, are joint clients with respect to those files. The post-2006 files are those opened after the Duke Transaction, when Crescent Resources was no longer a subsidiary of Duke. Based on stipulations of the parties, the Court has determined that the Trust is to be considered a sole client with respect to those files. The remaining files relate to Project Galaxy/the 2006 Duke Transaction. The parties did not make any stipulations as to the owners of these files, with Duke asserting that they should be deemed the sole client, and the Trust asserting that they should be at least deemed a joint client. Additionally, The Trust disputes that they should be considered joint clients with regards to certain pre-2006 files and allege they should be considered the sole client.

## PARTIES' CONTENTIONS

After the hearing, several issues were taken under advisement: (A) who bears the burden of establishing the existence of an attorney-client privilege and what that burden is; (B) whether

---

[4] Project Galaxy was the name given to what has been referred to as the 2006 Duke Transaction.

The Trust is to be considered a joint or sole client, or no client at all, of RBH with respect to the Project Galaxy files; (C) whether The Trust is to be considered a joint or sole client of RBH with respect to the files which the parties stipulate The Trust is at least a joint client; (D) whether a party in a joint-client relationship may waive the attorney-client privilege; and (E) whether a joint client can use those jointly privileged files in adversary proceedings unrelated to the co-client.  The Court will discuss each issue in turn.

A.      The Burden of Proof

        1.      Who Bears the Burden

As an initial matter, Duke contends that the appropriate burden of proof rests with the party claiming the attorney-client relationship.  The Trust, in arguing what the standard of proof should be, states that for § 542(a), the burden is on the Trust to prove that the files at issue are property of the estate.  *See Faulkner v. Kornman (In re Heritage Org., L.L.C.)*, 350 B.R. 733, 737-38 (Bankr. N.D.Tex. 2006).

As to § 542(e), the Trust argues that when a party asserts a privilege claim to resist a trustee's request for information, the party asserting that privilege claim bears the burden of proving the claim of privilege.  Duke argues that the burden rests on the Trust to show the Trust's rights to the files.  Both parties argue that the other side is the party responsible for showing that a privilege exists.  The Trust is arguing that it has a right to the files, while Duke is arguing that the Trust should not receive the files because there is an attorney-client privilege between RBH and Duke.  It seems both parties are correct as to who bears the burden.

"[D]ocuments which are not property of the estate may still be subject to turnover under Section 542(e) if they relate to the debtor's property or financial affairs, subject to any claim of privilege."  *In re Heritage*, 350 B.R. at 739.  The court goes on to state that "the language of

Section 542(e) suggests that the [t]rustee must carry the initial burden to establish that the [d]ocuments 'relat[e] . . . to the debtor's property or financial affairs.'" *Id.* at 740. If the trustee can satisfy this initial burden, then the burden shifts to the party asserting the privilege, who must establish the elements required to show the existence of an attorney-client privilege. *Id.*

Based on the above discussion, for Section 542(a) purposes, the Trust must show that the files at issue are property of the estate in order for the Court to order a turnover. For Section 542(e), the Trust must first show that the documents relate to the debtor's property or financial affairs. If the Trust can meet this initial burden, then Duke must show the existence of an attorney-client relationship between Duke and RBH.

2.     Standard of Proof

a.     Section 542(a)

Duke argues that in a turnover proceeding, the Trust must show that RBH's files are property of the Trust by clear and convincing evidence. The Trust, on the other hand, argues that it need only show it has the right to RBH's files by a preponderance of the evidence.

Duke cites an unpublished Fifth Circuit case which states, "It is well-settled that, in turnover proceedings, the trustee must prove by clear and convincing evidence both that the property at issue is property of the bankruptcy estate and that it is in the possession of the party proceeded against." *Norris v. Johnson (In re Norris)*, 1997 WL 256808, at *8 (5th Cir. 1997) (unpub.). Duke relies on this case to assert that the Trust must establish that Crescent Resources was the client of RBH with respect to each of the files by clear and convincing evidence.

The Trust argues that the Court should use a preponderance of the evidence standard. The Trust cites to a case from this district which states:

> Where the question is not qualitative, but quantitative, it logically follows that the party seeking turnover bears the burden or presenting evidence that, by a

preponderance, shows the proportion of the property that rightly belongs to the estate.

*In re Donnell*, 357 B.R. 386, 396 (Bankr. W.D.Tex. 2006).  The *Donnell* court dealt with an action under § 542(a) to allocate and turn over a tax refund.  The court made the distinction between qualitative and quantitative determinations.  The *Donnell* court was making a quantitative decision as to what proportion of a tax refund was property of the estate.  The Court here is asked to make a qualitative determination as to the status of various files held by RBH, distinguishing the *Donnell* decision.

The Trust also discusses *Grogan v. Garner* in discussing the modern trend of courts finding a preponderance standard appropriate.  498 U.S. 279 (1991).  The Court in *Grogan* held:

> Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless "particularly important individual interests or rights are at stake."

498 U.S. at 286 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-90 (1983)).  Courts outside this district have cited *Grogan* in determining that a preponderance of the evidence standard is appropriate in all bankruptcy proceedings, including turnover motions.  *See e.g. In re Santaella*, 298 B.R. 793, 799 (Bankr. S.D.Fla. 2002).

Duke argues that the sanctity of the attorney-client privilege may be the type of right that could be determined to be "particularly important" so as to give rise to a clear and convincing standard.  However, the Supreme Court has discussed those types of "particularly important individual interests or rights" that would give rise to a clear and convincing standard.  *Herman & MacLean*, 459 U.S. at 389-90.  The rights and interests specifically mentioned by the Supreme Court which would be considered "particularly important" were proceedings to terminate parental rights, involuntary commitment proceedings, and deportation.  *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745 (1982); *Addington v. Texas*, 441 U.S. 418 (1979); *Woodby v.*

*INS*, 385 U.S. 276 (1966)).  This Court does not believe the sanctity of the attorney-client privilege is the type which would be included in this list.

Based on the above discussion, this Court finds that for the purposes of turnover of attorney-client files under Section 542(a), the Trust bears its burden by a preponderance of the evidence.

      b.     <u>Section 542(e)</u>

As discussed above, under Section 542(e), the Trust must first show that the documents relate to Crescent Resources' property or financial affairs.  If the Trust can meet this initial burden, then Duke must show the existence of an attorney-client relationship between Duke and RBH.

Duke makes no differentiation between Sections 542(a) and (e) in their arguments on the applicable standard of proof.  At oral argument, when asked if *Norris* differentiated between Sections 542(a) and (e), Duke stated that the case just says Section 542.  However, the case quotes the relevant statute in stating

> The Bankruptcy Code provides that, subject to certain exceptions not applicable here, "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."

*Norris* at *8.  This is the language from Section 524(a), so it appears the Fifth Circuit did make a differentiation.

Duke next points to the purpose of Section 542(e) as discussed by the Supreme Court in *Commodity Futures Trading Comm'n v. Weintraub*.  471 U.S. 343 (1986).  The Supreme Court examined the legislative history of Section 542(e) and stated that the purpose of the statute was to prevent attorneys and accountants from placing liens on clients' files under state law and using that leverage to ensure they were paid ahead of other creditors.  *Id.* at 351.  Duke argues that this

can only happen when the attorney actually represented the debtor in connection with the relevant matters in the first place and can thereby make a claim that the attorney owned his client's files.  Duke then cites to a Seventh Circuit case for the notion that "§ 542(e) was enacted to prevent any dispute over ownership between the debtor and its lawyer"  (docket no. 1718, p. 15 (citing **Underwood v. Hilliard (In re Rimsat, Ltd.)**, 98 F.3d 956, 965 (7th Cir. 1996))).

Duke argues that the Trust bears the initial burden under Section 542(e) of proving that Crescent Resources was RBH's client on the relevant matters.  This Court agrees, but disagrees with Duke's assertion that the Trust bears this burden under a clear and convincing standard. The Supreme Court went on to state that Section 542(e) was "not intended to limit the trustee's ability to obtain corporate information."  **Weintraub**, 471 U.S. at 351.  The statute states nothing about what must be shown by the party requesting the turnover, it only states that the turnover is "[s]ubject to any applicable privilege."  11 U.S.C. § 542(e).   The Trust need only show the property is related to Crescent Resources' property or financial affairs.  Duke is the party claiming the existence of a privilege, therefore the burden is on Duke.  For the reasons discussed under the analysis of the standard of proof under Section 542(a), this Court finds that Duke bears the burden of showing an attorney-client privilege in order to restrict the turnover of the requested documents by a preponderance of the evidence.

B.    Project Galaxy

The major issue before the Court is whether the Trust is to be considered a joint or sole client, or no client at all, of RBH with respect to the Project Galaxy files.  The majority of the arguments and evidence were on this subject.

The various cases cited by both the Trust and Duke involve cases where a parent corporation and subsidiary were represented by the same attorney during a spin-off, sale, or

divestiture. *See e.g.* ***In re Teleglobe Commc'ns Corp.***, 493 F.3d 345 (3rd Cir. 2007) (in-house counsel of the parent corporation represented both the subsidiary and parent companies); ***Polycast Tech. Corp. v. Uniroyal, Inc.***, 125 F.R.D. 47 (S.D.N.Y. 1989) (in-house counsel of the parent corporation represented both the subsidiary and parent in the sale of the subsidiary); ***Medcom Holding Co. v. Baxter Travenol Labs., Inc.***, 689 F.Supp. 841 (N.D.Ill. 1988); ***In re Mirant Corp.*** 326 B.R. 646 (Bankr. N.D.Tex. 2005) (same law firm representing both parent and subsidiary in a public stock offering of the subsidiary). In those cases, the courts determined the parties were joint clients. The issue remaining before this Court is whether RBH represented Crescent Resources with respect to the 2006 Duke Transaction. The Trust argues that RBH did represent Crescent Resources, while Duke would have the Court believe that RBH jointly represented Crescent Resources before the 2006 Duke Transaction and after the 2006 Duke Transaction, but not *during* the 2006 Duke Transaction. Duke further alleges that Crescent Resources was not represented by counsel *at all* during the 2006 Duke Transaction. Duke is arguing, essentially, that for the purposes of the 2006 Duke Transaction only, RBH did not represent Crescent Resources. So the issue to be resolved is whether RBH represented Crescent Resources with respect to the 2006 Duke Transaction.

     1.   <u>Legal Standard</u>

Under North Carolina law, the existence of an attorney-client relationship is a question of fact. ***Ferguson v. DDP Pharmacy, Inc.***, 621 S.E.2d 323, 327 (N.C. Ct.App. 2005). The Supreme Court of North Carolina established a test to determine if there is an attorney-client privilege:

> A privilege exists if (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving

or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*State v. Murvin*, 284 S.E.2d 289, 294 (N.C. 1981).  Duke cited a case dealing with establishing whether there was an attorney-client relationship between a corporation's attorney and a shareholder of that corporation.  *See **Classic Coffee Concepts, Inc. v. Anderson***, 2006 WL 3476598 (N.C.Super. 2006).  While slightly off point, this Court finds the factors presented in that case as good guidance in establishing if an attorney-client relationship existed between the parties.  Those factors are:

> (1) whether the stockholder was separately represented by other counsel when the corporation was created or in connection with its affairs; (2) whether the stockholder sought advice on and whether the attorney represented the stockholder in particularized or individual matters, including matters arising prior to the attorney's representation of the corporation; (3) whether the attorney had access to the stockholder's confidential or secret information that was unavailable to other parties; (4) whether the attorney's services were billed to and paid by the corporation or the stockholder; (5) whether the corporation is closely held; (6) whether the stockholder could reasonably have believed that the attorney was acting as his individual attorney rather than as the corporation's attorney; (7) whether the attorney affirmatively assumed a duty of representation to the stockholder by either express agreement or implication; (8) whether the matters on which the attorney gave advice are within his or her professional competence; (9) whether the attorney entered into a fee arrangement; and (10) whether there was evidence of reliance by the stockholder on the attorney as his or her separate counsel or of the stockholder's expectation of personal representation.

*Id.* at *8.  Additionally, "the relation of attorney and client may be implied from the conduct of the parties, and is not dependent on the payment of a fee, nor upon the execution of a formal contract."  *North Carolina State Bar v. Sheffield*, 326 S.E.2d 320, 325 (N.C. Ct.App. 1985).  After discussing the evidence presented by both sides, this Court will use these factors in determining if the evidence establishes the existence of an attorney-client relationship.

Once it is established there is an attorney-client relationship, the issue then becomes whether there was an attorney-client relationship between RBH and Crescent Resources with respect to the matter in question.  *See* RESTATMENT (THIRD) OF THE LAW GOVERNING LAWYERS

§75 cmt. c. (2000) [hereinafter RESTATEMENT] ("The scope of the co-client relationship is determined by the extent of the legal matter of common interest."). In a case cited by both Duke and the Trust, the Third Circuit discussed how there are a wide variety of circumstances relevant in determining whether two or more parties intended to create a joint-client relationship. *Teleglobe*, 493 F.3d at 363 (citing *Sky Valley Ltd. P'ship v. ATX Sky Valley Ltd.*, 150 F.R.D. 648, 652-53 (N.D.Cal. 1993)). Those same circumstances are relevant in determining the scope of any joint representation. *Id.* The *Teleglobe* court stated that "[t]he keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully (in addition to the content of the communications themselves) any testimony from the parties and their attorneys on those areas." *Id.*

       2.   <u>Summary of the Evidence and Arguments Presented</u>

       a.   <u>The Trust</u>

The Trust presented the Application to Employ RBH submitted to this Court on June 11, 2009 (the "Application") (docket no. 24). That document details RBH's pre-petition relationship with the Debtors. "RB&H has been representing Crescent and many of its debtor and non-debtor subsidiaries since 1986 and has served as Crescent's primary corporate counsel for several years." *Id.* at 7. The Application states that "RB&H represented Crescent in connection with the formation, in 2006, of its current parent holding company, incident to a change in Crescent's historical ownership structure as a wholly-owned, indirect subsidiary of Duke Energy Corporation." *Id.* The Application also contains the Declaration of Robert C. Sink in Support of Application to Employ (the "Sink Declaration") (docket no. 24, Ex. B). Mr. Sink is a shareholder with RBH and the declaration was made on RBH's behalf. In the Sink Declaration, Mr. Sink echoes the Application and states that "RB&H has represented Crescent Resources and

many of its debtor and non-debtor subsidiaries in various matters since 1986 and has served as Crescent's primary corporate counsel for several years." *Id.* at 3.  The Sink Declaration also states that "RB&H does not represent, and has not represented, Duke Energy Corporation or its affiliates in transactions or other matters adverse to the Debtors." *Id.*  The Declaration is signed and sworn to by Mr. Sink.

The Trust also introduced an Opinion Letter prepared and delivered by RBH pursuant to the credit agreement which was part of the 2006 Duke Transaction (the "Opinion Letter").  In the Opinion Letter, RBH wrote "We have acted as counsel to certain subsidiaries and affiliates of Crescent Resources, LLC, a Georgia limited liability company . . . in connection with the execution and delivery of the [credit agreement]" (Trust Ex. 40).

The Trust also discussed statements made by various RBH lawyers on RBH's website. Stephan J. Willen's page, under "Representative Experience" includes "Representing a real estate developer, as borrower, in connection with a $1.5 billion revolving and term loan letter of credit facility used to recapitalize the developer." The Trust stated that this represents the 2006 Duke Transaction and shows Mr. Willen's understanding that Crescent Resources was RBH's client with respect to the 2006 Duke Transaction.  Additionally, William K. Packard's page, under "Representative Experience" states "Representation of Crescent Resources, as borrower, in connection with a $1.5 billion revolving and term loan letter of credit facility."

The Trust pointed to Duke's definition of the Project Galaxy Files as comprising Rows 1, 224, and 285 of the RBH spreadsheet (docket no. 1724).  Duke and the Trust have already been deemed joint clients for rows 224 and 285, per the Order Concerning Claims of Privilege to RBH Files (docket no. 1804).  Row 224 concerns the Bank of America Credit Facility and was opened by RBH with Crescent Resources, LLC listed under "Client Name" (docket no. 1724, Ex. 2 at p.

333). Row 242 concerns the LandMar Group, LLC and was opened by RBH with Crescent Resources, LLC listed under "Client Name." *Id.* at p. 238. No conflict checks were run in either of these matters. For the Row 224 matter, no conflict check was run with the reasoning that "[RBH has] already been handling this matter for the last 4 months (Galaxy)." The Trust argued that this shows that Row 224 is an extension of the earlier representation of Crescent Resources on the Galaxy matter.

Additionally, the Trust argues that Rows 2-218 of the RBH Spreadsheet occurred before the 2006 Duke Transaction, and Duke, by conceding that the Trust and Duke are co-clients, concedes that RBH represented Crescent Resources prior to 2006.

> b.   Duke

Duke argues that Duke retained RBH to represent it for Project Galaxy. Duke states that Crescent Resources was not represented by counsel for the transaction. Duke argues that there was no conflict with this "because the owners of Crescent, both before the transaction and after the transaction, as well as the bankers who were part of the loan, all knew what the transaction was going to be." Transcript from February 17, 2011 hearing, p. 61. "It was a distribution of proceeds up to Duke and all of the parties knew about the transaction and they all had lawyers. Duke had its lawyers. [Morgan Stanley] had its lawyers. The banks had their lawyers." *Id.*

As for the Fee Application discussed above, Duke argues that Duke should not be bound by the imprecision in the fee application.

Duke acknowledged that RBH worked with Crescent Resources on Project Galaxy, but downplayed that by stating that "of course [RBH interacted with Crescent], because they're representing Duke in the sale of . . . its 49 percent sharehold interest in Crescent. And of course, when you're providing information to the buyer—the prospective buyer—you're going to work

with the company in which you're selling a portion of your shares." *Id.* at 71. Duke argues that this contact between RBH and Crescent Resources is not the same as RBH representing Crescent Resources with respect to Project Galaxy.

Duke then put on evidence in furtherance of their assertion that Duke retained RBH as special counsel to Duke in connection with the due diligence for Project Galaxy. Counsel for Duke stated that they believed the evidence would show that RBH took direction from, reported to, and provided legal services to Duke on Project Galaxy.[5] Duke presented their evidence in five categories.

Their first category was evidence Duke believed would show that Duke retained RBH as special counsel to Duke in connection with due diligence for the sale of Crescent Resources to Morgan Stanley (Project Galaxy). Duke presented the affidavit of Mr. Torning, Duke's in-house attorney responsible for Project Galaxy and attorney in charge of outside counsel for Duke on Project Galaxy. In the affidavit, Mr. Torning testified that "[i]n May 2006, Duke retained RBH to assist Duke as special counsel in connection with due diligence in response to this request" (docket no. 1630, Ex. E, Torning Aff., ¶ 14) [hereinafter Torning Aff.]. Duke then discussed the qualifications of Peter C. Buck, Robert C. Sink, and Stephen Willen, shareholders of RBH.

Duke then discussed the engagement letter between Duke and RBH signed in 2004 (the "Engagement Letter") (docket no. 1630 Ex. E) [hereinafter Duke Engagement Letter]. Duke acknowledged that Crescent Resources never had an engagement letter with RBH before Project Galaxy or any time throughout Project Galaxy. Counsel for Duke stated that the Engagement Letter governed RBH's work for Project Galaxy. Duke stated that Duke is the owner of all work product generated by RBH by virtue of the Engagement Letter and that RBH personally

---

[5] Duke asserts this is the North Carolina standard for the existence of an attorney-client relationship without providing any relevant case law. The Court was unable to find any case giving this standard; however, as will be discussed below, this is of no real consequence.

represented Duke. However, as will be discussed further below, the Engagement Letter, under "Scope of Services," states

> A. The Firm is retained to represent Duke Energy (*or any of its subsidiaries or affiliates*) and to render legal advice or representation as directed and specified by a Duke Energy attorney . . . with respect to a given matter . . . However, the Duke Energy Office of General Counsel has the ultimate responsibility and authority for handling all decisions in connection with the Services.

*Id.* Duke then produced evidence in the form of a deposition from Mr. Buck where Mr. Buck stated that RBH was unable to locate any engagement letter from RBH in which Crescent Resources was a signatory (docket no. 1630, Ex. A, Buck 30(b)(6) Dep., 8:23-24, Jan. 13, 2011) [hereinafter Buck 30(b)(6) Dep.].

Duke's second category of evidence was evidence showing that RBH and Duke provided sworn testimony that Duke was RBH's sole client for Project Galaxy. Mr. Torning testified that it was his understanding "that at all times during Project Galaxy, RBH represented Duke, not Crescent." Torning Aff., ¶ 18. Mr. Buck, testifying as RBH's corporate representative, testified that Duke was RBH's client with respect to Project Galaxy. Buck 30(b)(6) Dep., 12:7-12. Mr. Buck, testifying personally, testified that Duke was his client with respect to Project Galaxy and that RBH was "asked by Duke Energy to perform these services (Project Galaxy). We reported to Duke Energy lawyers and other personnel. Duke Energy was the party to the transaction. And we took instruction from people at Duke Energy" (docket no. 1630, Ex. C, Buck Dep., 14:8-17, Jan. 13, 2011) [hereinafter Buck Dep.]. Mr. Sink and Mr. Willen also testified that Duke was the client of RBH with respect to Project Galaxy (docket no. 1630, Ex. B, Sink Dep., 15:8-11, Jan. 13, 2011) [hereinafter Sink Dep.]; (docket no. 1630, Ex. C, 11:5-8, Jan. 13, 2011) [hereinafter Willen Dep.].

Duke then presented evidence, in the form of an affidavit from Mr. Torning, that RBH submitted invoices to Duke in connection with Project Galaxy, and RBH was paid directly by

Duke.   Torning Aff., ¶ 17.   Duke next presented evidence of Mr. Torning directing Duke employees to check in with RBH on the due diligence performed by RBH for Duke on Project Galaxy in the form of an email from Mr. Torning (docket no. 1630, Ex. H).  Duke also presented an email from Mr. Torning asking counsel for Morgan Stanley to include Mr. Torning and Mr. Buck on "future distributions to Duke on (Project) Galaxy" (docket no. 1630, Ex. I).  Duke next presented RBH's internal matter set-up documentation for Project Galaxy showing the client as Duke Energy Corporation and the contact as Mr. Torning as further evidence that RBH considered Duke to be RBH's client on Project Galaxy (docket no. 1630, Ex. G).

Duke's third group of evidence was meant to show that RBH took direction from, reported to, and provided legal services to Duke, including legal advice to the extent necessary, in connection with its work for Duke for Project Galaxy.  Duke again pointed to the Engagement Letter which stated that all correspondence and communication must be directed to Duke.  Duke Engagement Letter.  Under "Scope of Services," the Engagement Letter stated that that "[t]he Duke Energy attorney who assigns a Matter Assignment to the Firm . . . is responsible for such Matter Assignment.  All correspondence and communication related to such Matter Assignment must be directed to the Duke Energy Attorney."  *Id.*   According to Duke, the Duke Energy Attorney was Mr. Torning for Project Galaxy.

Duke then returned to the deposition of Mr. Sink testifying on behalf of RBH, where Mr. Sink testified that, with regards to Project Galaxy, RBH reported to Duke, RBH took direction from Duke, Duke sought legal advice from RBH, and RBH provided Duke legal advice.  Buck 30(b)(6) Dep., 12:13-22.  Mr. Buck confirmed the same in his deposition and also testified as to the scope of the due diligence performed by RBH on Project Galaxy.  Buck Dep., 15:3-19.  Mr. Buck testified that RBH did a due diligence review of Crescent Resources' documents and

prepared schedules to be used in agreements between Duke Energy and Morgan Stanley. *Id.* at 13:4-10. Mr. Buck also testified that he reported principally to Mr. Torning and Kevin Donnelly, both Duke employees. *Id.* at 14:13-16. Mr. Willen testified that, for Project Galaxy, he also reported to Duke, took direction from Duke, that Duke sought his legal advice, and that he provided legal advice to Duke. Willen Dep., 11:15-12:6. Finally, Duke presented a memo from October 3, 2006, from RBH to Mr. Torning stating that

> [RBH] acted as due diligence counsel to Duke Ventures. In that role, [RBH] gathered, organized and reviewed documentation relevant to Crescent's business operations, both to assist in providing information to [Morgan Stanley] and its counsel for their due diligence review and also to identify and resolve potential obstacles to the Transactions on behalf of Duke Ventures.

(docket no. 1630, Ex. J).

Duke's fourth group of evidence was meant to show that RBH did not take direction from or report to Crescent in connection with Project Galaxy. Mr. Buck testified that neither he nor any RBH attorneys represented Crescent in the Project Galaxy transaction. Buck 30(b)(6) Dep., 14:6-17. Mr. Buck additionally testified that he did not report to Crescent nor take direction from Crescent during Project Galaxy. Buck Dep., 16:1-4. Mr. Sink testified likewise. Sink Dep., 16:3-10. Mr. Willen testified similarly, although he did acknowledge that he interacted with Crescent on Project Galaxy. Willen Dep., 12:11-17.

Duke's fifth group of evidence was meant to show that no one from Crescent communicated that it thought RBH represented Crescent in connection with Project Galaxy. Mr. Buck and Mr. Willen both testified that no one at Crescent ever communicated to them that they believed RBH represented Crescent. Buck Dep., 16:5-10; Willen Dep., 12:18-23. Mr. Sink testified similarly, only adding that "Crescent was aware that [RBH was] doing this due diligence work for Duke, and I don't remember any objection to that." Sink Dep., 16:11-18. Mr. Buck also testified that "[Crescent was] aware we [RBH] were—had been asked by Duke to do

this review and assemble the information and help prepare the schedules, and they assisted us in the work we were doing." Buck Dep., 16:23-17:1.

    3. <u>Conclusion</u>

Looking at *Classic Coffee*, many of the factors which would establish an attorney-client privilege between RBH and Crescent are present. Modifying the factors slightly to account for the fact that the *Classic Coffee* factors concerned the relationship between an attorney and a shareholder of a company, and here the Court is talking about the relationship between an attorney and a subsidiary, the Court will now discuss the relevant factors.

Factor 1: "whether the stockholder was separately represented by other counsel when the corporation was created or in connection with its affairs." *Classic Coffee*, 2006 WL 3476598, at *8. Crescent was not separately represented by other counsel when Duke was created. RBH had a long-term relationship with Crescent before Project Galaxy. Additionally, there was no other representation of Crescent during Project Galaxy.

Factor 2: "whether the stockholder sought advice on and whether the attorney represented the stockholder in particularized or individual matters, including matters arising prior to the attorney's representation of the corporation." *Id.* Both RBH and Duke acknowledge that RBH represented Crescent prior to Project Galaxy.

Factor 3: "whether the attorney had access to the stockholder's confidential or secret information that was unavailable to other parties." *Id.* Duke and RBH acknowledged that RBH was selected for the due diligence project because of their longstanding relationship with Crescent.

Factor 4: "whether the attorney's services were billed to and paid by the corporation or the stockholder." *Id.* The evidence shows that Duke, not Crescent, paid for the legal services

provided in connection with Project Galaxy. However, that is not dispositive, as there can still be an implied attorney-client relationship independent of the payment of a fee. *See **North Carolina State Bar***, 326 S.E.2d at 325.

Factor 6: "whether the stockholder could reasonably have believed that the attorney was acting as his individual attorney rather than as the corporation's attorney." ***Classic Coffee***, 2006 WL 3476598, at *8. This factor weighs heavily in the Trust's favor. RBH represented both Crescent and Duke prior to Project Galaxy. There was no end to the attorney-client relationship and RBH attorneys were going through Crescent files in performing the due diligence for Project Galaxy. It is reasonable that a current client would believe that an attorney was representing them if the attorney showed up to that current client's office and started going through files.

Factor 7: "whether the attorney affirmatively assumed a duty of representation to the stockholder by either express agreement or implication." ***Id.*** Again, this factor weighs in the Trust's favor. RBH acknowledges having represented Crescent prior to Project Galaxy, and therefore had assumed a duty of representation to Crescent.

Factor 8: "whether the matters on which the attorney gave advice are within his or her professional competence." ***Id.*** As Duke is arguing that they hired RBH for their professional competence, this factor is undisputed.

Factor 9: "whether the attorney entered into a fee arrangement." ***Id.*** As discussed above, RBH entered into a fee arrangement with Duke in the Engagement Letter. While the Engagement Letter was not specifically between RBH and Crescent, the Engagement Letter does state that the representation is to include subsidiaries. *See* Duke Engagement Letter.

Factor 10: "whether there was evidence of reliance by the stockholder on the attorney as his or her separate counsel or of the stockholder's expectation of personal representation."

*Classic Coffee*, 2006 WL 3476598, at *8.  Based on the evidence presented, as well as RBH and Crescent's prior relationship, this Court finds that Crescent had an expectation of personal representation by RBH.

Based upon the above discussion, this Court finds that an attorney-client relationship did exist between RBH and Crescent during Project Galaxy.  This conclusion is strengthened by examining the North Carolina Professional Conduct Rules.  While Duke put on evidence that RBH represented Duke during Project Galaxy, Duke did not put on any evidence that RBH's representation of Crescent ever terminated.   Under North Carolina law, an attorney may withdraw from representing a client if:

> (1) withdrawal can be accomplished without material adverse effect on the interests of the client;
>
> (2) the client knowingly and freely assents to the termination of the representation;
>
> (3) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;
>
> (4) the client insists upon taking action that the lawyer considers repugnant, imprudent, or contrary to the advice and judgment of the lawyer, or with which the lawyer has a fundamental disagreement;
>
> (5) the client has used the lawyer's services to perpetrate a crime or fraud;
>
> (6) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;
>
> (7) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client;
>
> (8) the client insists upon presenting a claim or defense that is not warranted under existing law and cannot be supported by good-faith argument for an extension, modification, or reversal of existing law; or
>
> (9) other good cause for withdrawal exists.

27 N.C. ADMIN. CODE 2.1 (Prof. Cond. Rule 1.16(b)).    Additionally, there are notice requirements of an attorney upon terminating representation:

> Upon termination of representation, a lawyer must take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for the employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

27 N.C. ADMIN. CODE 2.1 (Prof. Cond. Rule 1.16(d)).

Duke provided no evidence which would have given RBH cause to terminate their relationship with Crescent, nor did Duke provide any evidence that RBH gave notice to Crescent that RBH was terminating their relationship.    Further, Duke acknowledges that RBH and Crescent continued to maintain an attorney-client relationship post Project Galaxy, which would negate any potential argument by Duke that RBH and Crescent's relationship may have terminated by implication.

The *Teleglobe* court stated that "[t]he keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully (in addition to the content of the communications themselves) any testimony from the parties and their attorneys on those areas." *Teleglobe*, 493 F.3d at 363.  The Trust did not provide any evidence to show any intent on behalf of Duke to establish a joint representation with respect to Project Galaxy.  However, Duke presented the Engagement Letter.  The Engagement Letter appears to be a global outside counsel service agreement, encompassing Duke and Duke's subsidiaries (including Crescent) as RBH's clients.  Pursuant to the Engagement Letter, RBH had represented Crescent prior to Project Galaxy, and as discussed, there was no formal termination of RBH's services to Crescent.  RBH then continued to interact with Crescent pursuant to Project Galaxy.  "While written agreements limiting the scope of a joint

representation might be preferable, nothing requires this so long as the parties understand the limitations." *Id.* The *Teleglobe* court warns against too readily finding a joint-client representation, quoting a Maryland District Court case:

> What the Court takes exception to is the plaintiff's effort to argue, in effect, that a joint representation of Party A and Party B may somehow arise through the expectations of Party B alone, despite Party A's views to the contrary. This position is untenable, because it would allow the mistaken (albeit reasonable) belief that it was represented by an attorney to serve to infiltrate the protections and privileges afford to another client.

*Id.* (quoting *Neighborhood Dev. Collaborative v. Murphy*, 223 F.R.D. 436, 441-42 (D.Md. 2005) (internal punctuation omitted). Additionally, the Restatement, in discussing how the co-client relationship is determined by the extent of the legal matter of common interest, states that "a lawyer might also represent one co-client on other matters separate from the common one." RESTATMENT §75 cmt. c. This is what Duke is arguing—that although Duke and Crescent were co-clients with respect to other, pre-Project Galaxy matters, Duke and Crescent were not co-clients with respect to Project Galaxy. However, the Trust presented evidence in the form of statements by RBH attorneys on RBH's website, as well as the Application to Employ RBH that states that RBH represented Crescent in connection with certain aspects of Project Galaxy. Duke's evidence shows that Duke controlled the attorneys during Project Galaxy, as well as that Duke entered into the Engagement Letter. *Teleglobe*, relied on by both parties, reads almost as an instructional manual to in-house counsel on how to avoid tangled joint-client issues. *Teleglobe* instructs that a court should consider the testimony from the parties and their attorneys on the areas of contention. 493 F.3d at 363. The testimony presented by Duke appears to show that, for Project Galaxy, both Duke and RBH intended Duke to be the sole client. *Teleglobe* cautions against finding too broad a scope of a joint representation. *Id.* However, the scope of the global representation was never defined in the Engagement Letter. RBH was hired by Duke

and controlled by Duke.  RBH and in-house counsel for Duke should have heeded the warnings in *Teleglobe* and taken greater care to have in place an information shielding agreement or ensured that Crescent was represented by outside counsel.  *See **Id.*** at 373-374.

Based on the above discussion and evidence presented to the Court, the Court finds that the Trust has met its burden in establishing that Crescent was a co-client with respect to Project Galaxy for Section 542(a).  In making this determination, the Court will not examine the evidence presented in this section in light of Section 542(e).

C.      Pre-Transaction Files

1.      Parties' Contentions

The Trust asserts that there are certain pre-Project Galaxy matters RBH worked on in which Crescent was the sole client.  Duke asserts that for those matters, Duke and Crescent were co-clients.  The specific files at issue are Files 2-218 and File 220 of the Spreadsheet (the "Pre-Transaction Files").

2.      Summary of the Evidence and Arguments Presented

a.      The Trust

The Trust points to the Spreadsheet, which shows that Crescent is listed as the client for the Pre-Transaction Files.  Mr. Sink testified that he considered Crescent a separate client beginning in 1996.  Sink Dep., 6:4-8.  File 2, the oldest of the Pre-Transaction Files, was opened in October of 1996.  Since that time, RBH's bills for these matters were submitted to Crescent and Crescent paid the bills (*See* Trust Ex. 8).

The Trust argues that any interest Duke may have had in the Pre-Transaction Files was derivate, based on Duke's then 100% ownership interest in Crescent Resources.  The Trust argues that by virtue of Project Galaxy, Duke conveyed 100% of its interest in Crescent

Resources, LLC and transferred that interest to Crescent Holdings, LLC.  In doing this, the Trust argues that Duke lost any interest it had to the Pre-Transaction Files by virtue of this transfer.

        b.    <u>Duke</u>

Duke argues that when Duke first retained RBH, Crescent had not yet been formed and that prior to Project Galaxy, Duke retained RBH to represent Duke and report to Duke on matters related to Crescent.  Mr. Torning testified that it was his "understanding and belief that Duke was in an attorney-client relationship with RBH for all matters impacting Crescent prior to the closing of the transaction."  Torning Aff., ¶ 9.  Mr. Torning went on to testify that Duke was the party that sought out and retained RBH and Duke had final authority to direct RBH's work on the Pre-Transaction Files.  *Id.*  Mr. Torning also testified that "Sink was instructed to report periodically to [Mr. Torning], as Duke's lead in-house lawyer responsible for Crescent, regarding all material matters that could impact Crescent or Duke, and [Mr. Torning] would provide instruction as to how RBH should proceed in its representation."  *Id.* at ¶ 6.

Mr. Buck, testifying on behalf of RBH, stated that with respect to the Pre-Transaction Files, Duke was RBH's client, RBH reported to Duke, RBH took direction from Duke, Duke sought legal advice from RBH, and RBH provided Duke legal advice.  Buck Dep., 11:6-15.  Mr. Sink testified that as a general matter, he regarded both Crescent and Duke as clients of RBH.  Sink Dep., 7:11-14.  He also stated that invoices were sent to and paid by Crescent.  Sink Dep., 8:8-13.  Mr. Sink testified that while he did not regularly report to Duke on Crescent matters, he did occasionally report to Duke on matters related to litigation, environmental matters, and obtaining approvals for projects.  *Id.* at 8:14-18.  Mr. Sink then stated that for those matters, he took direction from Duke and reported to Duke because "[RBH was] requested to do so and regarded [Duke] as [RBH's] client."  *Id.* at 9:4-5.

3. <u>Conclusion</u>

It is well-settled that "the power to control the attorney-client privilege passes with the power to control the corporation." ***In re Bounds***, 443 B.R. 729, 733 (Bankr. W.D.Tex. 2010) (citing ***Weintraub***, 471 U.S. at 349). The Trust argues that in the 2006 Duke Transaction, 100% of the ownership and control of Crescent Resources passed from Duke to the new entity created as part of the transaction, Crescent Holdings. Due to this change in control of Crescent Resources, the Trust argues that the attorney-client privilege passed to Crescent's new management, which then passed to the Trust by operation of the confirmed Plan of Reorganization.

Duke argues that Duke had a personal privilege with RBH with respect to these files. The evidence Duke presented only leads to the conclusion that Duke was managing Crescent as the owner of Crescent prior to Project Galaxy. At trial, counsel for Duke made the comparison of Bill Gates selling shares of Microsoft. Duke argued that if Bill Gates hired an attorney to sell Microsoft stock, he would not convey any privilege he had with those shares. Duke argued that the sale of stock would not constitute a transfer and similarly, Duke's sale of Crescent does not constitute a transfer by which the attorney-client privilege would pass.

The Court will not reach the issue of whether Project Galaxy included an entire divestiture and change of control of Crescent. However, upon filing bankruptcy, control of the company changed from the former owners, including Duke, to the new bankruptcy estate. The privilege then passed to the Litigation Trust by operation of the plan of reorganization. Because the evidence does not show that Duke controlled RBH in any other function than managers of the corporation pre-petition, the Court finds that the Trust should be considered the sole client with respect to the Pre-Petition Files.

D.      Post-Transaction Files

1.      Parties' Contentions

The Trust asserts that there are certain post-Project Galaxy matters RBH worked on in which Crescent was the sole client.  Duke asserts that for those matters, Duke and Crescent were co-clients.  The specific files at issue are Files 224, 242, 285, and 308 of the Spreadsheet (the "Post-Transaction Files").

2.      Summary of the Evidence and Arguments Presented

a.      The Trust

The Trust argues that Duke never had any legal right to claim an interest in these files, documents, or privileges as they were all matters in which Crescent was the designated client, the work was done for Crescent Resources, and the work was billed to and paid for by Crescent Resources.  The Trust also makes the same loss of control argument made with respect to the Pre-Transaction Files.

(1)      Row 224

At trial, the Trust went through each of the four Post-Transaction Files.  Row 224 is described on the RBH document opening the file as "Bank of America Credit Facility" (docket no. 1724, Ex. 2, p. 333).  RBH listed "Crescent Resources, LLC" as the client and under the conflict check, the sheet states "I don't really think we need to do a conflict check – we've already been handling this matter for the last 4 months (Galaxy).  I'd just use Bob's original matter description for the new matter number."  *Id.*  The Trust said that this matter concerned an amendment to the credit agreement negotiated with Bank of America.  In an Opinion Letter issued by RBH on December 15, 2006, RBH stated that they "acted as counsel to certain

subsidiaries and affiliates of Crescent Resources, LLC . . . in connection with the execution and delivery of the First Amendment referred to below" (Trust Ex. 40).

(2)     <u>Row 242</u>

Row 242 is called "LandMar Group, LLC" and described as "representing majority owner re various joint venture matters" on the RBH document opening the file (docket no. 1724, Ex. 2, p. 238). RBH listed "Crescent Resources, LLC" as the client and under the conflict check, the sheet states "Do not run conflict check. – [Robert Sink]." *Id.* The Trust stated that the subject matter of this representation was a negotiation that resulted in the purchase of Mr. Burr's 20% minority interest in LandMar, which was a subsidiary of Crescent at the time. Documents prepared on behalf of this matter list Crescent Resources, LLC as the client (Trust Ex. 55). Additionally, an invoice for a small amount of time in that file was submitted to this Court for approval (Trust Ex. 47).

(3)     <u>Row 285</u>

Row 285 is described on the RBH document opening the file as "Crescent Mortgage Project" and described as "obtain legal descriptions and related information on all of client's real property" (docket no. 1724, Ex. 2, p. 332). RBH listed "Crescent Resources, LLC" as the client and under the conflict check, the sheet states "no conflict. – [Robert Sink]." *Id.* Counsel for the Trust summarized this matter as the amendment to the original credit facility that resulted in Crescent placing mortgages on all of its properties for the benefit of the Bank of America consortium of lenders.

(4)     <u>Row 308</u>

Row 308 is described on the RBH document opening the file as "Restructure (2008)" and described as "Restructuring" (docket no. 1724, Ex. 2, p. 304). RBH listed "Crescent Resources,

32

LLC" as the client, the client contact as Mr. Lambert, and under conflict check, the sheet states "N/A per [Robert Sink]." *Id.* The Trust described the subject matter of this file as "pre-petition planning or maybe planning in hopes of avoiding the filing of bankruptcy."

The Trust produced a Common Interest Agreement made between Morgan Stanley and its counsel, Duke and its counsel, and Crescent and its counsel (docket no. 1724, Ex. 3). Weil, Gotshal & Manges, LLP and RBH are listed as outside counsel for Crescent and Skadden is listed as counsel for Duke. *Id.* Additionally, RBH submitted a fee application to this Court for over $230,000 in fees on this matter.

### b. Duke

#### (1) Rows 224 & 285

Duke argues that RBH continued to represent Duke after Project Galaxy on these matters arising out of Project Galaxy. Duke presented the affidavit of Mr. Sink, who testified that it was his understanding that "[Rows 224 and 285] was just a continuation and part of the Project Galaxy and was retained through Peter Buck." Sink Dep., 17:8-15. However, Mr. Sink also testified that he "performed a very limited amount of work on the credit agreement [Row 224] and slightly more work on the mortgage project [Row 285]." *Id.* at 17:18-22. Mr. Sink testified that he considered Duke to be his client, but that was based on the understanding he had through Mr. Buck. *Id.* at 18:6-14. Mr. Sink stated that he did not report to Duke, he did not take direction from Duke, Duke did not seek his legal advice, nor did he provide legal advice to Duke on these two subjects. *Id.* at 18:15-25.[6]

Mr. Torning testified that

"RBH was also retained to assist Duke in connection with the credit facilities undertaken as part of the transaction, which representation continued after the

---

[6] Mr. Sink also testified that he did not report to, or take direction from, Crescent on these matters. Sink Dep., 19:1-7.

closing of the Project Galaxy transaction in September 2006. Stephen Willen at RBH had primary responsibility for providing legal support and advice to Duke's treasury department in connection with the initial execution and subsequent modifications of the credit agreement.

Torning Aff. ¶ 20.

Mr. Willen testified that he worked on the credit agreement, the extensions and modifications from the Project Galaxy transaction. Willen Dep., 14:2-4. Mr. Willen stated that he understood Duke Energy to be his client because "Charlie Wilson called me, gave me direction, and I reported to him regarding these matters." *Id.* at 14:11-14. Mr. Willen testified that he took direction from Duke, that Duke sought his legal advice, and that he provided legal advice to Duke. *Id.* at 14:21-15:9. He went on to testify that he did not report to Crescent and that he did not take direction from Crescent. *Id.* at 15:10-15.

Mr. Buck testified similarly, although he acknowledged that he did not do any work on Matter 285 and only did very limited work on Matter 224. *See* Buck Dep., 17:2-20:17. Mr. Sink also testified similarly, that Duke was the client for Rows 224 and 285, but also that he only did limited work on those matters. *See* Sink Dep., 17:8-18:10. Mr. Sink testified that he did not report to Duke, he did not receive direction from Duke, Duke did not seek his legal advice, and he did not provide legal advice to Duke. *Id.* at 18:15-25.

(2)      Rows 242 and 308

Mr. Buck testified that his understanding for Row 242 was that Duke and Crescent were co-clients and for Row 282, Duke was RBH's client. Buck Dep, 9:16-21. Mr. Buck testified that he reported to Duke and took direction from Duke. *Id.* at 10:16-11:8. He also testified that during this time frame, his understanding was that Duke was a 49% owner of Crescent. *Id.* at 10:8-11.

### 3. Conclusion

The subject matter of the four files at issue are the Bank of America Credit Facility (Row 224), the LandMar Group (Row 242), the Crescent Mortgage Property (Row 285), and Restructure (Row 308). The Court adopts the same reasoning as for the Pre-Transaction Files. The evidence presented by Duke does not establish a separate relationship between Duke and RBH that survived the change in control as a result of the bankruptcy, and thus, the Court finds that Crescent, and therefore the Trust, is the sole client with respect to the Post-Transaction Files.

### D. The Joint Client Privilege

#### 1. As to Litigation Between Duke and the Trust

The Trust cites to Comment 30 to Rule 1.7 of the North Carolina Rules of Professional Conduct, which states:

> A particularly important factor in determining the appropriateness of common representation is the effect on client-lawyer confidentiality and the attorney-client privilege. With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach. Hence, it must be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications, and the clients should be so advised.

Additionally, under North Carolina law, "where two or more persons employ the same attorney to act for them in some business transaction, their communications to him are not ordinarily privileged *inter sese*." *Dobias v. White*, 83 S.E.2d 785, 788 (N.C. 1954).

The Court agrees with this reasoning and finds that Duke cannot invoke an attorney-client privilege to stop the Trust from using the joint-client files in adversary proceedings between Duke and the Trust.[7]

---

[7] The Court has also dealt with this issue previously in the Chapter 7 context. *See In re Bounds*, 443 B.R. 729 (Bankr. W.D.Tex. 2010).

2.     <u>As to Litigation Between the Trust and Third Parties</u>

The Trust argues that any party to a joint-client privilege can waive the privilege as to third parties. The Trust cites to a case from the Southern District of New York for the proposition that any party to a joint-client privilege may waive the privilege as to third parties. *Polycast*, 125 F.R.D. 47. The Trust quotes the passage

> Because there are ample grounds for a finding that the privilege is held jointly by Polycast and Uniroyal, and because Polycast acquired control over Plastics' privilege rights when it purchased the company, Polycast and Plastics' new management may now waive the privilege at their discretion.

*Id.* at 51. However, this case involved litigation between Polycast (the purchaser of a subsidiary company, Plastics) and Uniroyal (the parent company). *Id.* at 48. Polycast was suing Uniroyal, claiming that Uniroyal misrepresented the conditions of Plastics' business. *Id.* Uniroyal asserted an attorney-client privilege as to jointly controlled files. *Id.* Therefore, this case is more along the lines of litigation between two joint clients and is not dispositive in the situation between a joint client and third parties.

The Trust also cites to *Medcom*, which states

> Although both Medcom, Inc. [the former subsidiary] and Baxter [the former parent] are entitled to assert the attorney-client privilege with respect to communications made on their behalf, either may waive it. A client may waive a privilege by voluntary disclosure to a third party; the disclosure breaches the confidentiality of the attorney-client relationship and, therefore, waives the privilege.

689 F.Supp. at 844. The Third Circuit recognized that much of this case seems to disagree with the Restatement (Third) of the Law Governing Lawyers, and chose not to follow this case. *Teleglobe*, 493 F.3d at 380.

This Court is more inclined to agree with the reasoning of *Teleglobe*, the Restatement, and a treatise by Epstein. *Teleglobe* follows the Restatement in saying that "waiving the joint-client privilege requires the consent of all joint clients." 493 F.3d at 363 (citing the

RESTATEMENT § 75).  The **Teleglobe** court went on to state that "[o]ne co-client does not have authority to waive the privilege with respect to another co-client's communications to their common lawyer.  **Id.** at 379.[8]

A treatise by Edna Selan Epstein, discussing the waiver of common-interest privileges, states

> After a falling-out between parties who made confidential communications in their common interest, the privilege continues to apply against third parties not privy to the privilege.  That is, neither party may unilaterally waive the joint privilege.

EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 145 (3rd ed. 1997).

In response, the Trust raises the adverse interest exception and comment e to the Restatement.  Specifically, the Restatement states that "[d]isclosure of a co-client communication in the course of subsequent adverse proceeding between co-clients operates as waiver by subsequent disclosure under § 79 with respect to third persons."  RESTATEMENT § 75 cmt. e.  Section 79 of the Restatement says "The attorney-client privilege is waived if the client, the client's lawyer, or another authorized agent of the client voluntarily discloses the communication in a non-privileged communication."  RESTATEMENT § 79.  The Trust's reading of the Restatement would make any co-client privilege superfluous.  The Restatement says co-client communication is not privileged as between the co-clients.  The Trust's reading of the Restatement appears to state that if co-client communication is then used in an adversary between the former co-clients, it would then waive the privilege as to third parties.  This would

---

[8] However, the **Teleglobe** court also states that "each co-client may waive the privilege with respect to that co-client's own communications with the lawyer, so long as the communication relates only to the communicating and waiving client."  493 F.3d at 379.  If, in the future, Crescent seeks to use a jointly privileged document in this manner, future evidentiary hearings may be necessary, or the document may first have to be submitted for *in camera* inspection.

effectively make the privilege superfluous.  Protections can be placed on any future hearings between Duke and the Trust, and any co-client privileged information can remain privileged as to third parties even if used in a future adversary proceeding between Duke and the Trust.

The Court therefore finds that the Trust may not unilaterally waive the joint-client privilege and use jointly privileged information in proceedings involving third parties, absent a waiver from Duke.

## CONCLUSION

Having gone through the facts of the case and considered the evidence submitted by the parties, this Court finds that (1) the Trust has met its burden of showing it is a joint client with respect to the 2006 Duke Transaction matter; (2) the Trust has met its burden of showing it is entitled to both the pre- and post-transaction files, while Duke has not met its burden in showing it was a joint client with respect to those files; and (3) the Trust may not use the jointly-privileged files in matters with third parties but can use the files in matters between Duke and the Trust.  For these reasons, Duke is allowed only to assert a privilege for matters relating to Project Galaxy, and only for the limited purpose of preventing the Trust from using those files in adversary proceedings between the Trust and a third party.

Having made these findings the Court can now make a ruling on the Motion to Compel Turnover of Client Files (docket no. 1257).

IT IS THEREFORE ORDERED that the Trust's Motion to Compel Turnover of Client Files (docket no. 1257) is GRANTED.

IT IS FURTHER ORDERED that Robinson, Bradshaw & Hinson, P.A. shall turn over to Dan Bensimon, Trustee for the Crescent Resources Litigation Trust, all files and records relating to RBH's representations of Crescent Resources, in whatever form they are held, including

matters in which Crescent was a joint client of RBH, within five (5) business days of the entry of this Order.

IT IS FURTHER ORDERED that the Trust's use of these documents is limited only to the client files relating to the 2006 Duke Transaction in conformity with this Opinion.

IT IS FURTHER ORDERED that RBH shall account, in writing, for each and every document in those files and records that has removed, moved, or altered in any way, including, but not limited to the identification of the specific location from which any documents were removed.

# # #